EAST BATON ROUGE PARISH
Filed Oct 21, 2019 3:17 PM
Deputy Clerk of Court

C-689530
21/D

727507

CALUMET SPECIALTY PRODUCTS
PARTNERS, L.P., CALUMET
REFINING, LLC, CALUMET
SHREVEPORT REFINING, LLC,

SUIT NO. **689530** DIVISION NO. **D**

        Plaintiffs,

VERSUS

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA,
ACE AMERICAN INSURANCE COMPANY,
GENERAL SECURITY INDEMNITY
COMPANY OF ARIZONA, XL
INSURANCE AMERICA, INC., HOUSTON
CASUALTY COMPANY, PEMBROKE
SYNDICATE #4000, SYNDICATE #1221,
SWISS RE INTERNATIONAL SE
(UK BRANCH), GREAT LAKES
REINSURANCE (UK) PLC, PARTNER
RE IRELAND INSURANCE LTD.,
INFRASSURE LTD., HDI GLOBAL
SPECIALTY SE (FORMERLY
INTERNATIONAL INSURANCE COMPANY
OF HANNOVER, LTD.), CERTAIN
UNDERWRITERS AT LLOYDS (TALBOT
SYNDICATE #1183), CERTAIN
UNDERWRITERS AT LLOYDS (CATLIN
SYNDICATE #2003), CERTAIN
UNDERWRITERS AT LLOYDS (ARGO
SYNDICATE #1200), CERTAIN
UNDERWRITERS AT LLOYDS (BRIT
SYNDICATE #2987),

19TH JUDICIAL DISTRICT COURT

EAST BATON ROUGE PARISH

        Defendants.

STATE OF LOUISIANA

---

### PLAINTIFFS' PETITION

---

Plaintiffs Calumet Specialty Products Partners, L.P., Calumet Refining, LLC, and Calumet

Shreveport Refining, LLC (collectively "Calumet" or "Plaintiffs") file this Petition and would

respectfully show:

### I.    NATURE OF THE ACTION

1.    This is a first party insurance coverage action by Calumet seeking recovery of

insured losses exceeding $22 million.  The defendant insurers in the caption of this Petition

("Defendants") have denied Calumet's claim for loss of business income and expenses that

Calumet incurred as a result of the April 28, 2012 rupture of an oil pipeline in Pointe Coupee

Parish.  That pipeline, known as the "North Line," served as a critical conveyance for crude oil to

Calumet's oil refinery located in Shreveport, Louisiana.  The North Line, operated by ExxonMobil



Certified True and
Correct Copy
CertID: 2019102300904



East Baton Rouge Parish
Deputy Clerk of Court

Generated Date:
10/23/2019 4:28 PM
**EXHIBIT A**

Pipeline Company, was an expressly insured "contingent property" under the policies purchased by Calumet from Defendants. As a result, Calumet is covered for the losses it sustained during the period of time the North Line was closed, to the extent of the applicable coverages. Calumet seeks a declaration of its entitlement to coverage under the policies and recovery of damages incurred as a result of the Defendants' breach of their contractual obligations and their obligations of good faith and fair dealing in violation of applicable law.

## II.    PARTIES

### A.    Plaintiffs

2.    Calumet Specialty Products Partners, L.P. is a publicly traded limited partnership organized and existing under the laws of the State of Delaware with its principal place of business in Indianapolis, Indiana. Calumet is held in common by its general and limited partners, which include citizens of every state of the United States. The general partner of the Company is Calumet GP, LLC, a Delaware limited liability company. As of December 31, 2018, the Company had 77,177,159 limited partner common units.

3.    Calumet Refining, LLC is a Delaware limited liability company with its principal place of business in Indianapolis, Indiana. Calumet Refining, LLC purchases crude oil and other raw hydrocarbon products which are used in the refining process at Calumet's Shreveport refinery in Shreveport, Louisiana.

4.    Calumet Shreveport Refining, LLC is a Delaware limited liability company with its principal place of business in Indianapolis, Indiana. Calumet Shreveport Refining, LLC produces specialty hydrocarbon products made at Calumet's Shreveport refinery in Shreveport, Louisiana.

### B.    Defendants

5.    Defendant National Union Fire Insurance Company of Pittsburgh, PA ("National Union") issued policy number 63803935. It is a Pennsylvania corporation with its principal place of business in New York.

6.    Defendant ACE American Insurance Company ("ACE") issued policy number EPR NO 5111559. It is a Pennsylvania corporation with its principal place of business in Pennsylvania.

7.    Defendant General Security Indemnity Company of Arizona issued policy number E120600. It is an Arizona corporation with its principal place of business in New York.

2

Certified True and
Correct Copy
CertID: 2019102300904

East Baton Rouge Parish
Deputy Clerk of Court

Generated Date:
10/23/2019 4:28 PM


EXHIBIT A

8.     Defendant XL Insurance America, Inc. ("XL") issued policy number US00006797PR12A. It is a Delaware corporation with its principal place of business in Connecticut.

9.     Defendant Houston Casualty Company issued policy number H12-TP10101-00. It is a Texas corporation with its principal place of business in Texas.

10.     Defendants Pembroke Syndicate #4000 and Syndicate #1221, operated by Navigators Insurance Company, are foreign unincorporated associations of underwriters formed under foreign law, who severally subscribe to policy number 12NSRO1390-01.

11.     Defendant Swiss Re International SE (UK Branch) issued policy number E120600. It is an English corporation with its principal place of business in England.

12.     Defendant Great Lakes Reinsurance UK PLC ("Great Lakes") issued policy number E122276. It is an English public limited company with its principal place of business in England.

13.     Defendant Partner Re Ireland Insurance Ltd. issued policy number E120600. It is an Irish corporation with its principal place of business in Ireland.

14.     Defendant Infrassure Ltd. issued policy number E122280. It is a Swiss corporation with its principal place of business in Switzerland.

15.     Defendant HDI Global Specialty SE (formerly known as International Insurance Company of Hannover, Ltd.) issued policy number E120600. It is a German corporation with its principal place of business in Germany.

16.     Defendants Certain Underwriters at Lloyds identified as Talbot Underwriting Ltd. Syndicate #1183, Catlin Syndicate #2003, Argo Syndicate #1200, and Brit Insurance Syndicate #2987 are foreign unincorporated associations of underwriters formed under foreign law who severally subscribe to policy numbers E120600 and/or AJH085579D12.

17.     The Defendants have contractually agreed that service of process may be made upon the law firm of Mendes & Mount, located at 750 Seventh Avenue, New York, NY 10019-6829.

3


Certified True and
Correct Copy
CertID: 2019102300904


East Baton Rouge Parish
Deputy Clerk of Court

Generated Date:
10/23/2019 4:28 PM


EXHIBIT A

### III.   JURISDICTION & VENUE

18.   Jurisdiction over the subject matter is proper because Plaintiffs' have a registered principal business establishment in Louisiana, and the pipeline rupture at issue took place in Pointe Coupee Parish.

19.   This Court has personal jurisdiction over the Defendants as they have each contractually agreed to submit "at the request of the Insured" to "the jurisdiction of any Court of Competent Jurisdiction within the United States." Furthermore, Defendants issued policies of insurance that expressly insured property located in Louisiana and can reasonably anticipate being brought into a Louisiana court for breaching obligations under those policies.

20.   Venue is proper in this district under La. Code Civ. Proc. art. 42(7) as action(s) against a foreign or alien insurer *shall* be brought in the Parish of East Baton Rouge. All defendants are foreign or alien insurers, as pleaded above.

### IV.   BACKGROUND FACTS

**A.   Plaintiffs' Business**

21.   Calumet has owned and operated an oil refinery in Shreveport, Louisiana since 2001. At capacity, the refinery processes approximately 60,000 barrels of crude oil per day. It produces refined products such as specialty lubricating oils and waxes, gasoline, diesel, jet fuel, and asphalt. At the time of the incident, the refinery relied primarily on the North Line owned and operated by ExxonMobil Pipeline Company ("EMPCO") to obtain delivery of its crude feedstock.[1] Calumet's Shreveport refinery had a connection to the North Line at Brown Station in Caddo Parish. All crude was delivered to Calumet via Brown Station.

**B.   The North Line Rupture and Restart Process**

22.   On or about April 28, 2012, a rupture in the North Line occurred near Torbert, Louisiana (the "Rupture"). The Rupture resulted in EMPCO's immediate shutdown of the North Line and corresponding loss to Calumet.

23.   On information and belief, EMPCO detected the Rupture as a sudden pressure drop and immediately undertook emergency response action, including shutdown of the entire North Line, from St. James, Louisiana, to Longview, Texas, including the segment serving Calumet's Shreveport refinery. Visual inspection of the ruptured segment indicated the presence of an

---

[1] The North Line is an underground and partly underwater 22-inch pipeline spanning hundreds of miles originating in St. James, Louisiana.

4



**Certified True and Correct Copy**
CertID: 2019102300904

East Baton Rouge Parish
Deputy Clerk of Court


Generated Date:
10/23/2019 4:26 PM

**EXHIBIT A**

approximately seventeen (17)-foot long seam failure. EMPCO commenced other response actions, including locating the affected segment, draining the oil remaining in the line, cleaning up the spilled oil from the surrounding area, removing and replacing the ruptured segment, and transporting that segment for failure analysis.

24.    On May 8, 2012, as a direct result of the Rupture, the United States Department of Transportation Pipeline and Hazardous Materials Safety Administration ("PHMSA"), the regulatory entity responsible for pipeline safety, issued a Corrective Action Order ("CAO") to EMPCO, a true and correct copy of which is attached hereto as Exhibit A. The CAO required EMPCO to undertake a comprehensive failure analysis, including metallurgical testing, to determine the root cause of the Rupture, and to perform additional testing to determine if there were other ruptures in the system causing the drop in pressure and to rule out the possibility that the Rupture was part of a larger problem in the North Line system. The CAO ordered EMPCO to prepare and submit a written restart plan for prior approval of the Director of PHMSA before restarting operation of the affected pipeline. Completion of a failure analysis, including metallurgical testing, was a prerequisite to EMPCO's restart of service on the North Line.

25.    On information and belief, the metallurgical testing was completed and submitted to PHMSA on or about September 18, 2012.

26.    On or about September 19, 2012, EMPCO submitted a request to PHMSA to restart the North Line pipeline system at a reduced operating pressure and flow.

27.    On October 15, 2012, upon receipt of EMPCO's testing results and restart plan, PHMSA indicated that it had no objection to restarting the North Line at reduced operating pressure and flow. However, EMPCO did not restart the North Line until January 2013 because of additional testing, start-up procedures, and the nomination process.

28.    By the time the North Line was fully functioning in 2013, Calumet had been forced to transition its crude delivery off of the North Line, using substituted suppliers and other pipelines. Calumet never again received deliveries of crude oil from the North Line after the Rupture.

29.    The Rupture is a covered cause of loss under the "all risk" insurance policy Calumet purchased from Defendants.

5


Certified True and
Correct Copy
CertID: 2019102300904


East Baton Rouge Parish
Deputy Clerk of Court


Generated Date:
10/23/2019 4:28 PM

**EXHIBIT A**

## C. Plaintiffs' Claim and Mitigation Efforts

30. As result of the loss of service from the North Line from the date of shutdown on April 28, 2012, Calumet suffered substantial covered losses, in an amount totaling in excess of $22,000,000.

31. As a result of the Rupture, Calumet incurred significant extra expense in attempting to mitigate its losses. These included the cost of:

- Securing additional volume from other pipeline suppliers and making spot purchases of crude oil;

- Arranging storage agreements to store part of Calumet's contracted crude oil supply that was intended for delivery into the North Line;

- Reaching agreements with suppliers to defer scheduled crude deliveries in May 2012 until restart of the North Line;

- Selling stranded crude supply back to suppliers on best-available terms to avoid extended storage fees;

- Reconfiguring existing land transfer and storage facilities to maximize volumes through alternate supply systems;

- Operating the Shreveport refinery inefficiently to avoid shutdown, including recycling crude bottoms; and

- Pressuring EMPCO to restart the North Line.

32. By undertaking these efforts, Calumet was able to avoid a complete shut-down of its refinery and reduce the amount of its losses.

33. Nevertheless, Calumet still suffered significant losses, including lost earnings and extra expense incurred as a result of the Rupture.

34. Calumet timely and properly filed a claim (the "Claim") under the insurance policies purchased from Defendants.[2]

## D. The Policy

35. Calumet purchased "all risk" property insurance policies from Defendants to protect its business against a number of risks, including losses that resulted from the Rupture.

36. The Defendants each severally issued the same or substantially similar versions of the policy form at issue in this action. By way of example, the policy form number E120600 issued

---

[2] Calumet initially notified Defendants of its Claim on June 13, 2012, but withdrew the Claim on February 18, 2013. On June 7, 2017, Calumet notified Defendants of its intent to resume the Claim because it was now in a position to demonstrate that Calumet suffered a covered CBI/CEE loss from the damage to the EMPCO North Line. Defendants acknowledged Calumet's Claim on May 31, 2018. Defendants sent Calumet a letter on October 23, 2018, denying Calumet's Claim.

6


Certified True and Correct Copy
CertID: 2019102300904

East Baton Rouge Parish
Deputy Clerk of Court


Generated Date:
10/23/2019 4:28 PM
EXHIBIT A

by Swiss Re International SE (UK Branch) and six other insurers will be referred to as the "Policy." A copy of the Policy is attached hereto as Exhibit B.[3]

37.    The Policy period incepted April 1, 2012, and remained in effect until April 1, 2013 ("Policy Period").

38.    The Policy was in effect at the time of the Rupture.

39.    The Policy expressly names EMPCO as a "named supplier" and expressly contemplates coverage for Calumet property located in Louisiana.

40.    The Policy is an "all risk" insurance policy. The Policy coverage grant reads as follows:

> ### 4. *PERILS INSURED AGAINST:*
>
> *This policy covers the property insured hereunder or as may be included by Endorsement hereto, against all risks of direct physical loss or damage occurring during the Policy Period, except as hereinafter excluded.*

Policy at p. 7.

41.    The Policy provides coverage for Business Interruption ("BI") as follows:

> ### 5. *Business Interruption*
>
> *The Company agrees to insure, subject to all the terms, conditions, limitations, exceptions, exclusions, provisions and stipulations of this policy not in conflict herewith, against loss directly resulting from necessary interruption of business caused by destruction of or damage to Property Insured, except finished stock, and arising from a peril covered hereunder and occurring during the Policy Period; all while at the locations covered under this endorsement.*

Policy at pp. 51-52.

42.    The Policy provides coverage for Extra Expense ("EE") as follows:

> ### 6. *Extra Expense*
>
> *The Company agrees to insure, subject to all the terms, conditions, limitations, exceptions, exclusions, provisions and stipulations of this policy not in conflict herewith, the necessary Extra Expense incurred by the Insured in order to continue as nearly as practicable the normal operation of the Insured's business following damage to or destruction of real or personal property, by the peril(s) insured against during the term of this policy, which property is on premises occupied by the Insured and all while at the locations covered under this endorsement.*

Policy at pp. 54-55.

43.    The definition of Time Element specifically includes Contingent Business Interruption ("CBI") and Contingent Extra Expense ("CEE") as follows:

> ### *ITEM NO. TWO (Amount of Insurance) Time Element – Per Schedule of Locations (Endt. No. 19)*

---

[3] On information and belief, all of the policy forms issued by Defendants are substantially the same. Calumet anticipates that Defendants will produce certified copies of all relevant policies during discovery in this case.



Certified True and Correct Copy
CertID: 2019102300904

East Baton Rouge Parish
Deputy Clerk of Court

Generated Date:
10/23/2019 4:28 PM



EXHIBIT A

*Time Element shall include Business Interruption, Extra Expense, Contingent Business Interruption/Extra Expense, Service Interruption, and all other Time Element extensions provided under Endorsement No. 19.*

Policy at p. 7.

44.    The terms "Contingent Business Interruption" and "Contingent Extra Expense" are not defined in the Policy, but rather the scope of their coverage is set forth in Section 8 of the "Time Element Endorsement" as follows:

### 8.    *CONTINGENT BUSINESS INTERRUPTION (CBI) / CBI EXTRA EXPENSE*

*Contingent Business Income and Contingent Extra Expense Benefit. The Company shall pay the actual loss sustained by the Insured resulting directly from such interruption of business or Extra Expense sustained by the Insured during the Period of Restoration that is caused by direct physical loss or damage occurring during the Policy Period to property of a supplier of goods or services to the Insured or property of a purchaser of goods and services from the Insured, but only if: (i) the loss or damage to such property results from a peril insured against by this Policy that prevents the supplier of goods or services from supplying goods or services to the Insured, or prevents the purchaser of goods or services from receiving goods and services from the Insured; and (2) such property would have been Property insured if it were located at an insured location and were either owned by the Insured or under the care, custody or control of the Insured.*

*To be covered under this Time Element Coverage, the property must be located within the Policy Territory.*

*In addition, the business interruption must occur during the period commencing on the date of the direct physical loss or damage to the property that gave rise to the claim and ending on the date not later than 18 months following the end of the applicable deductible period specified in the Declarations. This Time Element Coverage does not apply to: (1) business interruption or Extra Expense resulting from the loss of incoming utility services (refer to SERVICE INTERRUPTION above); or (2) business interruption or Extra Expense of a trader, reseller or wholesaler of electricity, gas, telephone services or any other commodity or service.*

*Period Of Restoration. The term "Period Of Restoration" shall mean the period of time that begins on the date of the direct physical loss or damage to Property Insured that gave rise to the claim, and ending on the earlier of (1) the date when the property at the insured location should be repaired, rebuilt, or replaced with commercially reasonable diligence or (2) the date when the business could be resumed at a new permanent location with commercially reasonable diligence.\*\*\**

Policy at p. 56-57.

45.    The Policy provides a Civil Authority Endorsement, which broadens and extends coverage under the Time Element Endorsement:

### *CIVIL AUTHORITY ENDORSEMENT*

*Subject to all terms and conditions of this Policy, the Business Interruption and Extra Expense extensions of coverage are amended to include the additional period of time during which resumption of the Insured's business is prevented as a result of any order, rule, regulation, statute or ordinance of a governmental agency or authority (including, but not limited to, the*

8


Certified True and
Correct Copy
CertID: 2019102300904


East Baton Rouge Parish
Deputy Clerk of Court


Generated Date:

**EXHIBIT A**

> *U.S. Occupational Safety and Health Administration {OSHA} which limits, prevents or otherwise affects the repair, replacement, reconstruction, retesting (to include digging up and relaying of any pipelines) or resumption of the damaged and/or demolished and/or undamaged portions of any facility following physical loss or damage by a peril not otherwise excluded to the facility. Such additional period of time is limited to 60 days.*
>
> *Furthermore, coverage is extended to include the actual loss sustained by the Insured resulting from necessary interruption of business as covered hereunder during the period of time not exceeding 60 days, while access to any premises of the Insured is prohibited by order of civil or military authority but only when such order is given as a direct result of direct physical loss or damage by a peril insured against within 5 miles of the Insured premises affected subject always to the limit of the Policy.*
>
> *This endorsement shall take precedent over any like coverage contained in the Time Element Endorsement No. 19 except when the coverage provided by this Endorsement is more restrictive than the coverage provided under Time Element Endorsement No. 19.*

Policy at p. 58.[4]

46.     The Policy also provides an additional $500,000 in coverage for claim preparation expenses and professional fees, including costs incurred by Calumet for accountants or other professionals for proofs or documents required by Defendants Insurers resulting from a covered loss. *See* Policy at p. 63.

### E.     Defendants' Response and Denial of Coverage

47.     Defendants were timely notified of Calumet's Claim on June 13, 2012, although Calumet later withdrew the claim without prejudice on or about February 18, 2013. On June 7, 2017, Calumet notified Defendants of its intent to resume the claim. Defendants acknowledged resuming of the claim on May 31, 2018.

48.     On October 23, 2018, Defendants denied Calumet's Claim.

49.     Defendants' denial is unsupported and is based, in part, on the erroneous assertion that the Claim was for property excluded under the Policy.

50.     The Policy excludes from coverage "[u]nderground and underwater piping and contents, fittings, conduits, drains and flues, *except such property and contents on insured premises or when such is included in the values declared.*" *See* Policy at p. 8, Section 8.i (the "Pipeline Exclusion") (emphasis added).

51.     The Pipeline Exclusion does not bar Calumet's Claim.

---

[4] Specific policies issued to Calumet may invoke a shorter indemnity period on civil authority coverage on those policies of 45 days.

 **Certified True and Correct Copy** CertID: 2019102300904

East Baton Rouge Parish
Deputy Clerk of Court

 Generated Date: **EXHIBIT A**

52.    Endorsement No. 33 to the Policy, titled "Named Contingent Interruption and Contingent Extra Expense," broadens the Policy to provide coverage for "agreed" Suppliers reflected in the declarations.

53.    The first supplier on the list of named suppliers is EMPCO, which supplied Calumet only via the North Line.

54.    Defendants agreed to endorse the Policy by expressly adding a supplier of an underground pipeline that Calumet used and declared.

55.    Defendants additionally contend, again incorrectly, that Calumet's losses were caused by a peril excluded under the Policy.

56.    The Policy does not insure:

> Cost of making good faulty or defective material, faulty workmanship, errors or omissions in design, errors in processing or manufacture of the Insured's product, unless physical loss or damage by a peril not otherwise excluded by this Policy ensues, and then only for the actual loss or damage directly caused by such ensuing loss or damage.

*See* Policy at p. 9, Section 9.b (the "Faulty Workmanship Exclusion").

57.    The Faulty Workmanship Exclusion does not apply to Calumet's Claim.

58.    Further, even if the Faulty Workmanship Exclusion applied, it would not bar Calumet's Claim because its losses fall within an exception to the Faulty Workmanship Exclusion.

59.    The insurance market made substantially the same exclusionary arguments in *Lion Oil Co. v. National Union Fire Insurance Co. of Pittsburgh, PA*. Ultimately, the *Lion Oil* court rejected these arguments.

60.    Defendants also mistakenly assert that the Civil Authority Endorsement cannot attach to a facility operated by a supplier such as EMPCO and does not apply to CBI or CEE.

61.    The Civil Authority Endorsement is an extension of coverage; it enhances the BI and EE coverage provided by the Time Element Endorsement. By its terms, the Civil Authority Endorsement takes "precedent over any like coverage in the Time Element Endorsement" and does not operate to restrict the Policy terms. The Civil Authority coverage attaches from the date of loss and operates to indemnify Calumet during the Policy's 90-day deductible period.

62.    Further, Defendants erroneously contend that Calumet's Claim cuts off on May 15, 2012, the date that EMPCO installed a new undamaged 30-foot segment of pipeline, based upon the Period of Restoration clause in Section 8 of the CBI/CEE Time Element Endorsement.

10


**Certified True and Correct Copy**
CertID: 2019102300904


East Baton Rouge Parish
Deputy Clerk of Court

Generated Date:
10/23/2019 4:28 PM


**EXHIBIT A**

63.    As of May 15, 2012, the North Line was impaired, inoperable and unusable. The North Line was dangerous to life and property and remained so until such time as PHMSA-prescribed life safety measures were accomplished in full—at the end of calendar year 2013.

64.    The North Line remained impaired, inoperable, and unusable in November 2012, when Calumet successfully transitioned its crude delivery off of the North Line, using substituted suppliers and other pipelines.

65.    Calumet incurred significant covered losses from the date of the Rupture through November 2012, when it successfully transitioned its crude delivery off of the North Line.

66.    Defendants have misrepresented pertinent facts or insurance policy provisions relating to the coverage at issue. Defendants' misrepresentation of the Policy terms is inconsistent with the common intent of the parties and the reasonable expectations of a reasonable policy purchaser.

67.    Defendants were paid substantial premiums by or on behalf of Calumet for the policies described above.

68.    Calumet is entitled to the benefits of all available coverage grants under the Policy that may apply to its claim.

## V.    CAUSES OF ACTION

### A.    Declaratory Judgment

69.    Calumet incorporates and re-alleges each of the averments set forth in paragraphs 1 through 68 above.

70.    Calumet seeks a declaration, pursuant to La. Code Civ. Proc. art. 1871 or other applicable law, that Defendants are obligated, in accordance with the terms of the Policy, to indemnify Calumet for its losses resulting from the Rupture.

71.    The Policy provides coverage for Calumet's CBI and CEE losses.

72.    Calumet's Claim for losses is based on the coverages provided in the Policy.

73.    Defendants wrongfully denied coverage by falsely asserting that Calumet's losses were not covered under the Policy terms or were otherwise excluded under the Policy.

74.    An actual and justifiable controversy exists between the parties with respect to this issue because of the Defendants' refusal to perform its obligations under the Policy. This controversy is ripe and of sufficient immediacy to justify the issuance of a declaratory judgment.

11


Certified True and
Correct Copy
CertID: 2019102300904

East Baton Rouge Parish
Deputy Clerk of Court

Generated Date:
10/23/2019 4:28 PM


**EXHIBIT A**

75.     No applicable exclusions or limitations bar coverage for Calumet's Claim.

76.     All conditions precedent to Calumet's right to coverage have been satisfied to the extent required by law.

77.     A declaration of the parties' rights and obligations under the Policy will serve to resolve the dispute between them.

**B.     Breach of Contract**

78.     Calumet incorporates and re-alleges each of the averments set forth in paragraphs 1 through 77 above.

79.     As set forth above, in return for premiums paid, Defendants sold Calumet an insurance policy in which Defendants promised to indemnify Calumet for all Loss up to the applicable limits of liability.

80.     Calumet suffered a covered Loss.

81.     Calumet timely and properly submitted a Claim under the Policy. By refusing to accept coverage, Defendants breached their contractual obligations to Calumet under the Policy.

82.     As a result of the breach, Calumet was deprived of benefits under the Policy for which Calumet has paid substantial premiums. Consequently, Calumet has suffered substantial damage.

83.     Defendants' breach was the proximate cause of loss, liability, damages, expenses and costs to Calumet. Calumet is entitled to coverage for the Claim and resulting damages from the Defendants' failure to pay.

84.     Calumet is also entitled to recover its actual damages as well as incidental and consequential damages resulting from Defendants' breach.

85.     All conditions precedent to Calumet's right to coverage have occurred to the extent required by law.

86.     No applicable exclusions or limitations purport to bar coverage for any of Calumet's claims.

**C.     Breach of Duty of Good Faith**

87.     Calumet incorporates and re-alleges each of the averments set forth in paragraphs 1 through 86 above.

12



Certified True and
Correct Copy
CertID: 2019102300904

East Baton Rouge Parish
Deputy Clerk of Court



Generated Date:
10/23/2019 4:38 PM

**EXHIBIT A**

88.    Defendants owed Calumet a duty of good faith and fair dealing, including but not limited to those duties outlined in La. R.S. §§ 22:1973, 22:1892, and/or other applicable law.

89.    Defendants owed a duty to Calumet of good faith and fair dealing with regard to Defendants' investigation, evaluation, and response to Calumet's tender of its Claim.

90.    An insurer's duty of good faith and fair dealing includes an obligation to properly consider all potentially relevant policy provisions and to read them in an even-handed manner, all in an effort to find coverage for the claim.

91.    Defendants failed to properly consider all potentially applicable policy provisions in its decision denying Calumet's Claim.

92.    Defendants also had an affirmative duty to adjust claims fairly and promptly.

93.    Defendants also failed to timely pay the amount of Calumet's Claim due upon receipt of satisfactory proof of the loss.  Such failure was (and is) continuing and repeated.

94.    Defendants acted in bad faith by declining coverage and by failing to make timely payment of insurance proceeds which are due and owing to Calumet under the Policy.  Defendants' actions were arbitrary, capricious, and without probable cause.

95.    Defendants breached their duties as described herein and are liable to Calumet for all damages incurred as a result of such conduct.

96.    As a result of Defendants' wrongful conduct, Calumet is also entitled—pursuant to La. R.S. §§ 22:1973, 22:1892, and/or other applicable law—to be awarded statutory damages, penalties, attorneys' fees, costs, and expenses expended in prosecuting the Claim.

## VI.    CONCLUSION AND PRAYER

Calumet respectfully prays that upon trial of this cause the Court enter judgment awarding it:

a.    A judicial declaration clarifying that Calumet's understanding of the foregoing policy provisions is correct;

b.    All actual damages suffered by Calumet as a result of Defendants' breach of contract in an amount to be determined at trial;

c.    All compensatory damages Calumet suffered as a result of Defendants' breach of their duties of good faith and fair dealing;

d.    Statutory damages and penalties;

e.    Attorneys' fees and costs of court;

f.    Pre- and post-judgment interest at the highest rate allowed by law; and

g.    Such other further relief to which it may be justly entitled.

13


Certified True and
Correct Copy
CertID: 2019102300904


East Baton Rouge Parish
Deputy Clerk of Court

Generated Date:

EXHIBIT A

## VII.   JURY REQUEST

Calumet requests a trial by jury on any and all counts that are so triable.

Respectfully Submitted:

Donald J. Cazayoux, Jr. #20742
J. Lane Ewing, Jr. #29854
CAZAYOUX EWING, LLC
257 Maximilian Street
Baton Rouge, LA 70802
Telephone: (225) 650-7400
Facsimile: (225) 650-7401
don@cazayouxewing.com
lane@cazayouxewing.com

Geoffrey J. Greeves
    *(pro hac vice application to be filed)*
Bradley Arant Boult Cummings LLP
1615 L Street NW, Suite 1350
Washington, DC 20036
Telephone: 202-719-8221
ggreeves@bradley.com

And

ALEX PURVIS
    *(pro hac vice application to be filed)*
BRADLEY ARANT BOULT CUMMINGS LLP
Suite 1000, One Jackson Place
188 East Capitol Street
PO Box 1789
Jackson, MS 39215-1789
Telephone: (601) 948-8000
Facsimile: (601) 948-3000
apurvis@bradley.com

**PLEASE SERVE:**

National Union Fire Insurance Company of Pittsburgh, PA, who can be served via the Louisiana Long Arm Statute at Mendes & Mount, located at 750 Seventh Avenue, New York, NY 10019-6829.

ACE American Insurance Company who can be served via the Louisiana Long Arm Statute at Mendes & Mount, located at 750 Seventh Avenue, New York, NY 10019-6829.

General Security Indemnity Company of Arizona who can be served via the Louisiana Long Arm Statute at Mendes & Mount, located at 750 Seventh Avenue, New York, NY 10019-6829.

XL Insurance America, Inc. who can be served via the Louisiana Long Arm Statute at Mendes & Mount, located at 750 Seventh Avenue, New York, NY 10019-6829.

Houston Casualty Company who can be served via the Louisiana Long Arm Statute at Mendes & Mount, located at 750 Seventh Avenue, New York, NY 10019-6829.

Pembroke Syndicate #4000 and Syndicate #1221 who can be served via the Louisiana Long Arm Statute at Mendes & Mount, located at 750 Seventh Avenue, New York, NY 10019-6829.


Certified True and
Correct Copy
CertID: 2019102300904

East Baton Rouge Parish
Deputy Clerk of Court

Generated Date:
10/23/2019 4:26 PM


**EXHIBIT A**

Swiss Re International SE (UK Branch who can be served via the Louisiana Long Arm Statute at Mendes & Mount, located at 750 Seventh Avenue, New York, NY 10019-6829.

Great Lakes Reinsurance UK PLC who can be served via the Louisiana Long Arm Statute at Mendes & Mount, located at 750 Seventh Avenue, New York, NY 10019-6829.

Partner Re Ireland Insurance Ltd who can be served via the Louisiana Long Arm Statute at Mendes & Mount, located at 750 Seventh Avenue, New York, NY 10019-6829.

Infrassure Ltd. who can be served via the Louisiana Long Arm Statute at Mendes & Mount, located at 750 Seventh Avenue, New York, NY 10019-6829.

HDI Global Specialty SE (formerly known as International Insurance Company of Hannover, Ltd.) who can be served via the Louisiana Long Arm Statute at Mendes & Mount, located at 750 Seventh Avenue, New York, NY 10019-6829.

Certain Underwriters at Lloyds identified as Talbot Underwriting Ltd. Syndicate #1183, Catlin Syndicate #2003, Argo Syndicate #1200, and Brit Insurance Syndicate, who can be served via the Louisiana Long Arm Statute at Mendes & Mount, located at 750 Seventh Avenue, New York, NY 10019-6829.

15


Certified True and
Correct Copy
CertID: 2019102300904


East Baton Rouge Parish
Deputy Clerk of Court

Generated Date:
10/23/2019 4:35 PM

EXHIBIT A

MAY 8 2012

**VIA CERTIFIED MAIL [Mr. Gary W. Pruessing] AND FAX TO: (713)-656-2170**

Mr. Gary W. Pruessing
President
ExxonMobil Pipeline Company, LP
800 Bell Street
Room 3180H
Houston, TX 77002

**Re: CPF No. 4-2012-5019H**

Dear Mr. Pruessing:

Enclosed please find the Corrective Action Order issued in the above-referenced case. It finds that operation of the portion of ExxonMobil Pipeline Company's hazardous liquid pipeline running from the Anchorage pump station in West Baton Rouge Parish, Louisiana, to Finney pump station in Caddo Parish, Louisiana, would be hazardous to life, property, or the environment without corrective action. The Corrective Action Order requires you to take immediate action to protect the public, property, and the environment in connection with the failure of the pipeline on or about April 28, 2012, near Torbert, Louisiana.

Service of the Corrective Action Order is being made by certified mail and facsimile. Your receipt of this Corrective Action Order constitutes service of that document under 49 C.F.R. § 190.5. The terms and conditions of the Order are effective upon receipt.

We look forward to a successful resolution of the concerns arising out of this pipeline failure to ensure the safe and environmentally sound operation of the pipeline. Please direct any questions on this matter to Rod Seeley, Director, Southwest Region, OPS, at (713) 272-2852.

Sincerely,

Jeffrey D. Wiese
Associate Administrator
for Pipeline Safety

Enclosures: Corrective Action Order and Copy of 49 C.F.R. § 190.233

cc:    Mr. Alan Mayberry, Deputy Associate Administrator for Field Operations, OPS
Mr. Rod Seeley, Director, Southwest Region, OPS



**EXHIBIT A**

U.S. DEPARTMENT OF TRANSPORTATION
PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION
OFFICE OF PIPELINE SAFETY
WASHINGTON, D.C.  20590

|  |  |  |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| ExxonMobil Pipeline Company, LP, | ) | CPF No.  4-2012-5019H |
| | ) | |
| Respondent. | ) | |

## CORRECTIVE ACTION ORDER

### Purpose and Background

This Corrective Action Order (Order) is being issued under 49 U.S.C. § 60112 to ExxonMobil Pipeline Company, LP (EMPCO or Respondent), the operator of a hazardous liquid pipeline running from the company's Anchorage pump station in West Baton Rouge Parish, Louisiana, to its Finney pump station in Caddo Parish, Louisiana, known as Segments 3 and 4 of the North System within the Brass Area Unit (Affected Pipeline).  This Order finds that operation of the Affected Pipeline without corrective action is or would be hazardous to life, property, or the environment and requires Respondent to take immediate action to ensure the safe and environmentally sound operation of the pipeline.

On or about April 28, 2012, Respondent experienced a failure on the Affected Pipeline requiring shut down and reported a crude oil spill to the National Response Center (NRC) the following day after identifying the failure site near the town of Torbert, Louisiana (Failure).  Respondent currently estimates the volume of the oil spill to be approximately 1891 barrels.

Pursuant to 49 U.S.C. § 60117, the Pipeline and Hazardous Materials Safety Administration (PHMSA), Office of Pipeline Safety (OPS), initiated an investigation of the Failure.  OPS determined that the release originated from the Affected Segment, but the cause of the Failure has not yet been determined.  The preliminary findings of the investigation are as follows:

### Preliminary Findings

- At approximately 10:40 p.m. CST on April 28, 2012, Respondent experienced a sudden pressure drop on the Affected Pipeline requiring shut down of the line.  Respondent initiated steps to identify the cause of the Failure.

EXHIBIT A

- At approximately 1:50 p.m. CST on April 29, 2012, Respondent identified the failure site by ground patrol and notified the NRC of a crude oil spill at 3:19 p.m. (NRC Report No. 1010007). The Failure occurred at Station 2717+85 in Pointe Coupee Parrish, Louisiana, near the town of Torbert.

- The volume of the crude oil spill is currently estimated by Respondent to be approximately 1891 barrels. Due to the proximity of the spill area to the Intracoastal Canal, Respondent initiated surface water containment measures, including the deployment of booms.

- Following the Failure, Respondent isolated the failed pipe by closing block valves upstream and downstream of the Failure site. Respondent installed a drain tap at a low point to evacuate the crude oil that remained in the line. The portion of the line running from the Anchorage Pump Station to the Finney Pump Station, designated as Segments 3 and 4, i.e., the Affected Pipeline, remains out of service.

- The maximum operating pressure (MOP) of the Affected Pipeline is 1061 psig, as established by hydrostatic test in 2001. At the time of the Failure, the actual operating pressure of the pipeline was 969 psig.

- The operator determined that a 20% pressure reduction on Segment 1 (from the St. James pump station to the Anchorage pump station), Segment 2 (from the Anchorage pump station to the Krotz Springs pump station), and Segment 5 (from the Finney pump station to the Mid Valley pump station) of the North System was appropriate.

- On May 7, 2012, Respondent excavated the Failure site and removed the section of pipe containing the Failure origin. The preliminary visual inspection by OPS at the scene indicated the presence of a 17-foot-long rupture along the longitudinal seam at the 12 o'clock position. The failed pipe section is being transported to a metallurgist for failure analysis.

- Respondent deployed absorbent padding and vacuum trucks to begin removal of the spilled oil and initiated soil removal and remediation actions.

- The cause of the Failure is unknown and the investigation is ongoing.

- Due to its proximity to public roads and various surface waters, including drainage channels, streams, and the Intracoastal Canal, portions of the Affected Pipeline are in areas that could affect High Consequence Areas (HCA), as defined in 49 C.F.R. § 195.450, and the pipe at the Failure site is subject to the Integrity Management Program requirements of 49 C.F.R. § 195.452.

- The 22-inch diameter portion of the Affected Pipeline was constructed in 1956 of 0.312-inch wall thickness, grade X52 pipe with an electric resistance welded (ERW) seam. It was manufactured by Youngstown Steel and has a coal tar enamel coating and an impressed-current cathodic protection system.

EXHIBIT A

- The Affected Pipeline is part of Respondent's pipeline system known as the North System within the Brass Area Unit. The Affected Pipeline consists of approximately 198.8 miles of pipe transporting crude oil and refined petroleum products across Louisiana and Texas.

- The most recent internal assessment of the Affected Pipeline occurred in 2007. The operator reported that this assessment did not reveal any anomalies requiring corrective action.

- EMPCO is an affiliate of ExxonMobil Pipeline Company, LP, and transports over 2.7 million barrels of crude oil and refined products every day through over 8000 miles of pipelines.[1]

**Determination of Necessity for Corrective Action Order and Right to Hearing**

Under 49 U.S.C. § 60112 and 49 C.F.R. § 190.233, the Associate Administrator for Pipeline Safety (Associate Administrator) may issue a corrective action order after providing reasonable notice and the opportunity for a hearing if he finds that a particular pipeline facility is or would be hazardous to life, property, or the environment. The terms of such an order may include the suspended or restricted use of a pipeline facility, physical inspection, testing, repair, replacement, or any other action as appropriate. The Associate Administrator may also issue a corrective action order without providing any notice or the opportunity for a hearing if he finds that a failure to do so expeditiously will result in likely serious harm to life, property or the environment. The opportunity for a hearing will be provided as soon as practicable after the issuance of the CAO in such cases.

After evaluating the preliminary findings, I find that the continued operation of the Affected Pipeline without corrective measures would be hazardous to life, property, and the environment. Additionally, having considered the age of the pipe, the manufacture of the pipe, the circumstances surrounding the Failure, the proximity of the pipeline to populated areas, public roadways, HCAs, and the Intracoastal Canal, the hazardous nature of the product being transported, the pressure required for transporting the material, and the ongoing investigation to determine the cause of the Failure, I find that a failure to issue this Order expeditiously to require immediate corrective action would result in likely serious harm to life, property, and the environment. Accordingly, this Corrective Action Order is being issued without prior notice and opportunity for a hearing and the terms and conditions are effective upon receipt.

Within 10 days of receipt of this Order, Respondent may request a hearing, to be held as soon as practicable, by notifying the Associate Administrator for Pipeline Safety in writing, with a copy to the Director, Southwest Region, PHMSA (Director). If a hearing is requested, it will be held telephonically or in-person in Houston, Texas.

After receiving and analyzing additional data in the course of this investigation, PHMSA may identify other corrective measures that need to be taken. Respondent will be notified of any

---

[1] http://www.exxonmobilpipeline.com/USA-English/EMPCo/ourcompany.aspx (last visited May 6, 2012).

EXHIBIT A

additional measures required and amendment of this Order will be considered. To the extent consistent with safety, EMPCO will receive notice and an opportunity for a hearing prior to the imposition of any additional corrective measures.

<u>Required Corrective Action</u>

Pursuant to 49 U.S.C. § 60112, EMPCO is ordered to immediately take the following corrective actions to ensure the safe operation of the Affected Pipeline:

1. Develop and submit a written re-start plan for prior approval of the Director. Obtain written approval from the Director prior to resuming operation of the Affected Pipeline. The restart plan must provide for adequate patrolling of the Affected Pipeline during the restart process and must include an incremental start-up, with each increment to be held for at least two hours. Include sufficient surveillance of each increment to ensure that no leaks are present when operation of the line is resumed. The restart plan must specify a daylight restart and specify advance communications with local emergency response officials.

2. After receiving approval from the Director to restart the Affected Pipeline, maintain a twenty percent (20%) pressure reduction in the operating pressure of the Affected Pipeline. The operating pressure is not to exceed eighty percent (80%) of the actual operating pressure in effect immediately prior to the Failure. Submit the operating pressures for each pump station on the Affected Pipeline at the time of failure and reduced discharge pressure limits for approval by the Director in the restart plan referenced in Item 1. This pressure restriction will remain in effect until written approval to increase the pressure or return the pipeline to its pre-failure operating pressure is obtained from the Director pursuant to Item 10.

3. As recommended in PHMSA Advisory Bulletin 2012–06, verify the records for the Affected Pipeline relating to operating specifications for maximum operating pressure (MOP). Within 45 days of receipt of this Order, submit a report on this record verification and copies of these records to the Director.

4. Within 45 days of receipt of this Order, complete mechanical and metallurgical testing and failure analysis of the failed pipe, including analysis of soil samples and any foreign materials. Complete the testing and analysis as follows:

   A. Document the chain-of-custody when handling and transporting the failed pipe section and other evidence from the Failure site;

   B. Use the testing protocol provided by PHMSA and submit the selection of the testing laboratory to the Director for prior approval;

   C. Prior to commencing the mechanical and metallurgical testing, provide the Director with the scheduled date, time, and location of the testing to allow a PHMSA representative to witness the testing; and

4

EXHIBIT A

D. Ensure that the testing laboratory distributes all resulting reports in their entirety (including all media), whether draft or final, to the Director at the same time as they are made available to Respondent.

5. Within 60 days following receipt of this Order, complete a failure analysis. Elements of the failure analysis must include but not be limited to: a scoping document of the analysis; procedures associated with failure analysis; and multiple methods used for the analysis and updates on each method as it progresses. Provide the Director with the scheduled date, time, and location of personnel interviews and document reviews to allow a PHMSA representative to attend either in person or via teleconference. The analysis must document all contributory factors and the decision-making process. Submit a final report of the failure analysis results to the Director, including any lessons learned and whether the findings are applicable to other locations beyond the Affected Pipeline but within Respondent's Brass Area Unit pipeline system.

6. Within 90 days following receipt of this order, submit an integrity verification and remedial work plan to the Director for approval. The plan must provide for the verification of the integrity of the Affected Pipeline and must address all factors known or suspected in the Failure. The plan must include:

A. Integration of the results of the metallurgical analysis performed pursuant to Item 4 above and the failure analysis required by Item 5 above with all relevant pipeline system data, including all historical repair information, construction, operating, maintenance, testing, metallurgical analysis or other third-party consultation information, and assessment data. Data-gathering activities must include a review of the failure history (including both in-service and pressure test failures) of the North System pipelines and development of a written report containing all available information regarding locations, dates, and causes of leaks and failures;

B. The performance of additional field testing, inspections, and evaluations to determine whether and to what extent the conditions associated with the Failure, or any other integrity-threatening conditions are present elsewhere on the Affected Pipeline. Additional in-line inspections that can reliably detect any defects similar to those that caused or were a contributing factor to the Failure and confirmatory hydrostatic testing must be considered in the plan. Include a detailed description of the criteria to be used for the evaluation and prioritization of any integrity threats and anomalies that are identified;

C. A detailed description of the inspection and repair criteria to be used in the evaluation and prioritization of identified integrity threats. This is to include a description of how any defects are to be graded and a schedule for repairs or replacement;

D. Provisions for continuing long-term periodic testing and integrity verification measures, considering the results of the analyses, inspections, and corrective

5

EXHIBIT A

measures undertaken pursuant to this Order, to ensure the ongoing safe operation of the Affected Pipeline;

    E.  A proposed schedule for completion of the actions required by paragraphs A-D of this Item.

7.  Upon approval by the Director, the integrity verification and remedial work plan becomes incorporated into this Order and shall be revised as necessary to incorporate the results of actions undertaken pursuant to this Order and whenever necessary to incorporate new information obtained during the failure investigation and remedial activities. Submit any such plan revisions to the Director for prior approval. The Director may approve plan elements incrementally.

8.  Implement the work plan as approved by the Director, including any revisions to the plan.

9.  Submit quarterly reports to the Director that: (1) include all available data and results of the testing and evaluations required by this Order; and (2) describe the progress of the repairs or other remedial actions being undertaken. The first quarterly report for the period from April 28, 2012, through June 31, 2012, shall be due by July 31, 2012.

10.  The Director may allow the removal or modification of the pressure restriction set forth in Item 2 above upon receipt of a written request from Respondent demonstrating that the hazard has abated and that restoring the Affected Pipeline to its pre-failure operating pressure or established MOP is justified based on a reliable engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies and operating parameters of the pipeline.

The Director may grant an extension of time for compliance with any of the terms of this Order upon a written request timely submitted demonstrating good cause for an extension.

With respect to each submission that under this Order requires the approval of the Director, the Director may: (a) approve, in whole or part, the submission; (b) approve the submission on specified conditions; (c) modify the submission to cure any deficiencies; (d) disapprove, in whole or in part, the submission, directing that Respondent modify the submission; or (e) any combination of the above. In the event of approval, approval upon conditions, or modification by the Director, Respondent shall proceed to take all actions required by the submission as approved or modified by the Director. If the Director disapproves all or any portion of the submission, Respondent shall correct all deficiencies within the time specified by the Director, and resubmit it for approval. If a resubmitted item is disapproved in whole or in part, the Director may again require Respondent to correct the deficiencies in accordance with the foregoing procedure, and the Director may otherwise proceed to enforce the terms of this Order.

Be advised that all material you submit in response to this enforcement action is subject to being made publicly available. If you believe that any portion of your responsive material qualifies for confidential treatment under 5 U.S.C. 552(b), you must provide, along with the complete original document, a second copy of the document with those portions you believe qualify for

EXHIBIT A

confidential treatment redacted, along with an explanation of why you believe the redacted information qualifies for confidential treatment under 5 U.S.C. 552(b).

In your correspondence on this matter, please refer to "CPF No. 4-2012-5019H" and for each document you submit, please provide a copy in electronic format whenever possible.   The actions required by this Order are in addition to and do not waive any requirements that apply to Respondent's pipeline system under 49 C.F.R. Parts 190 through 199, under any other order issued to EMPCO under authority of 49 U.S.C. Chapter 601, or under any other provision of Federal or State law.

Respondent may appeal any decision of the Director to the Associate Administrator, whose decision will be final.

Failure to comply with this Order may result in the assessment of civil penalties and in referral to the Attorney General for appropriate relief in United States District Court pursuant to 49 U.S.C. § 60120.

The terms and conditions of this Order are effective upon service in accordance with 49 C.F.R. § 190.5.


_____                    _____
Jeffrey D. Wiese                                                    Date Issued
Associate Administrator
   for Pipeline Safety


7

**EXHIBIT A**



# WORTHAM
*Insurance & Risk Management*

**Calumet Specialty Products Partners, L.P.**

**2012-2013 Property Damage and Time Element Insurance Policy
London $650MM Quota Share**

<u>**ANNUAL PREMIUM BASIS - $6,691,134**</u>

**Schedule of Lloyd's, London and European Insurers**

**Policy No. E120600**

| Insurance Company | % Participation | $ Participation | $ Premium |
|---|---|---|---|
| **Underwriters at Lloyd's London** | | | |
| Catlin (SJC) Syndicate #2003 | 3.75% | $24,375,000 | $250,917.52 |
| Brit (BRT) Syndicate #2987 | 2.00% | $13,000,000 | $133,822.68 |
| Argo (AMA) Syndicate #1200 | 3.00% | $19,500,000 | $200,734.02 |
| **London and European Companies** | | | |
| Swiss Re International SE (UK Branch) | 10.00% | $65,000,000 | $669,113.40 |
| General Security Indemnity Company Of Arizona (GSINDA – SCOR) | 10.00% | $65,000,000 | $669,113.40 |
| Partner Re Ireland Insurance Limited | 7.50% | $48,750,000 | $501,835.05 |
| International Insurance Company of Hannover, Ltd (Inter Hannover) | 3.00% | $19,500,000 | $200,734.02 |
| **TOTALS:** | **39.25** | **$255,125,000** | **$2,626,270.09** |

The Assured shall remit applicable state taxes to John L. Wortham & Son, L.P. (JLW) for the state of Texas and other states as may be agreed. The Assured assumes responsibility for such state taxes, if any, in all other states. JLW will assist you if desired.

This insurance contract is with an insurer not licensed to transact insurance in this state and is issued and delivered as surplus line coverage under the Texas insurance statutes. The Texas Department of Insurance does not audit the finances or review the solvency of the surplus lines insurer providing this coverage, and the insurer is not a member of the property and casualty insurance guaranty association created under Chapter 462, Insurance Code. Chapter 225, Insurance Code, requires payment of a 4.85 percent tax on gross premium.

John L. Wortham & Son, L.P.
J. Wortham, L.L.C., General Partner
*A Member of The Wortham Group*

P.O. Box 1388, Houston, TX 77251-1388
Wortham Tower, American General Center, 2727 Allen Parkway, 77019
Telephone: 713.526.3366



**EXHIBIT**

**EXHIBIT A**

# IMPORTANT NOTICE

To obtain information or make a complaint:

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at:

1-800-252-3439

You may write the Texas Department of Insurance:

P.O. Box 149104
Austin, TX  78714-9104
Fax # 512/475-1771

**PREMIUM OR CLAIMS DISPUTES:**  Should you have a dispute concerning your premium or about a claim you should contact the agent or the company first.  If the dispute is not resolved, you may contact the Texas Department of Insurance.

**ATTACH THIS NOTICE TO YOUR POLICY:**  This notice is for information only and does not become a part or condition of the attached document.

**EXHIBIT A**

# Important Notice

**ILLINOIS**
Notice to Policyholder: This contract is issued, pursuant to Section 445 of the Illinois Insurance Code, by a company not authorized and licensed to transact business in Illinois and as such is not covered by the Illinois Insurance Guaranty Fund.

> **LOUISIANA**
> Notice: This insurance policy is delivered as a surplus line coverage under the Insurance Code of the State of Louisiana. In the event of insolvency of the company issuing this contract, the policyholder or claimant is not covered by the Louisiana Insurance Guaranty Association, which guarantees only specific policies issued by an insurance company authorized to do business in Louisiana. This surplus lines policy has been procured by the following licensed Louisiana surplus lines broker:
>
> _(signature)_ | John L. Wortham & Son, L.P.
> Signature of Licensed Louisiana Surplus Lines Surplus | Printed Name of Licensed Louisiana
>
> **Broker or Authorized Representative** | **Lines Broker**

**MINNESOTA**
This insurance is issued pursuant to the Minnesota Surplus Lines Insurance Act. The insurer is an eligible surplus lines insurer but is not otherwise licensed by the State of Minnesota. In case of insolvency, payment of claims is not guaranteed.

**MISSOURI**
This is evidence of insurance procured and developed under the Missouri Surplus Lines Laws. It is NOT covered by the Missouri Insurance Guaranty Association. This insurer is not licensed by the state of Missouri and is not subject to its supervision.

**PENNSYLVANIA**
The insurer that has issued this insurance is to licensed by the Pennsylvania Insurance Department and is subject to limited regulation. This insurance is NOT covered by the Pennsylvania Property and Casualty Insurance Guaranty Association.

**UTAH**
The insurer issuing this policy does not hold a certificate of authority to do business in this state and thus is not fully subject to regulation by the Utah Insurance Commissioner. This policy received no protection from any of the guaranty associations created under Title 31A, Chapter 28.

**WISCONSIN**
This insurance contract is with an insurer that has not obtained a certificate of authority to transact a regular insurance business in the state of Wisconsin, and is issued and delivered as a surplus lines coverage pursuant to s. 618.41 of the Wisconsin Statutes. Section 618.43(1), Wisconsin Statutes, requires payment by the policyholder of 3 percent tax on gross premium.

**EXHIBIT A**

Policy No. B0180 E120600

## CALUMET SPECIALTY PRODUCTS PARTNERS, L.P.

### PROPERTY / TIME ELEMENT WORDING

### From April 1, 2012 to April 1, 2013

## CONTENTS:

                                                                    Page No.
DECLARATIONS ................................................................ 1

SCHEDULE OF INSURERS .................................................. 6

1.  NAMED OF INSURED ................................................... 7
2.  PROPERTY INSURED .................................................. 7
3.  TERRITORY ............................................................... 7
4.  PERILS INSURED AGAINST ......................................... 7
5.  LIMIT OF LIABILITY ................................................... 7
6.  SUB-LIMITS .............................................................. 8
7.  RETENTIONS ............................................................ 8
8.  PROPERTY EXCLUDED .............................................. 8
9.  PERILS EXCLUDED .................................................... 9
10. VALUATION ............................................................. 11
11. LIMITATIONS .......................................................... 12
12. COINSURANCE ........................................................ 12

GENERAL CONDITIONS APPLICABLE TO ALL ITEMS
13. PERMISSIONS CLAUSE ............................................. 13
14. CANCELLATION ...................................................... 13
15. EARTHQUAKE ......................................................... 13
16. FLOOD CLAUSE ...................................................... 14
17. FOAM LOSS ASSUMPTION CLAUSE ........................... 14
18. FIRE FIGHTING EXPENSE CLAUSE ............................ 14
19. DEBRIS REMOVAL CLAUSE ...................................... 14
20. POWER FAILURE LOSS EXCLUSION .......................... 15
21. OTHER INSURANCE ................................................. 15
22. PRO-RATA LIABILITY CLAUSE .................................. 15
23. NO CONTROL .......................................................... 15
24. BREACH OF WARRANTY .......................................... 15
25. INSPECTION OF PROPERTY AND OPERATIONS .......... 16
26. MISREPRESENTATION AND FRAUD ........................... 16
27. MACHINERY ........................................................... 16
28. LABELS .................................................................. 16
29. PAIR, SET OR PARTS ............................................... 16
30. REINSTATEMENT .................................................... 16
31. DUTIES OF THE INSURED IN THE EVENT OF LOSS OR DAMAGE ...... 16
32. PAYMENT OF LOSS .................................................. 17
33. SUBROGATION ....................................................... 17
34. SALVAGE AND RECOVERIES ..................................... 18
35. CLAIMS AGAINST THIRD PARTIES ............................. 18
36. PROTECTION OF PROPERTY ..................................... 18



**EXHIBIT A**

Policy No. B0180 E120600

37. SUIT AGAINST THE COMPANY ........................................ 18
38. IMPAIRMENT OF RECOVERY RIGHTS 36 ...................... 18
39. NO BENEFIT TO BAILEE .............................................. 18
40. COMPANY'S OPTIONS ................................................. 18
41. ABANDONMENT ......................................................... 19
42. PRIVILEGE TO ADJUST WITH OWNER .......................... 19
43. EXAMINATION UNDER OATH ....................................... 19
44. EXAMINATION OF RECORDS ....................................... 19
45. RECORDS AND INVENTORY ........................................ 19
46. APPRAISAL CLAUSE ................................................... 20
47. CHANGES ................................................................. 20
48. CONFORMITY TO STATUTE ......................................... 20
49. TITLES AND PARAGRAPHS .......................................... 20
50. CONFLICT OF WORDING ............................................. 20

ENDORSEMENTS
1. REPLACEMENT COST ENDORSEMENT ........................... 21
2. POLLUTANT CLEAN-UP AND REMOVAL ENDORSEMENT ... 23
3. DEMOLITION AND INCREASED COSTS OF CONSTRUCTION ENDORSEMENT .... 24
4. TRANSIT ENDORSEMENT .............................................. 25
5. UNNAMED LOCATIONS ENDORSEMENT .......................... 27
6. NEWLY ACQUIRED LOCATIONS (AUTOMATIC ACQUISITIONS) ENDORSEMENT .. 28
7. VALUABLE PAPERS AND RECORDS ENDORSEMENT ........... 29
8. ACCOUNTS RECEIVABLE ENDORSEMENT ........................ 31
9. BIOLOGICAL OR CHEMICAL MATERIALS EXCLUSION ........ 33
10. FIRE BRIGADE CHARGES & EXTINGUISHINGS EXPENSES ENDORSEMENT ....... 34
11. POLITICAL RISKS EXCLUSION ..................................... 35
12. BOILER AND MACHINERY ENDORSEMENT ..................... 36
13. SCHEDULE OF LOCATIONS ENDORSEMENT .................... 45
14. SERVICE OF SUIT ENDORSEMENT ................................ 46
15. DATA DISTORTION/CORRUPTION ENDORSEMENT ............ 47
16. ADJUSTER ENDORSEMENT .......................................... 48
17. FUNGI EXCLUSION ENDORSEMENT ............................... 49
18. LENDERS LOSS PAYABLE CLAUSE ................................ 50
19. TIME ELEMENT ENDORSEMENT .................................... 51
20. CIVIL AUTHORITY ENDORSEMENT ................................. 58
21. INCIDENTAL COURSE OF CONSTRUCTION ENDORSEMENT .... 59
22. COVERAGE TERRITORY ENDORSEMENT ("OFAC") ............ 60
23. NAMED WINDSTORM COVERAGE LIMITATION ENDORSEMENT ... 61
24. FLOOD ENDORSEMENT ................................................ 62
25. CLAIMS PREPARATION EXPENSES / PROFESSIONAL FEES ... 63
26. ERRORS AND OMISSIONS ........................................... 64
27. MILLENNIUM ENDORSEMENT ....................................... 65
28. TERRORISM EXCLUSION ENDORSEMENT ........................ 66
29. EXPEDITING EXPENSES ENDORSEMENT ......................... 67
30. AUTHORITIES ENDORSEMENT ...................................... 68
31. FINE ARTS ENDORSEMENT .......................................... 69
32. RENTAL VALUE ......................................................... 70
33. NAMED CONTINGENT BUSINESS INTERRUPTION AND CONTINGENT EXTRA EXPENSE ENDORSEMENT ............................................. 71
34. SOFT COSTS/ADDITIONAL EXPENSE ENDORSEMENT ......... 72
35. CONFIRMATION OF COVERAGE ENDORSEMENT ............... 73



**EXHIBIT A**

Policy No. B0180 E120600

LONDON AMENDMENT ENDORSEMENTS

A.  SERVICE OF SUIT CLAUSE NMA1998 ....................................................... 74
B.  U.S. TERRORISM RISK INSURANCE ACT OF 2002 AS AMENDED NOT PURCHASED
    CLAUSE ............................................................................................... 75
C.  TERRORISM EXCLUSION ENDORSEMENT NMA2920 .................................. 76
D.  FRAUDULENT CLAIMS CLAUSE ............................................................... 77



EXHIBIT A

Policy No. B0180 E120600

# CALUMET SPECIALTY PRODUCTS PARTNERS, L.P.

### DECLARATIONS

**INSURED & MAILING ADDRESS:**

Calumet Specialty Products Partners, L.P.
2780 Waterfront Parkway
East Drive, Suite 200
Indianapolis, IN 46214

Calumet Specialty Products Partners, L.P. and/or Calumet GP LLC and/or Calumet Shreveport, LLC and/or Calumet Shreveport Fuels, LLC and/or Calumet Shreveport Lubricants and Waxes, LLC and/or Calumet Operating, LLC and/or Calumet LP GP, LLC and/or Calumet Lubricants Co., Limited Partnership and/or Calumet Finance Corp. and/or Calumet Penreco, LLC and/or Calumet Sales Company Incorporated and/or Calumet Superior, LLC and/or Calumet Missouri, LLC and/or all affiliated, associated and subsidiary Companies or Corporations or Partnerships or Joint Ventures as were, or are now or as may hereinafter be constituted and including those for whom the Assured has assumed responsibility to provide insurance all as their respective rights and interests may appear

**POLICY PERIOD:**

April 1, 2012 at 12:01 a.m.      To: April 1, 2013 at 12:01 a.m.
Local Standard Time at the above described mailing address

**POLICY LIMIT OF LIABILITY:**

USD650,000,000 (100%) any one Occurrence excess of the Retentions detailed herein and subject to the Sublimits as detailed below.

The Company will pay no more than its proportional share of the above limit(s) of liability, in any one occurrence.  In addition, the company will not be liable for more than its proportionate share of the following sublimits, which are part of and not in additional to the Limits of Liability.  Sub-limits apply excess of Retentions

**SUBLIMITS:**

| | | |
|---|---|---|
| In respect of the coverage provided for the peril of Named Windstorm in respect of the Dickinson location only | USD 40,000,000 | Annual Aggregate |
| In respect of the coverage provided for the peril of Flood — except: | USD100,000,000 | Annual Aggregate |
| - Flood at Karns City Plant, PA (Flood Zone A) | USD 40,000,000 | Annual Aggregate |
| - Flood at all other locations, except as specified below, within Flood Zone A or V (including all sub-zones thereof) | USD 1,000,000 | Annual Aggregate |

> Attached to and forming a part Policy No. B0180 E120600
> All other Terms and Conditions remain unchanged.

1



**EXHIBIT A**

Policy No. B0180 E120600

All the above sublimits for Flood shall apply as part of, not in addition to the overall Flood sublimit of USD100,000,000

| | | |
|---|---|---|
| In respect of the peril of Earthquake Shock or Volcanic Action | USD 25,000,000 | Annual Aggregate |
| In respect of the coverage provided under the Accounts Receivable Endorsement | USD 1,000,000 | Any one Occurrence |
| In respect of the coverage provided under the Civil Authority Endorsement | 60 Days/5 miles | Any one Occurrence |
| In respect of the coverage provided under the Contingent Business Interruption/ Contingent Extra Expense Clause of the Time Element Endorsement: | | |
| - arising from Direct Named Customers and Suppliers | USD10,000,000 | Any one Occurrence, except loss arising from Flood (all zones) at Westlake LA location(s) which subject to an Annual Aggregate |
| - arising from plant(s) located in Westlake, LA to owned and/or to Lyondell Basell Houston, TX and/or Conosol/South Hampton Silsbee TX contracts with Calumet | USD30,000,000 | |
| - arising from all other (unnamed) direct customers and suppliers | USD 2,500,000 | |
| In respect of the Incidental Course of Construction Endorsement | USD 10,000,000 | Any one Occurrence |
| In respect of the coverage provided under the Debris Removal Clause — the greater of 25% of the adjusted property loss or | USD 5,000,000 | Any one Occurrence |
| In respect of the coverage provided under the Demolition and Increased Cost of Construction Endorsement | USD 10,000,000 | Any one Occurrence |
| In respect of the coverage provided under the Errors & Omissions Endorsement | USD 1,000,000 | Any one Occurrence |
| In respect of the coverage provided under the Expediting Expenses Endorsement | USD 5,000,000 | Any one Occurrence |
| In respect of the coverage provided under the Extra Expense Clause of the Time Element Endorsement | USD 10,000,000 | Any one Occurrence |
| In respect of the coverage provided under the Fine Arts Endorsement | USD 50,000 | Any one Occurrence |

In respect of the coverage provided under the Fire Brigade Charges and Extinguishing Expenses

---

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

2



Policy No. B0180 E120600

| | | |
|---|---|---|
| Endorsement | USD    250,000 | Any one Occurrence |
| In respect of the coverage provided for Ingress/Egress under the Time Element Endorsement | 60 Days/5 miles | Any one Occurrence |
| In respect of the coverage provided under the Newly Acquired Locations (Automatic Acquisition) Endorsement | USD  25,000,000 | Subject to 90 day reporting |
| In respect of the coverage provided under the Pollutant Clean-up and Removal Endorsement | USD    500,000 | Annual Aggregate |
| In respect of the coverage provided under the Service Interruption Clause of the Time Element Endorsement | USD  10,000,000 | Any one Occurrence |
| In respect of licensed trailers (& trucks when attached); railroad rolling stock & contents and emergency vehicles while on scheduled premises | USD    100,000 | Any one Occurrence |
| In respect of the coverage provided under the Soft Costs/Additional Expense Endorsement | USD  1,000,000 | Any one Occurrence |
| In respect of the coverage provided under the Transit Endorsement | USD  2,500,000 | Any one Occurrence |
| In respect of the coverage provided under the Unnamed Locations Endorsement | USD  5,000,000 | Any one Occurrence |
| In respect of the coverage provided under the Valuable Papers and Records Endorsement | USD  1,000,000 | Any one Occurrence |

**RETENTIONS:**

| | | |
|---|---|---|
| Property Damage* for all risks not listed below | USD2,500,000 | Any one Occurrence |
| Flood (as defined) at Kams City, plant only | An amount equivalent to 2% of the scheduled property damage insured value of the location(s) affected by the loss, subject to a minimum of USD2,500,000 any one occurrence. | |
| Flood at all other locations in Flood Zones A and V (including all sub zones): | An amount equivalent to 2% of the scheduled property damage insured value of the location(s) affected by the loss, subject to a minimum of USD2,500,000 any one occurrence. | |
| Named Windstorm (as defined): | An amount equivalent to 2% of the scheduled property damage insured value of the location(s) affected by the loss, subject to a minimum of USD2,500,000 any one occurrence. | |

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

3



**EXHIBIT A**

Policy No. B0180 E120600

| Property in Transit | USD100,000 | Any one Occurrence |
|---|---|---|
| Time Element** | 90 days | Any one Occurrence |
| Service Interruption | 24-hour qualifier then above Property Damage and/or Time Element retention apply as applicable. | |

*Expediting Expense shall be included in the Property Damage Retention.

**Time Element shall include Business Interruption, Extra Expense, Contingent Business Interruption/Extra Expense, Service Interruption, and all other Time Element extensions provided.

If a number of hours/days apply as a Time Element Retention then the specified number of hours/days are to be applied immediately following the Occurrence.

Application of Retentions
If two or more Retention amounts within each coverage section apply to a single occurrence, the total Retention shall be the largest single retention applicable for that section. Property Damage and Time Element retentions will be applied separately.

VALUATION:

Real & Personal Property - Replacement Cost; Actual Cash Value if not replaced.

Time Element – Actual Loss Sustained (Gross Earnings form standards and definitions to apply).

Extra Expense – 100% Recovery

COINSURANCE:

No Coinsurance – Agreed Amount

SCHEDULE OF VALUES:

See Endorsement Numbers 13 & 19

ANNUAL PREMIUM:

USD 6,691,134 plus taxes and fees

Premium associated with Business Interruption is a provisional amount.  See Endorsement 19 for details.

---

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

4



**EXHIBIT A**

Policy No. B0180 E120600

NOTIFICATION OF CLAIMS TO:

John L. Wortham & Son, L.L.P., Agent
Attention: Mr. Alan Godso
P.O. Box 1388
Houston, Texas 77251

FORMS:

Subject to manuscript forms and endorsements attached.

POLICY JACKET:

In the event the policy form is attached to a Policy Jacket of Underwriters which contains conditions which conflict with the provisions of this Policy, the Underwriters agree to waive such conflicting conditions and substitute the terms of the Policy.

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

5



EXHIBIT A

Policy No. B0180 E120600

## SCHEDULE OF INSURERS

**Insurer's liability several not joint**

The liability of an insurer under this contract is several and not joint with other insurers party to this contract. An insurer is liable only for the proportion of liability it has underwritten. An insurer is not jointly liable for the proportion of liability underwritten by any other insurer. Nor is an insurer otherwise responsible for any liability of any other insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by an insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is an insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

**Insured with:**

| | |
|---|---|
| 10.000% | Swiss Re International SE, UK Branch. |
| 10.000% | SCOR UK Company Ltd |
| 3.750% | Lloyd's Syndicate SJC 2003 |
| 3.000% | International Insurance Co of Hannover Ltd. |
| 7.500% | Partner Re Ireland Insurance Limited |
| 3.000% | Lloyd's Syndicate AMA1200 |
| 2.000% | Lloyd's Syndicate BRT 2987 |

| | |
|---|---|
| 39.250% | of 100%. |

This Insurance, being signed for 39.250% of 100% insures only that proportion of any loss, whether total or partial, including but not limited to that proportion of associated expenses, if any, to the extent and in the manner provided in this Insurance.

The percentages signed in the Table are percentages of part of 39.250% of the amount(s) of Insurance stated herein.

---

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.



**EXHIBIT A**

Policy No. B0180 E120600

NAME OF INSURED:                    Calumet Specialty Products Partners L.P.

1.    **LOSS PAYABLE CLAUSE:**

Loss, if any, to be adjusted only with the Named Insured and payable to the Named Insured and/or Mortgagees and/or Additional Named Insured's, as their respective interests may appear, subject, nevertheless, to all the terms and conditions of the policy.

2.    **PROPERTY INSURED:**

The Company agrees to insure (subject to all the terms, conditions, limitations, exceptions, exclusions, provisions and stipulations of this policy):

A.    **ITEM NO. ONE** (Amount of Insurance)    Property Damage - Per Schedule of Locations (Endt. No. 13)

(Except as hereinafter excluded) real and personal property of the Insured of every kind and description, improvements and betterments, all buildings, tanks, structures, machinery, equipment and, on all contents therein and/or property of every description upon the premises as now or hereinafter constituted including electronic data processing equipment and media, valuable papers and records, accounts receivable, stock, materials or inventory, petroleum products in storage above and below ground, catalysts and refractory linings; all whether the Insured's own including property of the Insured's whilst in the care, custody or control of others or property of others whilst in the care, custody or control of the Insured or held in trust or on consignment or on commission or held in storage or for repairs or sold but not delivered or removed or property for which the Insured may be legally liable, or has assumed liability including the property of joint ventures, personal property of officers and employees of the Insured; all comprising a part of and/or appertaining to the Insured's operations located: Per schedule of Locations (Endt. No. 13).

B.    **ITEM NO. TWO** (Amount of Insurance) Time Element - Per Schedule of Locations (Endt. No. 19)

Time Element shall include Business Interruption, Extra Expense, Contingent Business Interruption/Extra Expense, Service Interruption, and all other Time Element extensions provided under Endorsement No. 19.

3.    **TERRITORY:**

This policy covers within the fifty states of the United States of America, the District of Columbia and Canada (excluding transportation, if covered, to and from Alaska and Hawaii).

4.    **PERILS INSURED AGAINST:**

This policy covers the property insured hereunder or as may be included by Endorsement hereto, against all risks of direct physical loss or damage occurring during the Policy Period, except as hereinafter excluded.

5.    **LIMIT OF LIABILITY:**

As respects Property Insured - Item Nos. One and Two, the total combined Limit of Liability under this policy shall in no event exceed The Policy Limit of Liability stated in the Declarations for loss, damage or expense arising from any one occurrence.

| Attached to and forming a part Policy No. B0180 E120600 |
| All other Terms and Conditions remain unchanged. |

7



EXHIBIT A

Policy No. B0180 E120600

6.  **SUBLIMITS:**

See Declarations.

7.  **RETENTIONS:**

See Declarations.

8.  **PROPERTY EXCLUDED:**

This policy does not cover:

a.  Currency, money, deeds, evidence of debt or title, bills, notes, securities, jewelry, precious or semi-precious stones, gold, silver, platinum and other precious alloys or metals (except platinum in process vessels), furs, fine arts, valuable papers, and accounts receivables, unless endorsed hereon;

b.  Land, land values, land restoration, landscaping, lawns, trees, plants, shrubs, standing timbers, crops, water, animals; except for Berms, Levees and/or Dikes intended for containment in terminal and/or plant operations areas damaged as a result of a covered peril herein;

c.  Cost of grading, excavations and fillings;

d.  Property while in transit, unless endorsed hereon;

e.  Architect's fees, unless endorsed hereon;

f.  All pilings, piers, docks, wharves, breasting dolphins, unless such property is within the boundary of an insured premises and in the value declared for such premises per the Schedule of Locations (End 13);

g.  Brick, stone or concrete foundations including pilings of buildings or structures which are below the under surface of the lowest floor, of where there is no pit or basement, which are below the surface of the ground inside the foundation walls of the buildings or structures, unless such property is damaged as a result of a covered peril herein;

h.  Brick, stone or concrete foundations of machinery or equipment which are below the surface of the ground, unless such property is damaged as a result of a covered peril herein;

i.  Underground and underwater piping and contents, fittings, conduits, drains and flues, except such property and contents on insured premises or when such is included in the values declared;

j.  Aircraft and their contents; satellite and/or spacecraft and their contents;

k.  Motor vehicles and/or trailers licensed for use on public highways and their contents (except licensed trailers (and their trucks) and contents therein on insured premises while not under control of common carrier);

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

8



EXHIBIT A

Policy No. B0180 E120600

l.    Hulls or waterborne vessels of every type, nature and description and their contents;

m.    Railroad or railway rolling stock and contents (except railroad or railway rolling stock and contents on insured premises while not under the control of public carrier);

n.    Earthen or concrete flow or storage pits or reservoirs and their contents, unless such property is within the boundary of an insured premises and in the value declared for such premises per the Schedule of Locations (End 13);

o.    All property specifically insured elsewhere;

p.    Property in course of construction, unless endorsed hereon;

q.    Any refractory lining or catalyst, except from the perils of fire, lightning, windstorm, hail, explosion, riot, riot attending a strike , civil commotion, aircraft, vehicles, smoke, flood, and earthquake;

r.    Crude oil, natural gas, coal or other minerals prior to recovery above ground;

s.    Underground caverns, subterranean strata and their contents; mines, slopes, shafts, tunnels, portals, pillars;

t.    Drilling and producing platforms, including rigs, derricks and equipment;

u.    Property located offshore or beyond the shoreline (in Gulf of Mexico off Texas and Louisiana, "offshore and beyond the shoreline" is to seaward of the inland edge of the Lease Block of the Plane Coordinate System, as defined on United States Department of the Interior, Bureau of Land Management Offshore Leasing Maps. Elsewhere, offshore shall mean the sea coasts of United States including Alaska), except that structures (and their contents) extending from land or shore are not to be considered as offshore;

v.    Electrical transmission and distribution lines and their supporting structures, distribution transformers, metering equipment, and accessories other than those on or within 1000 feet of the boundary of insured premises.

9.    <u>PERILS EXCLUDED:</u>

This policy does not insure:

a.    Misappropriation, secretion, conversion, embezzlement, infidelity or dishonesty of the Insured or any of his employees; nor loss or damage resulting from the Insured voluntarily parting with title or possession of any property if induced to do so by any fraudulent scheme, trick, device or false pretense; nor any unexplained loss, mysterious disappearance, or loss or shortage disclosed on taking inventory;



b.    Cost of making good faulty or defective material, faulty workmanship, errors or omissions in design, errors in processing or manufacture of the Insured's product, unless physical loss or damage by a peril not otherwise excluded by this Policy ensues, and then only for the actual loss or damage directly caused by such ensuing loss or damage;

c.    Mechanical or machinery breakdown or derangement, including rupture or bursting caused by centrifugal force, nor rupture, bursting or operation of pressure relief devices;

---

| Attached to and forming a part Policy No. B0180 E120600 |
| :---: |
| All other Terms and Conditions remain unchanged. |

9



<span style="color:red">**EXHIBIT A**</span>

Policy No. B0180 E120600

d.    Loss or damage caused by or resulting from electrical failure, electrical injury or disturbance to electrical appliances, devices, fixtures, or wiring caused by electrical currents artificially generated unless fire or explosion ensues, and then only for the actual loss or damage directly caused by such ensuing fire or explosion;

e.    Explosion, bulging, bursting, cracking, or rupture of steam boilers, or steam pipes, or steam turbines, or steam engines, or flywheel, or gas turbines, if owned by, leased by or operated under control of the Insured; and bulging, bursting, cracking of fired and unfired pressure vessels; except that this Company shall be liable for direct explosion loss caused by internal pressure of steam in processing machinery, equipment or apparatus, and direct loss resulting from the explosion of accumulated gases or unconsumed fuel within the firebox (or combustion chamber) of any fired vessel, other than gas turbines, or within the flues or passages which conduct the gases of combustion therefrom;

f.    Delay or loss of market;

g.    gradual deterioration, depletion, inherent vice, latent defect, ordinary wear and tear, dampness or dryness of atmosphere, extremes of temperature, smog, shrinkage, evaporation, loss of weight, rust, corrosion, erosion, wet or dry rot, change in flavor or color or texture or finish, unless physical loss or damage by a peril not otherwise excluded by this Policy ensues, and then only for the actual loss or damage directly caused by such ensuing loss or damage;

h.    loss or damage caused by or resulting from moth, vermin, termites or other insects, unless physical loss or damage by a peril not otherwise excluded by this Policy ensues, and then only for the actual loss or damage directly caused by such ensuing loss or damage;

i.    Loss or damage by normal settling, cracking, shrinkage, bulging or expansion in foundations, walls, floors or ceilings, unless physical loss or damage by a peril not otherwise excluded by this Policy ensues, and then only for the actual loss or damage directly caused by such ensuing loss or damage;

j.    Fines or penalties incurred or sustained by or imposed on the Insured at the order of any Government Agency, Court or other Authority arising from any cause whatsoever;

k.    Loss or damage resulting from the solidification of the contents of molten pots, molten pot lines and/or appurtenances;

l.    Pollution;

m.    Contamination;

n.    Seepage;

o.    Spillage or leakage Including cost of clean-up operations unless resulting from direct physical loss or damage to the tanks, taps or pipes by an insured peril; (cost of clean-up operations shall not cover for expenses of removal of any property or debris which discharges, releases, or escapes into or upon any watercourse or body of water whether above or below ground, nor for expenses of removal of any property or debris located off the premises of the insured);

p.    (i)    Asbestos material removal unless the asbestos is itself damaged by fire, lightning, aircraft impact, explosion, riot, civil commotion, smoke, vehicle impact, windstorm

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

10



**EXHIBIT A**

or hail, vandalism, malicious mischief, leakage or accidental discharge from automatic fire protective systems;

(ii)    Demolition or increased cost of reconstruction, repair, debris removal or loss of use necessitated by the enforcement of any law or ordinance regulating asbestos material;

(iii)    Any governmental direction or request declaring that asbestos material present in or part of or utilized on any undamaged portion of the Insured's property can no longer be used for the purpose for which it was intended or installed and must be removed or modified;

q.    Loss or damage caused directly or indirectly by:

(i)    Hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual impending or expected attack, a) by any government or sovereign power (dejure or de facto), or by any authority maintaining or using military, naval or air forces; b) by military, naval or air forces; c) by an agent of any such government, power, authority or forces;

(ii)    Any weapon of war employing atomic fission or radioactive force whether in time of peace or war;

(iii)    Insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an occurrence, seizure or destruction under quarantine or Customs regulations, confiscation by order of any government or public authority, or risks of contraband or illegal transportation or trade;

r.    Loss or damage caused directly or indirectly by nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, and whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by the peril(s) insured against in this policy; however, subject to the foregoing and all provisions of this policy, direct loss by fire resulting from nuclear reaction or nuclear radiation or radioactive contamination is insured against by this policy;

s.    Loss or damage caused by or resulting from freezing of plumbing, heating or fire protection systems in vacant properties;

t.    Control of Well (COW), Operator's Extra Expense (OEE) and/or Energy Exploration Development (EED), Loss of Hole and/or Redrilling Expenses.

10.    **VALUATION:** (As respects Real and Personal Property covered under Item No. One only):

In case of loss, the basis of adjustment unless otherwise endorsed hereon shall be as follows (Actual Cash Value as used in this policy shall be replacement cost less depreciation):

a.    Buildings and other structures, at actual cash value unless otherwise endorsed hereon;

b.    Machinery, equipment and any other insured property not otherwise provided for, at actual cash value at time and place of loss unless otherwise endorsed hereon;

c.    Improvements and betterments, at replacement cost at the time and place of loss if actually

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

11

Swiss Re

**EXHIBIT A**

Policy No. B0180 E120600

replaced; if not so replaced, at actual cash value on date of loss;

d.    Patterns and dies, at replacement cost if actually replaced; otherwise at actual cash value on date of loss;

e.    Finished goods and product sold but not delivered, at the Insured's net selling price after all discounts and unincurred expenses to which such property would have been subject had no loss occurred. Finished goods or product not sold, at replacement cost. (Finished goods shall be those goods on which the Insured, and/or others for the account of the Insured, shall have completed work to the extent that such goods are in a state ready for sale, normal to the business of the Insured);

f.    Raw stock and stock in process, at replacement cost with like kind and quality, at the time and place of loss;

g.    Catalyst or refractory linings, at actual cash value at the time and place of loss.

11.    **LIMITATIONS:**

A.    Books and Records:

As respects Item No. One, this policy limits coverage on books of account, abstracts, drawings, card index systems and other records (except film, tape, disk, drum, cell and other magnetic recording and storage media for electronic data processing), to not exceeding the cost of blank books, cards or other blank materials plus the cost of labor incurred by the Insured for transcribing or copying such records; on film, tape, disk, drum, cell and other magnetic recording and storage media for electronic data processing, to not exceeding the cost of such media in unexposed or blank form.

Employee's Tools and Wearing Apparel:

This policy also covers tools and wearing apparel of officers and employees, except in dwellings and living quarters, while on premises insured hereunder, subject to a limit of two hundred fifty dollars (USD250) on said property of any officer or employee in any one loss.

12.    **COINSURANCE:**

A.    As respects Item No. One only:

In consideration of the rate and/or form under which this policy is written, it is expressly stipulated and made a condition of this contract that the Insured shall at all times maintain contributing insurance on each item of property covered by this policy to the extent of at least Ninety percent (90%) of the actual cash value at the time of the loss, and that failing to do so, the Insured shall to the extent of such deficit bear his, or their proportion of any loss.

In the event that the aggregate claim for any loss is less than USD10,000 and less than 2% of the total amount of insurance upon the property described herein at the time such loss occurs, the Insured shall not be required to furnish any inventory of the undamaged property to establish the actual cash value referred in the Coinsurance Clause provided, however, that nothing herein shall be construed to waive the application of the Coinsurance Clause.

If this policy be divided into two (2) or more items, the foregoing conditions shall apply to

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

12



EXHIBIT A

Policy No. B0180 E120600

each item separately.

## GENERAL CONDITIONS APPLICABLE TO ALL ITEMS

13.  **PERMISSION CLAUSE:**

Permission is hereby granted:

A.   For other insurance;

B.   To do such work and to make such changes in the use of occupancy of the premises as is usual and/or incidental to the business of the Insured;

C.   To make alterations, additions, improvements and repairs;

D.   To work at any and all times;

E.   To shutdown or cease operations and for individual buildings to remain vacant or unoccupied without limit of time, but the entire plant not to cease operations, or to be vacant, or unoccupied for a period exceeding thirty (30) days at any one time;

F.   When not in violation of any law, statute, or municipal restriction, to do such work and to keep and use in the premises in unlimited quantities all such articles, materials, supplies and apparatus as may be necessary in their business;

G.   For motor vehicles to enter the premises for loading and other purposes.

14.  **CANCELLATION:**

This Policy may be cancelled at any time at the request of the Named Insured by surrender thereof to Underwriters or any of its authorised agents or by mailing to Underwriters written notice stating when thereafter such cancellation shall be effective. This Policy may be cancelled by Underwriters by mailing to the Named Insured at the address shown in this Policy written notice stating when, not less than 90 days thereafter (**10 days in respect of non-payment of premium**), such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The time of surrender or the effective date of the cancellation stated in the notice shall become the end of the Policy Period. Delivery of such written notice either by the Named Insured or by Underwriters shall be the equivalent to mailing.

IF CANCELLATION IS BY THE COMPANY OR BY THE INSURED, THE COMPANY WILL RETURN PRO-RATA UNEARNED PREMIUM. Premium adjustment may be made at the time cancellation is effective or as soon as practicable after cancellation becomes effective. The Underwriters' check or the check of their representative mailed or delivered as aforesaid shall be sufficient tender of any refund of premium due to the Insured.

15.  **EARTHQUAKE:**

Each loss by earthquake shock or volcanic action shall constitute a single claim hereunder; provided, if more than one (1) earthquake shock or volcanic action shall occur within any period of seventy-two (72) hours during term of this policy, such earthquake shocks or volcanic action shall be deemed to be a single loss within the meaning thereof. This Company shall not be liable for any loss caused by any earthquake shock or volcanic action occurring before the effective date and time of this policy, nor any loss occurring after the expiration date and time of this policy.

| Attached to and forming a part Policy No. B0180 E120600 |
| :---: |
| All other Terms and Conditions remain unchanged. |

13



**EXHIBIT A**

Policy No. B0180 E120600

16.  **FLOOD CLAUSE:**

The term flood shall mean waves, tide or tidal waves and the rising (including the overflowing or breaking of boundaries) of lakes, ponds, reservoirs, rivers, harbors, streams or similar bodies of water, all whether driven by wind or not, except as amended by the Named Windstorm Coverage Limitation Endorsement and the Flood Endorsement attached to this Policy . With respect to the peril of flood, any and all losses from this cause within seventy-two (72) hour period shall be deemed to be one (1) loss insofar as the limit of liability and deductible provisions of this policy are concerned.

17.  **FOAM LOSS ASSUMPTION CLAUSE:**

In consideration of the rate of premium at which this policy is written, this Company shall be liable for the loss to foam or other fire extinguishing materials lost, expended, or destroyed in fighting fire, involving property insured hereunder, including the loss to similar material which may be brought on the premises for the purpose of extinguishing fire already in progress at the time such materials are ordered and delivered, but the liability shall not exceed the combined value of such extinguishing materials which are on the premises, or on adjacent premises if such materials are jointly owned, at the time the fire originates.

If there shall be any other fire insurance on the property insured hereunder, this Company shall only be liable pro-rata with such other insurance whether such other insurance be against loss covered hereunder or not, and this Company shall only be liable pro-rata with all insurance covering in any manner the hazards or loss insured against by this policy anything in this policy to the contrary notwithstanding.

18.  **FIRE FIGHTING EXPENSE CLAUSE:**

This Company shall not be liable for any cost or expense in fighting fire except as provided by the Foam Loss Assumption Clause or unless endorsed hereon.

19.  **DEBRIS REMOVAL CLAUSE:**  (Applies Only to Items Of Insurance Covering Direct Property Loss)

This insurance covers expenses incurred in the removal of all debris of the property covered hereunder, from premises covered hereunder, which may be occasioned by loss caused by any of the perils insured against in this policy. However, the total liability under this policy for both loss to property and removal of debris shall not exceed the amount of insurance applying under this policy to the property damaged or destroyed.  This Company shall not be liable for more than the proportion of such debris removal expenses as the amount of insurance under this policy bears to the total amount of insurance on the property covered hereunder, whether or not all such insurance includes this clause.  Unless liability is otherwise specifically assumed by endorsement attached hereto, this Company shall not be liable for debris removal expense occasioned by the enforcement of any federal, state or municipal laws or ordinances which necessitate the demolition of any portion of property covered hereunder which has or has not suffered damage by any of the perils insured against.  Debris removal expense shall not be considered in the determination of actual cash value in the application of any co-insurance, average, distribution, or reduced rate contribution clause attached to this policy.

It is understood and agreed that the Company will not pay the expense to:

a.      Extract contaminants or pollutants from the debris, land, water, or atmosphere;

| Attached to and forming a part Policy No. B0180 E120600 |
| All other Terms and Conditions remain unchanged. |

14



**EXHIBIT A**

Policy No. B0180 E120600

b.    Remove, restore or replace contaminated or polluted land or water;

c.    Remove or transport any property or debris to a site for storage or decontamination, required because the property or debris is affected by pollutants or contaminants, whether or not such removal, transport, decontamination is required by law or regulation.

It is a condition precedent to recovery under this extension that the Company shall have paid or agreed to pay for physical loss or damage and that the Insured shall give notice to the Company of intent to claim for cost of removal of debris or cost of clean up NO LATER THAN TWELVE (12) MONTHS AFTER THE DATE OF SUCH PHYSICAL LOSS OR DAMAGE.

20.    POWER FAILURE LOSS EXCLUSION CLAUSE:

This Company shall not be liable for loss caused by or resulting from power, heating or cooling failure, unless such failure results from physical damage to power, heating or cooling equipment situated on premises where the property is located, caused by peril(s) insured against.

21.    OTHER INSURANCE:

In the event of loss, if there is other insurance in force covering any designated portion of the property against any or all the perils insured hereunder, or if any insurance covering more specifically any peril which occasioned such loss, or which would cover the same in the case of any of the foregoing but for the existence of this policy, the insurance hereunder shall be further limited to the excess, if any, beyond the amount which is or would have been payable under such other insurance had this policy not been effected, but in no event exceeding the amount insured under this policy. It is the intention of this policy to be construed as the initial surplus or excess insurance where any specific insurance exists on any or all of the property herein insured, and this insurance shall not apply or contribute until the amount collectible from such specific insurance shall be exhausted.

It is further understood and agreed that under this policy, the Insured shall be reimbursed to the extent of the difference between the amount collected from such specific insurance and the amount of actual loss sustained by the Insured, not exceeding, however, the limits of liability stipulated in this policy.  Further, surplus or excess insurance beyond the limits expressed in this policy is permitted, it being understood that any such excess or surplus insurance shall not be considered or held as contributing insurance in any clause under this policy.

22.    PRO-RATA LIABILITY CLAUSE:

The liability under this policy shall not exceed a greater proportion of any loss than the insurance hereunder bears to all insurance, whether collectible or not, covering in any manner the loss insured against by this policy.

23.    NO CONTROL:

This policy shall not be affected by failure of the Insured to comply with warranties contained in this contract in any portion of the premises over which the Insured has no control.

24.    BREACH OF WARRANTY:

If this policy covers two (2) or more buildings or the contents of two (2) or more buildings, the breach of any condition or warranty of the policy in any one (1) or more of the buildings insured or

| Attached to and forming a part Policy No. B0180 E120600 |
| :---: |
| All other Terms and Conditions remain unchanged. |

15



EXHIBIT A

Policy No. B0180 E120600

containing the property insured, shall not prejudice the right to recover for loss occurring in any building insured or containing the property insured, where at the time of the loss a breach of condition or warranty does not exist.

25.    INSPECTION OF PROPERTY AND OPERATIONS:

The Company shall be permitted but not obligated to inspect, at all reasonable times, any property of the Insured covered under this policy.  Neither the Company's right to make inspection nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the Named Insured or others, to determine or warrant that such property is safe or healthful.

26.    MISREPRESENTATION AND FRAUD:

This entire policy shall be void if, whether before or after a loss, the Insured has concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the Insured therein, or in case of any fraud or false swearing by the Insured relating thereto.

27.    MACHINERY:

In the event of loss of or damage to machinery consisting, when complete for sale of use, of several parts, the Company shall only be liable for the value of the part(s) lost or damaged.

28.    LABELS:

In the event of loss of or damage to labels, capsules or wrappers, the loss shall be adjusted on the basis of an amount sufficient to pay the cost of new labels, capsules or wrappers.

29.    PAIR, SET OR PARTS:

In the event of loss of or damage to:  (a) any article or articles which are a part of a pair or set, the measure of loss of or damage to such article or articles shall be a reasonable and fair proportion of the total value of the pair or set, giving consideration to the importance of said article or articles, but in no event shall such loss or damage be construed to mean total loss of the pair or set; or (b) any part of property covered consisting, when completed for use, of several parts, the Company shall be liable for the value of the part lost or damaged.

30.    REINSTATEMENT:

With the exception of loss caused by perils which are subject to Annual Aggregate Limits as noted in Sublimits Clause, it is a condition of this contract that in case of loss occurring hereunder, the amount of such loss shall be automatically reinstated after its occurrence without payment of additional premium for such reinstatement.

31.    DUTIES OF THE INSURED IN THE EVENT OF LOSS OR DAMAGE:

The Insured must see that the following are done in the event of loss or damage to Property Insured:

a.    Notify the police if a law may have been broken.

b.    Give the Company prompt notice of the loss or damage.  Include a description of the property involved.

---

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

---



EXHIBIT A

Policy No. B0180 E120600

c.   As soon as possible, give the Company a description of how, when and where the loss or damage occurred.

d.   Take all reasonable steps to protect the Property Insured from further damage by a Peril Insured Against. If feasible, set the damage property aside and in the best possible order for examination. Also keep a record of your expenses for emergency and temporary repairs, for consideration in the settlement of the claim. This will not increase the Limit of Liability or the Amount of Insurance.

e.   At the Company's request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

f.   Permit the Company or the Company's representative, to inspect the property and records proving the loss or damage.

      Also permit the Company to take samples of damaged property for inspection, testing and analysis.

g.   Notify the Company of the interest of the Insured and of all others in the business.

h.   Notify the Company of all other contracts of insurance, whether valid or not, covering in any manner the loss insured against by this policy.

i.   Notify the Company of any changes in the title, nature, location, encumbrance or possession of said business since the issuing of this policy; and by whom and for what purpose any building herein described and the several parts thereof were occupied at the time of damage or destruction.

j.   If requested, permit the Company to question you under oath at such times as may be reasonably required about any matter relating to this insurance or your claim, including your books and records. In such event, your answers must be signed.

k.   Send the Company a signed, sworn statement of loss containing the information we request to investigate the claim. You must do this within sixty (60) days after our request. We will supply you with the necessary forms.

l.   Cooperate with the Company in the investigation or settlement of the claim.

32.   **PAYMENT OF LOSS:**

All adjusted claims shall be paid or made good to the Insured within thirty (30) days after presentation and acceptance of satisfactory proof of interest and loss at the office of the Company. No loss shall be paid or made good if the Insured has collected the same from others.

33.   **SUBROGATION:**

In the event of a payment under this Policy, the Company shall be subrogated to the Insured's rights of recovery therefor against any party. The Insured shall execute and deliver instruments and papers and do whatever else is necessary to secure on behalf of the Company such rights of recovery provided, however, that the Company shall not acquire any rights of recovery which the Insured has expressly waived in writing prior to a loss insured hereunder. The insured, however,

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

17



EXHIBIT A

Policy No. B0180 E120600

may waive rights of recovery after a loss hereunder against a company which, at the time of the loss, was owned or controlled by the insured or a company which, at the time of the loss, owns or controls the insured.

34.  **SALVAGE AND RECOVERIES:**

In the event of any salvage or recovery arising out of a loss insured hereunder, such salvage or recovery shall accrue entirely to the benefit of the Company until the Company has been reimbursed in full the sum paid by it.

35.  **CLAIMS AGAINST THIRD PARTIES:**

In the event of any loss of or damage to the property covered hereunder, the Insured shall immediately make claim in writing against the carrier(s), bailee(s), or others involved.

36.  **PROTECTION OF PROPERTY:**

In the event of any loss or damage insured against, it shall be lawful and necessary for the Insured, his or their factors, servants and assigns, to sue, labor and travel for, in and about the defense, safeguard and recovery of the property insured hereunder, or any part thereof, without prejudice to this insurance, nor shall the acts of the Insured or the Company, in recovering, saving and preserving the property insured in case of loss be considered a waiver or an acceptance of abandonment. The expenses so incurred shall be borne by the Insured and the Company proportionately to the extent of their respective interests. However, the total liability under this policy for both loss to property, due to an insured peril, and the expenses incurred under this Protection of Property Clause shall not exceed the Limit of Liability applying under this policy to the property damaged or destroyed.

37.  **SUIT AGAINST THE COMPANY:**

No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless the Insured shall have complied with the requirements of this policy nor unless commenced within twelve (12) months of declination of claim by the Company, unless a longer period of time is provided by applicable statute.

*[handwritten: 12/8/12 Incident new claim closed?]*

38.  **IMPAIRMENT OF RECOVERY RIGHTS:**

Any act of agreement by the Insured before or after loss or damage whereby any right of the Insured to recover in whole or in part for loss or damage to property covered hereunder against any carrier, bailee or other party liable therefore, is released, impaired or lost, shall render this policy null and void, but the Insurer's right to retain or recover the premium shall not be affected. The Company is not liable for any loss or damage which, without its written consent, has been settled or compromised by the Insured.

39.  **NO BENEFIT TO BAILEE:**

This insurance shall in no wise inure directly or indirectly to the benefit of any carrier or other bailee.

40.  **COMPANY'S OPTIONS:**

It shall be optional with the Company to take all, or any part, of the property at the agreed or appraised value, and also to repair, rebuild or replace the property destroyed or damaged with other of like kind and quality within a reasonable time, on giving notice of its intention to do so within thirty

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

18



EXHIBIT A

(30) days after the receipt of the proof of loss so herein required.

41.  ABANDONMENT:

There can be no abandonment to this Company of the property insured.

42.  PRIVILEGE TO ADJUST WITH OWNER:

In the event of loss of or damage to property of others held by the Insured for which claim is made upon the Company, the right to adjust such loss or damage with the owner or owners of the property is reserved to the Company and the receipt of such owner or owners in satisfaction thereof shall be in full satisfaction of any claim of the Insured for which such payment has been made. If legal proceedings be taken to enforce a claim against the Insured as respects any such loss or damage, the Company reserves the right at its option without expense to the Insured, to conduct and control the defense on behalf of and in the name of the Insured. No action of the Company in such regard shall increase the liability of the Company under this policy, nor increase the limits of liability specified in the policy.

43.  EXAMINATION UNDER OATH:

The Insured, as often as may be reasonably required, shall exhibit to any person designated by the Company all that remains of any property herein described, and shall submit, and in so far as is within his or their power cause his or their employees, members of household and others to submit, to examinations under oath by any person named by the Company and subscribe the same; and, as often as may be reasonably required, shall produce for examination all writings, books of account, bills, invoices and other vouchers, or certified copies thereof if originals be lost, at such reasonable time and place as may be designated by the Company or its representative, and shall permit extracts and copies thereof to be made. No such examination under oath or examination of books or documents, nor any other act of the Company or any of its employees or representatives in connection with the investigation of any loss or claim hereunder, shall be deemed a waiver of any defense which the Company might otherwise have with respect to any loss or claim, but all such examinations and acts shall be deemed to have been made or done without prejudice to the Company's liability.

44.  EXAMINATION OF RECORDS:

The Insured shall, as often as may be reasonably required during the term of this policy and for one (1) year thereafter, produce for examination by the Company or its duly authorized representative all the books and records, inventories and accounts referred to above, relating to the property covered hereunder.

45.  RECORDS AND INVENTORY:

The Insured shall keep accurate books, records and accounts in the following manner:

A.    A detailed and itemized inventory record of all property covered hereunder shall be maintained and physical inventory shall be taken periodically at intervals not more than twelve (12) months apart;

B.    A set of books showing a complete record of the business transacted including all purchases and sales for both cash and credit;

C.    Detailed records of: (a) the property of others in his or their custody and control, (b) all

---

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.



EXHIBIT A

Policy No. B0180 E120600

travelers stocks and (c) property sent to others for any purpose;

D.    All such books, records and accounts shall be preserved for not less than one (1) year following the termination of this policy and any renewal thereof.

46.    APPRAISAL CLAUSE:

If the Company and the Insured disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss.  In this event, each party will select a competent and impartial appraiser.  The two appraisers will select an umpire.  If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction.  The appraisers will state separately the value of the property and amount of loss.   If they fail to agree, they will submit their difference to the umpire.   A decision agreed to by any two will be binding.   Each party will:

A.    Pay its chosen appraiser; and

B.    Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

47.    CHANGES:

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or stop the Company from asserting any right under the terms of this policy, nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy.

48.    CONFORMITY TO STATUTE:

Terms of this policy, which are in conflict with the statutes of the state wherein this policy is issued, are hereby amended to conform to such statutes.

49.    TITLES AND PARAGRAPHS:

The several titles of the various paragraphs of this form (and of endorsements and supplemental contracts, if any, now or hereafter attached to this policy) are inserted solely for convenience of reference and shall not be deemed in any way to limit or affect the provisions to which they relate.

50.    CONFLICT OF WORDING:

The conditions contained in this form shall supersede those of the basic policy to which this form is attached wherever the same may conflict.

| Attached to and forming a part Policy No. B0180 E120600 |
| All other Terms and Conditions remain unchanged. |



EXHIBIT A

Policy No. B0180 E120600

<u>REPLACEMENT COST ENDORSEMENT</u>
(Applicable to Item No. One Only)

1.    The Coinsurance Clause that is made a part of this policy to apply only to the item(s) to which this endorsement applies, is hereby deleted.

2.    The provisions of this policy applicable only to such item(s) are amended to substitute the term "replacement cost" (without deduction for depreciation) for the term "actual cash value" wherever it appears in this policy, subject, however, in all other respects to the provisions of this endorsement and of the policy to which this endorsement is attached.

3.    This endorsement shall not apply to stock (raw, in process or finished) or merchandise, including materials and supplies in connection therewith, property of others, household furniture or residential contents, or to manuscripts; or to paintings, etchings, pictures, tapestries, statuary, marbles, bronzes, antique furniture, rare books, antique silver, porcelains, rare glassware and bric-a-brac, or other articles of art, rarity or antiquity; or to any refractory lining or catalyst.

4.    This Company shall not be liable under this endorsement for any loss:

    a.    occasioned directly or indirectly by enforcement of any ordinance or law regulating the use, construction, repair or demolition of property unless such liability has been specifically assumed under this policy;

    b.    unless and until the damaged or destroyed property is actually repaired or replaced by the Insured with due diligence and dispatch.

5.    The Insured may elect to make claim under this policy in accordance with its provisions, disregarding this endorsement, except that the foregoing Coinsurance Clause applicable to the replacement cost of said property shall apply; and the Insured may make further claim for any additional liability brought about by this endorsement in accordance with its provisions, provided this company is notified in writing within 180 days after loss of the Insured's intent to make such further claim.

6.    This Company's liability for loss on a replacement cost basis shall not exceed the smallest of the following amounts:

    a.    the amount of the policy applicable to the damaged or destroyed property;

    b.    the replacement cost of the property or any part thereof similar with such property on the same or another premises and intended for the same occupancy and use; or

    c.    the amount actually and necessarily expended in repairing or replacing said property or any part thereof.

    Replacement cost shall be deemed to include the functional replacement of such property that is obsolete or replaceable with more efficient items not more expensive than replacement cost of the original, these items to function or operate and produce the same or similar quality, effect or objective.

Page 1 of 2                                                          End. No. 1

---

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

---

21



EXHIBIT A

Policy No. B0180 E120600

7.    APPORTIONMENT CLAUSE: This Company shall not be liable under this policy including this endorsement for a greater proportion of any loss than the amount of this policy applying to the property to which this endorsement applies bears to the total amount of insurance on such property against the peril involved, whether or not such other insurance includes the extension of coverage provided under this endorsement, and whether such other insurance is collectible or not.

8.    If the coverage on property under this policy be divided into two or more items, all of the foregoing shall apply separately to each item to which this endorsement applies.

Effective Date    1st April 2012                           Expiration Date    1st April 2013

Issued to  Calumet Specialty Products Partners, L.P.

End. No. 1

Page 2 of 2

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

22



**EXHIBIT A**

Policy No. B0180 E120600

<u>POLLUTANT CLEAN-UP AND REMOVAL ENDORSEMENT</u>

Subject to the limit of liability contained within this endorsement, this insurance is amended to cover the necessary and reasonable expenses actually incurred by the Insured to clean up and remove Pollutants from land or water confined to Property Insured if the release, discharge or dispersal of the Pollutants is caused by or results in Fire, Lightning, Removal, Wind and Hail, Flood, Earthquake Shock or Volcanic Action, leakage from Fire protective Equipment, Explosion, Smoke, Aircraft and Vehicles, Sonic Shock Wave, Riot, Civil Commotion and Vandalism, Molten Material, or Civil or Military Authority which occurs during the Policy Period except no liability is assumed for the expense to clean up and remove Pollutants from land or water at any Miscellaneous Unnamed Location.

<u>Limit of Liability:</u>
Liability for loss under this Pollutant Clean-up and Removal provision arising out of one Occurrence or in the aggregate for all such losses in any one policy year shall not exceed <u>the amount stated in the Declarations.</u>

No liability shall exist under this Pollutant Clean-up and Removal provision unless such expenses are reported to the Companies within 180 days of the date of direct physical loss or damage or the expiration of this Contract of Insurance, whichever shall be earlier.

<u>Definition of "Pollutants":</u>
When the term "Pollutants" is used in this Contract of Insurance, it shall mean any solid, liquid, gaseous or thermal irritant or contaminant, including, but not limited to, smoke, vapor, soot, fumes of such irritant or contaminant, acids, alkalis, chemicals, bacteria, virus, vaccines and waste irritant or contaminant.  Waste includes materials to be recycled, reconditioned or reclaimed.

<u>Water Exclusion:</u>
This Contract of Insurance does not cover loss to or loss resulting from physical damage to water except water which is normally contained within any type of tanks, piping system or other process equipment.

<u>Pollution Exclusion:</u>
This Contract of Insurance does not insure against the release, discharge or dispersal of Pollutants, or loss or damage caused thereby, regardless of any other cause or event contributing concurrently or in any other sequence to the loss or damage, except to the extent the release, discharge or dispersal is caused by or results in Fire, Lightning, Removal, Wind and Hail, Flood, Earthquake Shock or Volcanic Action, Leakage from Fire Protective Equipment, Explosion, Smoke, Aircraft and Vehicles, Sonic Shock Wave, Riot, Civil Commotion and Vandalism, Molten Material, or Civil or Military Authority.

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of the Policy, except as hereinabove set forth.

Effective Date    1st April 2012                                  Expiration Date    1st April 2013

Issued to  Calumet Specialty Products Partners, L.P.
                                                                                              End. No. 2

| Attached to and forming a part Policy No. B0180 E120600 |
| All other Terms and Conditions remain unchanged. |

23



<span style="color:red">EXHIBIT A</span>

EXHIBIT A

Policy No. B0180 E120600

## DEMOLITION AND INCREASED COST OF CONSTRUCTION ENDORSEMENT

Liability for loss under this Endorsement arising out of one occurrence shall not exceed <u>the amount stated in the Declarations.</u>

In the event of loss or damage by an insured peril under this policy that causes the enforcement of any law or ordinance regulating the construction or repair or damaged facilities, underwriters shall be liable for:

A.    The cost of demolishing the undamaged facilities including the cost of clearing site;

B.    The proportion that the value of the undamaged part of the facility bears to the value of the entire facility prior to loss;

C.    Increased cost of repair or reconstruction of the damaged and undamaged facility on same or another site and limited to the minimum requirements of such law or ordinance regulating the repair or reconstruction of the damaged property on the same site.  However, the Company shall not be liable for any increased cost of construction loss unless the damaged facility is actually rebuilt or replaced.

It is understood and agreed that this policy does not cover any increase of loss occasioned by the enforcement of any law or ordinance regulating any form of pollution or necessitated by any regulation or ordinance of the environmental protection agency.

The above sub-limit is part of and not in addition to the limit of liability on the face of the policy.

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of the policy, except as hereinabove set forth.

Effective Date    1st April 2012

Expiration Date    1st April 2013

Issued to  Calumet Specialty Products Partners, L.P.

End. No.  3

> Attached to and forming a part Policy No. B0180 E120600
> All other Terms and Conditions remain unchanged.

24



EXHIBIT A

Policy No. B0180 E120600

<u>TRANSIT ENDORSEMENT</u>

1.    This policy covers property insured while in due course of transit only at risk of the Insured within and between the states of the United States, the District of Columbia and Canada, excluding Alaska and Hawaii, from the time the property leaves the store, warehouse or factory at initial point of shipments and continuously thereafter; including while on docks, wharves, piers, bulkhead, depots, stations or platforms, until delivered at the store, warehouse or factory at destination.

2.    This Company's liability under this policy shall not exceed:

    a.    <u>USD2,500,000</u> while in the custody of any Truckman or Trucking Company;

    b.    <u>USD2,500,000</u> while in the custody of any Railroad or the Railway Express Agency (including while on ferries and/or in railroad cars on transfers or lighters);

    c.    <u>USD2,500,000</u> while in the custody of a Scheduled Air Transportation carrier;

    d.    <u>USD2,500,000</u> while in trucks, trailers or semi-trailers owned, leased or operated by or for the Insured;

    e.    <u>USD2,500,000</u> while in the custody of messengers or while contained in or on hand carts, hand trucks or taxicabs.

    f.    <u>USD2,500,000</u> while in Inland Waterways.

In no event shall this Company be liable for more than <u>USD2,500,000</u> in any one occurrence, either in case of partial or total loss, or salvage charges, or any other charges, or expenses, or all combined.

3.    <u>ADDITIONAL EXCLUSIONS APPLICABLE TO TRANSIT:</u>

This Endorsement does not insure:

    a.    Against loss or damage resulting from inadequate packing or improper preparation for shipment or from insecure stowage when not stowed by the carrier;

    b.    Against loss, damage or expense caused by or resulting from strikes, lockouts, labor disturbances, riots, civil commotions, or the acts of any persons taking part in any such occurrence or disorder;

    c.    Import shipments except only after Marine Insurance has ceased to cover, nor export shipments after laden on board export conveyance or under the protection of Marine Insurance, whichever first occurs;

    d.    Shipments by mail or parcel post;

End. No. 4

Page 1 of 2

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

25

Swiss Re

**EXHIBIT A**

Policy No. B0180 E120600

---

e.    Against loss caused by neglect of the Insured to use all reasonable means to save and preserve the property at and after any disaster insured against.

4.    VALUATION:

The property shall be valued at actual invoice cost, including prepaid or advanced freight, if any, together with such costs and charges (including the commission of the Insured as selling agent, but excluding duty), as may have accrued and become legally due thereon. In the event of there being no invoice, the valuation of the merchandise insured hereunder shall be the actual cash value of the property insured at point of destination on the date of disaster.

5.    CLAIM AGAINST CARRIER:

In the event of any loss or damage to the goods and/or merchandise insured hereunder, the Insured shall immediately make claim in writing against the carrier or carriers involved.

6.    OTHER INSURANCE:

If at the time of loss or damage there is available to a Named or unnamed Insured or any other interested party any other insurance which would apply in the absence of this policy, the insurance under this policy shall apply only as excess insurance over such other insurance.

7    IMPAIRMENT OF RECOVERY RIGHTS:

Any act or agreement by the Insured before or after loss or damage whereby any right of the Insured to recover in whole or in part for loss or damage to property covered hereunder against any carrier, bailee or other party liable therefore, is released, impaired or lost, shall render recovery under this Endorsement null and void, but the Insurer's right to retain or recover the premium shall not be affected. The Company is not liable for any loss or damage which, without its written consent, has been settled or compromised by the Insured. It shall, however, be permissible for the Insured without prejudice to this insurance, to accept the ordinary Bills of Lading or Shipping Receipts issued by carriers limiting their liability to less than the actual value.

No other part of this Policy or Endorsement attached hereto shall be affected or altered by the terms of this Endorsement.

Effective Date    1st April 2012

Expiration Date    1st April 2013

Issued to Calumet Specialty Products Partners, L.P.

End. No.  4

Page 2 of 2

---

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

---

26

Swiss Re

EXHIBIT A

Policy No. B0180 E120600

## UNNAMED LOCATIONS ENDORSEMENT

This Policy provides coverage for unnamed locations that the Insured has an insurable interest in.  This coverage excludes loss or damage to unnamed locations caused by the perils of Flood in Zones A or V including all sub-zones thereof, Earthquake Shock in the State of California or Named Windstorm.

Liability for loss under this Endorsement arising out of one occurrence shall not exceed the amount stated in the Declarations.

Effective Date        1st April 2012                                          Expiration Date    1st April 2013

Issued to Calumet Specialty Products Partners, L.P.

End. No. 5

| Attached to and forming a part Policy No. B0180 E120600 |
| All other Terms and Conditions remain unchanged. |

27

Swiss Re

**EXHIBIT A**

EXHIBIT A

Policy No. B0180 E120600
_____

### NEWLY ACQUIRED LOCATIONS (AUTOMATIC ACQUISITION) ENDORSEMENT

This policy is extended to automatically insure, subject to the policy terms and conditions, up to a value of USD25,000,000 on any location or property acquired or comes at risk to the Insured during the Policy Period within the Territorial Limits of this Policy.

If the location or property acquired or comes at risk to the Insured is greater than the amount specified above, this Policy shall provide automatic coverage provided that the Insurer is notified within ninety (90) days of such location or property and additional premium shall be due and payable for values so reported from the date the property is acquired.

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of the Policy, except as hereinabove set forth.

Effective Date    1st April 2012                              Expiration Date    1st April 2013

Issued to        Calumet Specialty Products Partners, L.P.

                                                                        End. No. 6

| Attached to and forming a part Policy No. B0180 E120600 |
| --- |
| All other Terms and Conditions remain unchanged. |

28



EXHIBIT A

Policy No. B0180 E120600

## VALUABLE PAPERS AND RECORDS ENDORSEMENT

Liability for loss under this endorsement arising out of one occurrence shall not exceed the amount stated in the Declarations. This sub-limit is part of and not in addition to the limit of liability stated in the Declarations.

In consideration of the premium charged and subject to all terms, conditions and stipulations of the policy to which this endorsement is attached, not in conflict herewith, this policy is extended to insure against valuable papers and records.

1.   PROTECTION OF VALUABLE PAPERS AND RECORDS:  Insurance under this Coverage Section shall apply only while valuable papers and records are contained in the premises covered hereunder, it being a condition precedent to any right of recovery hereunder that such valuable papers and records shall be kept in the receptacle(s) on the premises covered hereunder at all times when the premises are not open for business, except while such valuable papers and records are in actual use.

2.   ADDITIONAL EXCLUSIONS:

     THIS COVERAGE SECTION DOES NOT APPLY:

     A.   to loss directly resulting from errors or omissions in processing or copying unless fire or explosion ensues and then only for direct loss caused by such ensuing fire or explosion;

     B.   to loss or property held as samples for sale or for delivery after sale;

3.   SPECIAL CONDITIONS:

     A.   OWNERSHIP OF PROPERTY; INTEREST COVERED: The property covered may be owned by the Insured or held by him in any capacity, provided the insurance applies only to the interest of the Insured in such property, including the Insured's liability to others, and does not apply to the interest of any other person or organization in any said property unless included in the Insured's proof of loss.

     B.   LIMITS OF LIABILITY;  VALUATION;  SETTLEMENT OPTION:   The limit of this Company's liability for loss shall not exceed the actual cash value of the property at time of loss nor what it would then cost to repair or replace the property with other of like kind and quality, nor the applicable limit of insurance stated in this Coverage Section. The Company may pay for the loss in money or may repair or replace the property and may settle any claim for loss of the property either with the Insured or the owner thereof.  Any property so paid for or replaced shall become the property of this Company.  The Insured or this Company, upon recovery of any such property, shall give notice thereof as soon as practicable to the other and the Insured shall be entitled to the property upon reimbursing this Company for the amount so paid for the cost of replacement.

     Application of the insurance to property of more than one person shall not operate to increase the applicable limit of insurance.

End. No. 7

Page 1 of 2

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

29

Swiss Re

<span style="color:red">EXHIBIT A</span>

Policy No. B0180 E120600

4.    <u>DEFINITIONS (applicable to this Endorsement only):</u>

A.    Valuable Papers and Records - The term "valuable papers and records" means written, printed or otherwise inscribed documents and records including books, Maps, films, drawings, abstracts, deed, mortgages and manuscript, but does not mean money or securities.

B.    Premises - The unqualified word "premises" means the interior of that portion of the building at the location insured hereunder.

C.    Money - means currency, coins, bank notes and bullion; and travelers checks, register checks and money orders held for sale to the public.

D.    Securities - means all negotiable and non-negotiable instruments or contracts representing either money or other property and includes revenue and other stamps in current use, tokens and tickets, but does not include money.

E.    Loss - includes damage.

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of the policy, except as hereinabove set forth.

Effective Date    1st April 2012                            Expiration Date    1st April 2013

Issued to Calumet Specialty Products Partners, L.P.

                                                                End. No.  7

Page 2 of 2

---

| Attached to and forming a part Policy No. B0180 E120600 |
| All other Terms and Conditions remain unchanged. |

30

Swiss Re

EXHIBIT A

Policy No. B0180 E120600

## ACCOUNTS RECEIVABLE ENDORSEMENT

Liability for loss under this endorsement arising out of one occurrence shall not exceed the amount stated in the Declarations. This sub-limit is part of and not in addition to the limit of liability stated in the Declarations.

In consideration of the premium charged and subject to all terms, conditions and stipulations of the policy to which this endorsement is attached, not in conflict herewith, this policy is extended to insure against accounts receivable as follows:

1.    **THIS COMPANY AGREES TO PAY:**

    A.    All sums due the Insured from customers, provided the Insured is unable to effect collection thereof as the direct result of loss of or damage to records of accounts receivable;

    B.    Interest charges on any loan to offset impaired collections pending repayment of such sums made uncollectible by such loss or damage;

    C.    Collection expense in excess of normal collection cost and made necessary because of such loss or damage;

    D.    Other expenses when reasonably incurred by the Insured in reestablishing records of accounts receivable following such loss or damage.

2.    **PROTECTION OF RECORDS OF ACCOUNTS RECEIVABLE.**  Insurance under this Coverage Section shall apply only while records of accounts receivable are contained in the premises Insured hereunder it being a condition precedent to any right of recovery hereunder that such records shall be kept in the receptacle(s) described hereunder at all times when the premises are not open for business, except while such records are in actual use.

3.    **ADDITIONAL EXCLUSIONS**

THIS COVERAGE SECTION DOES NOT APPLY:

    A.    to loss due to bookkeeping, accounting or billing errors or omission;

    B.    to loss, proof of which as to factual existence, is dependent upon an audit of records or an inventory computation; but this shall not preclude the use of such procedures in support of claim for loss which the Insured can prove, through evidence wholly apart therefrom, is due solely to a risk of loss to records of accounts receivable not otherwise excluded hereunder;

    C.    to loss due to alteration, falsification, manipulation, concealment, destruction or disposal of records of accounts receivable committed to conceal the wrongful giving, taking, obtaining or withholding of money, securities or other property but only to the extent of such wrongful giving, taking, obtaining, or withholding.

End. No. 8

Page 1 of 2

| Attached to and forming a part Policy No. B0180 E120600 |
| :---: |
| All other Terms and Conditions remain unchanged. |

31



**EXHIBIT A**

Policy No. B0180 E120600

4.   SPECIAL CONDITIONS

A.   DEFINITION OF PREMISES:  The unqualified word "premises" means the interior of that portion of the building at the location insured hereunder.

B.   DETERMINATION OF RECEIVABLES:  DEDUCTIONS - When there is proof that a loss covered by this Coverage Section has occurred but the Insured cannot accurately establish the total amount of accounts receivable outstanding as of the date of such loss, such amount shall be based on the Insured's monthly statements and shall be computed as follows:

1.   determine the amount of all outstanding accounts receivable at the end of the same fiscal month in the year immediately preceding the year in which the loss occurs;

2.   calculate the percentage of increase or decrease in the average monthly total of accounts receivable for the twelve months immediately preceding the month in which the loss occurs, or such part thereof for which the Insured has furnished monthly statements to the Company, as compared with such average for the same months of the preceding year;

3.   the amount determined under 1 above, increased or decreased by the percentage calculated under 2 above; shall be the agreed total amount of accounts receivable as of the last day of the fiscal month in which said loss occurs;

4.   the amount determined under 3 above shall be increased or decreased in conformity with the normal fluctuations in the amount of accounts receivable during the fiscal month involved, due consideration being given to the experience of the business since the last day of the last fiscal month for which statement has been rendered.

There shall be deducted from the total amount of accounts receivable, however established, the amount of such accounts evidenced by records not lost or damaged, or otherwise established or collected by the Insured, and an amount to allow for probable bad debts which would normally have been uncollectible by the Insured.  All unearned interest and service charges shall be deducted.

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of the Policy, except as hereinabove set forth.

Effective Date   1st April 2012                                    Expiration Date   1st April 2013

Issued to Calumet Specialty Products Partners, L.P.

End. No. 8

Page 2 of 2

| Attached to and forming a part Policy No. B0180 E120600 |
| All other Terms and Conditions remain unchanged. |

32

Swiss Re

EXHIBIT A

Policy No. B0180 E120600

## BIOLOGICAL OR CHEMICAL MATERIALS EXCLUSION

It is agreed that this Insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with the actual or threatened malicious use of pathogenic or poisonous, biological or chemical materials regardless of any other cause or event contributing concurrently or in any other sequence thereto.

NMA2962
06/02/03

Effective Date    1st April 2012                                    Expiration Date    1st April 2013

Issued to  Calumet Specialty Products Partners, L.P.

                                                                        End. No. 9

| Attached to and forming a part Policy No. B0180 E120600 |
| All other Terms and Conditions remain unchanged. |

33



EXHIBIT A

Policy No. B0180 E120600

## FIRE BRIGADE CHARGES & EXTINGUISHING EXPENSES

The Company will pay when insured property is damaged or destroyed by an insured peril:

a.    fire brigade charges and other extinguishing expenses for which the Insured may be assessed;

b.    lost fire extinguishing materials expended.

Liability for loss under this endorsement arising out of one occurrence shall not exceed the amount stated in the Declarations.

Effective Date    1st April 2012

Issued to Calumet Specialty Products Partners, L.P.

Expiration Date    1st April 2013

End. No. 10

| Attached to and forming a part Policy No. B0180 E120600 |
| All other Terms and Conditions remain unchanged. |

34



**EXHIBIT A**

Policy No. B0180 E120600

## POLITICAL RISKS EXCLUSION

Loss of property due to Political Risks is hereby excluded. Political Risks are defined are follows:

"Confiscation, expropriation, nationalization, commandeering, requisition or destruction of or damage to property by order of the Government de jure or de facto or any public, municipal or local authority of the country or area in which the property is situated; seizure or destruction under quarantine or customs regulation"

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of the policy, except as herein above set forth.

Effective Date    1st April 2012

Expiration Date   1st April 2013

Issued to  Calumet Specialty Products Partners, L.P.

End. No.  11

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

35

Swiss Re

**EXHIBIT A**

EXHIBIT A

Policy No. B0180 E120600

### BOILER AND MACHINERY ENDORSEMENT

1.  **COVERAGES:**

    **COVERAGE A : LOSS ON PROPERTY OF INSURED**

    To pay for loss on property of the Insured, and property of others in the care, custody or control of the Insured for which the Insured is legally liable, directly damaged by the boiler and machinery peril (or, if this company so elects, to repair or replace such damaged property).

    **COVERAGE B: REPLACEMENT COST**

    To pay to the extent of any indemnity remaining after payment of all loss as may be required under Coverage A that amount actually expended by the Insured to repair or replace property of the Insured directly damaged by the boiler and machinery peril which is in excess of the actual cash value of such property at the time of loss.

2.  **COMBINED LIMITS AND DEDUCTIBLE AMOUNT:**

    A.  **Combined Limit of Loss** - as respects any covered premises, the Company's Total Liability for loss of the kinds insured against under this section, or under the provisions forming a part of this section, resulting from any one Accident shall in no event exceed the Limit of Liability of this Policy stated in the Declarations

    B.  **COMBINED RETENTION AMOUNT:**

        With respect to any one accident, it is agreed that the total amount of any loss and expense for which the company is liable under this section or endorsements forming a part thereof there shall apply excess of the applicable retention stated in the Declarations and the insurance under this section and endorsements therefore shall not apply to any part of such Retention.

3.  **ORDER OF PAYMENTS**

    Payments within the Limit of any one Accident provided shall be determined in the following fixed order, and the portion of the Limit applicable to each Coverage of this section shall be extent of any indemnity remaining after payment of all loss as may be required under all preceding Coverages.

    A.  Coverage A - Loss on Property of Insured

    B.  Coverage B - Repair or Replacement

    C.  Coverage C - Expediting Expenses

    D.  Business Interruption - Extra Expense

**LOCATIONS:**  Per Endorsement No. 13

End. No. 12

| Attached to and forming a part Policy No. B0180 E120600 |
| :---: |
| All other Terms and Conditions remain unchanged. |

36

Swiss Re

**EXHIBIT A**

Policy No. B0180 E120600

OBJECTS INSURED AT THE ABOVE LOCATIONS:

A.  The following objects described below are covered by this section, while the object is in use or connected ready for use, located on the premises of the Insured:

      Comprehensive - Including Production Machines

B.  With respect to any property hereafter acquired by the Insured any Object in use or connected ready for use at the time said property is acquired and which would be included by any object description shall be considered as added to the policy as of the time said property is acquired by the Insured, all subject to the following conditions:

    1.  Where such property falls within the limit provided under the Newly Acquired Locations Endorsement, any Object shall be covered automatically.

    2.  Property that falls outside the limit provided under the Newly Acquired Locations Endorsement shall be subject to the following:

       a)  The Insured shall notify the Company in writing within ninety (90) days after the date said property is acquired.

       b)  The Insured agrees to pay an additional premium for insurance in accordance with the Company's Manual of Rules and Rates applicable to such change.

    3.  Loss from an accident to any Object shall be subject to the highest Limit Per Accident applicable to any object, which would be included by any Object, or Description designated and described in any Boiler and Machinery Object Description attached to the policy.

    4.  This Coverage shall only apply to any Object within the Territorial Limits of this Policy.

    5.  In consideration of the premium charged it is agreed that as respects any turbine-generator unit newly installed, at any Generating or Power Station presently insured or to be added to the Policy shall be subject to the following conditions:

       a.  When said Objects have successfully and satisfactorily completed all tests as specified in any contract for purchase of installation of said object and,

       b.  the object is formally accepted by the insured and committed to the utility company's system dispatcher of unrestricted use.

    6.  It is further agreed that applicable premium due for the newly installed equipment shall be computed on the pro rata basis at the time such coverage becomes effective.

End. No. 12

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

37

Swiss Re

**EXHIBIT A**

A.    Definition of "Object" means any:

    1.    Boiler, fired vessel, or unfired vessel normally subject to vacuum or internal pressure other than weight of its contents, refrigerating and air-conditioning vessels and any piping and its accessory equipment;

    2.    Mechanical or electrical machine or apparatus used for the generation, transmission or utilization of mechanical or electrical power.

B.    "Object does not mean any:

    1.    Insulation or refractory material;

    2.    Non-metallic vessel, unless it is constructed and used in accordance with the American Society of Mechanical Engineers Code (A.S.M.E.);

    3.    Catalyst;

    4.    Buried vessel or piping, or underground cable;

    5.    Sewer piping, piping forming a part of a fire protection system or water piping other than:

        a.    Feed water piping between any boiler and its feed pump or injector; or

        b.    Boiler condensate return piping; or

        c.    Water piping forming a part of refrigerating and air-conditioning vessels and piping used for cooling, humidifying or space-heating purposes;

    6.    Cooling towers;

    7.    Part of a vessel that is not under:

        a.    Pressure of the contents of the vessel; or

        b.    Internal Vacuum;

    8.    Oven, stove, furnace, incinerator, pot or kiln;

    9.    Structure, foundation, cabinet or compartment containing the object;

    10.    Power shovel, dragline, excavator, vehicle, aircraft, floating vessel or structure, penstock, draft tube or well-casing.

    11.    Conveyer, crane, elevator, escalator or hoist, but not excluding any electrical machine or electrical apparatus mounted or used with this equipment;

    12.    Any data processing, calculating or computing equipment, or any electronic machine, device or instrument used for statistical, financial, or management information;

End. No. 12

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

Swiss Re
m

**EXHIBIT A**

Policy No. B0180 E120600

13.    Media used with any electronic computer or electronic data processing equipment;

14.    Machine or apparatus that is used for research, medical, diagnostic, surgical, dental or pathological purposes;

15.    Felt, wire, screen, die, extrusion plate, swing hammer, grinding disc, cutting blade, cable, chain, belt rope, clutch plate, brake pad, non-metallic part of any part of tool subject to frequent, periodic replacement;

16.    "Object" manufactured by you for sale.

17.    Any maintenance machine or apparatus.

18.    Any transmission or distribution lines on site beyond the main circuit breaker (s).

19.    Any precipitators.

8.    DEFINITION OF ACCIDENT

Applicable to all objects
As respects any object designated and described in this section, "Accident" shall mean a sudden and accidental breakdown of the Object, or a part thereof, which manifests itself at the time of the occurrence by physical damage to the Object that necessitates repair or replacement of the Object or part thereof, but "Accident" Shall not mean:

A.    Depletion, deterioration, corrosion, or erosion of material;

B.    Wear and tear;

C.    Leakage at any valve, fitting, shaft seal, packing gland, joint or connection;

D.    The breakage of any vacuum tube, gas tube or brush;

E.    The breakdown of any electronic computer or electronic data processing equipment, unless used to control or monitor one or more insured objects;

F.    The breakdown of any structure or foundation supporting the object of any part thereof;

G.    An explosion of gas or unconsumed fuel within the furnace of any object or within the passages from the furnace of said object to the atmosphere; nor

H.    The functioning of any safety device or protective device.

9.    SPECIAL PROVISIONS:

A.    As respect any boiler, fired or unfired vessel, refrigerating system of piping, the Company shall not be liable for loss from an Accident while said object is undergoing a Hydrostatic, Pneumatic or Gas Pressure Test.

End. No. 12

Page 4 of 9

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

39

Swiss Re

EXHIBIT A

Policy No. B0180 E120600

B.    As respect any condensate return tank used with any boiler, such tank shall be considered as included within the provision the Definition of object.

C.    As respect any boiler or fired vessel; the furnace of the "Object" and the Gas passages from there to the atmosphere will be considered as outside the "Object", The company shall not be liable for the loss from any explosion which (a) contributes to or aggravated by an Accident to any part of said object that contains steam or water, or (b) is caused in whole or in part directly or indirectly, by an Accident to any object; of part thereof.

D.    As respects any electrical machine or electrical apparatus, the Company shall not be liable for Loss from an Accident while said object is undergoing an insulation breakdown test or is being dried out.

E.    As respects any boiler of the chemical-recovery type, the Company shall not be liable for loss from any explosion within the furnace of any such boiler or within the passage from the furnace to the atmosphere, whether or not such explosion (a) is contributed to or aggravated by an Accident to any part of said boiler that contains steam or water, (b) is caused in whole or in part, directly or indirectly, by an Accident to any object; or part thereof.

F.    With respect to air-conditioning and refrigerating systems, the Company's Liability for, loss, including salvage expense, with respect to property damage by water or by ammonia contacting or permeating such property resulting from any one accident to one or more objects insured hereunder shall not exceed the amount of USD Included.

G.    When a vessel uses a heat transfer medium other than water or steam, we will consider the medium or its vapor substitutes for the words - water or steam.

H.    We will consider that the connected ready-for-use requirement of the Coverage form and its endorsements have been met by an "Object" section if that "Object" is:

1.    Periodically filled, moved, emptied and refilled in the course of its normal service; and

2.    Used for storage of gas or liquid.

I.    For any gas turbine, "accident" does not include the cracking of any part of the "Object" exposed to the products of combustion.

J.    We will not pay for:

1.    Damage to media used with any electronic computer or electronic data processing equipment; or

2.    Any indirect loss resulting from damage to that media.

K.    As respects any electrical equipment owned by a public utility whether or not such objects are located on the premises of the insured and which is used solely to supply the premises of the insured shall be included within the provisions of the Definition of Object. Limit per accident USD1.00.

Page 5 of 9                                                                    End. No. 12

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

40



**EXHIBIT A**

L.   As respects any Object, the company shall not be liable for loss expense resulting from an accident to such Object occurring prior to the time such Object has been completely (a) installed, (b) tested and (c) accepted by or is at the risk of the insured.

10.  **EXCLUSIONS:**

This section does not apply to loss from:

A.   Perils insured against under the property section;

B.   Fire concomitant with or following an Accident or from the use of water or other means to extinguish fire;

C.   An accident caused directly or indirectly by fire or from the use of water or other means to extinguish fire;

D.   A combustion explosion outside the Object concomitant with or following an Accident;

E.   An accident caused directly or indirectly by a combustion explosion outside the Object;

F.   Flood unless an Accident ensues and the Insurers shall then liable only for loss from such ensuing Accident; or

G.   Delay or interruption of business or manufacture or process, unless otherwise herein provided under this Policy;

H.   Lack or power, light, heat, steam or refrigeration; and

I.   Loss from any other indirect result of an Accident;

J.   Nuclear Energy Exclusion - This section does not apply to loss, whether it is direct or indirect, proximate or remote,

   1.   From an Accident caused directly or indirectly by a nuclear reaction, nuclear radiation or radioactive contamination, all whether controlled or uncontrolled; or

   2.   From nuclear reaction, nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, caused directly or indirectly by, an Accident;

   nor shall the Company be liable for any loss covered in whole or in part by contract or insurance, carried by the Insured, which also covers any hazard or peril of nuclear reaction or nuclear radiation.

K.   This section does not apply to any increase in the loss necessitated by an ordinance, law, regulation, rule or ruling regulating or restricting repair, alteration, use, operation, construction or installation;

End. No. 12

Page 6 of 9

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

41

Swiss Re

EXHIBIT A

Policy No. B0180 E120600

If, however, as a result of an Accident, any property is damaged, contaminated or polluted by a substance declared by an authorized governmental agency to be hazardous to health, the company's liability under Coverage A, B, and C from additional expenses incurred for cleanup, repair or replacement, or disposal of that damaged, contaminated or polluted property shall not exceed USD(See Declarations). This limit is part of not in addition to the Limit per Accident. As used here, additional expenses means expenses incurred beyond those for which the Company would have been liable if no substance hazardous to health had been involved in the Accident.

11.    A.    COLD BOX EXCLUSION:

It is agreed that the Definition of object wherever it appears in the policy,

1.    Shall not include any cold box used for cryogenic separation or liquification of gases, but

2.    Shall not exclude any object which is located within any such cold box and which is otherwise described in and covered by the policy.

It is further greed, with respect to loss from an Accident to any Object located within such cold box, the Company shall not be liable for the cost of the removal or replacement of the insulation within said cold box nor the cost of repairing the said cold box due to leakage at joints or bulging of section of the said cold box.

B.    CATALYSTS AND SALTS EXCLUSION:

It is agreed that as respect coverage for any object insured under this policy, the Company shall not be liable for loss or damage to any catalysts or salts nor the cost to replace any catalysts or salts.

C.    SULPHUR DIOXIDE EXCLUSION:

As respects an Accident to any steam boiler operating with sulfur dioxide waste heat gas or, to any sulfur recovery boiler, the company shall not be liable for:

1.    Loss or damage resulting from corrosion anywhere following the said Accident; and

2.    Loss or damage to any catalyst use solely by steam or water contacting or permeating the said catalyst following the said Accident.

D.    MOLTEN MATERIAL & SOLIDIFICATION

1.    It is agreed that the Company shall not be liable for: Loss or damage resulting directly or indirectly from accidental discharge and/or solidification of molten material including plastic, however caused; and,

Page 7 of 9

End. No. 12

| Attached to and forming a part Policy No. B0180 E120600 |
| All other Terms and Conditions remain unchanged. |

42

Swiss Re

EXHIBIT A

Policy No. B0180 E120600

2.       Payment under any Business Interruption and/or Extra Expense endorsement of the policy, for any time during which the resumption of business is in any way curtailed, delayed, or prevented as a result of the kind of accident referred to in the preceding section (a).

12.   <u>PERILS EXCLUDED:</u>

The company shall not be liable under Coverages A and B of this Endorsement for loss from:

A.    Lightning;

B.    Sprinkler leakage or leakage from fire protective equipment;

C.    Windstorm or hail;

D.    Freeze;

E.    Aircraft or vehicles;

F.    Smoke;

G.    Riot, civil commotion, vandalism, malicious mischief;

H.    Molten material;

I.    Action by civil Authority;

J.    Landslide, mudflow or earth sinking, rising or shifting;

K.    Earthquake;

L.    Explosion, of any object except the following:

1.    Steam boilers, including equipment attached to and forming a part thereof, steam turbines, gas turbines, steam engines, steam pipes interconnecting any of the foregoing;

2.    Moving or rotating machinery or parts of same where such loss is caused by centrifugal or mechanical breakdown.

13.   <u>ADDITIONAL CONDITIONS</u>

A.    Definitions:

1.    The term "One Accident" shall be taken as including all resultant or concomitant Accidents whether to one Object or to more than one object or to part of an object;

Page 8 of 9                                          End. No. 12

---

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

43



Policy No. B0180 E120600

2.    The word "Property" as used in this section shall mean Real and Personal Property as included under the property section.

**B.    Inspection:**

The Company shall be permitted, but not obligated, to inspect the insured's property and operations at any reasonable time.

Neither the right to make inspections nor the making thereof nor any advise or report resulting therefrom shall constitute an undertaking, on behalf of or for the benefit of the Insured or others, to determine or warrant that such property or operations are safe or healthful, or are in compliance with any law, rule or regulation.

**C.    Suspension:**

Upon the discovery of a dangerous condition with respect to any Object, any representative of the company may immediately suspend the insurance with respect to an Accident to said Object by written notice mailed or delivered to the Insured at the address of the Insured, or the location of the Object. Insurance so suspended may be reinstated by the Company, but only by an endorsement issued to form a part hereof.

**D.    Cracking Clarification**

It is hereby agreed and understood that the following shall not be considered an accident under the terms of the policy for insured turbines.

Any cracking of the object or part thereof unless the cracking at the time of its occurrence immediately prevents continued safe operation if the object.

**E.    Warranty**

It is agreed that in the event of installation or repair, under warranty, of any object, or part thereof, specified in this section forming a part of the policy, the insurance under the policy shall become and applicable only with respect to that part of any loss resulting from an accident, as defined in the policy, to such object, which is not recoverable under the conditions of such warranty.

The term warranty as used herein shall mean any warranty, guarantee, contract or agreement whether such warranty is written, verbal or implied.

Except to the extent provided above, all other terms, limitations and conditions of the policy remain full force and effect.

Effective Date    1st April 2012                          Expiration Date    1st April 2013

End. No. 12

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

44

Swiss Re

**EXHIBIT A**

EXHIBIT A

Policy No. B0180 E120600

### SCHEDULE OF LOCATIONS

It is understood and agreed that the Schedule of Replacement Cost Property Values are on file with the Underwriters, totaling $2,515,416,168.

The following pipelines are included in the Shreveport, Princeton and Cotton Valley values, respectively:

1) Brown Station to Shreveport: 8 miles at 10 in. diameter for crude transport. No major river crossings.
2) Princeton to Shoreline Crude Tankages: 34 miles/feet at 6 in. diameter for crude transport. Red River, major river crossings. (Cowhide Bayou, Horseshoe Bayou, Dooley Bayou, and FiFi Bayou are other crossings)
3) Fitch Pipeline to Cotton Valley: 6.2 miles/feet at 4 in. diameter for crude transport. No major river crossings.

* Permanently Idled Equipment at Shreveport, LA facility is excluded. Debris Removal coverage is provided for permanently idled equipment at the Shreveport, LA (Atlas) facility damaged as a direct result of a covered peril to covered equipment. Debris Removal sublimits apply.

Effective Date    1st April 2012

Issued to Calumet Specialty Products Partners, L.P.

Expiration Date    1st April 2013

End. No.  13

| Attached to and forming a part Policy No. B0180 E120600 |
| :---: |
| All other Terms and Conditions remain unchanged. |

45



EXHIBIT A

Policy No. B0180 E120600

## SERVICE OF SUIT

It is agreed that in the event of the failure of this Company to pay any amount claimed to be due hereunder, this Company, at the request of the Insured, will submit to the jurisdiction of any Court of Competent Jurisdiction within the United States and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.

It is further agreed that service of process in such suit may be made upon the highest one in authority bearing the title "Commissioner", Director" or "Superintendent" of Insurance of the state or commonwealth wherein the property covered by this policy is located, and that in any suit instituted against it upon this contract this Company will abide by the final decision of such Court or any Appellate Court in the event of an appeal.  The one in authority bearing the title "Commissioner", "Director" or "Superintendent" of Insurance of the state or commonwealth wherein the property covered by this policy is located is hereby authorized and directed to accept service of process on behalf of this Company in any such suit and/or upon the Insured's request to give a written undertaking to the Insured that they will enter a general appearance upon this Company's behalf in the event such a suit shall be instituted.

All other terms and conditions of this policy remain unchanged.

Effective Date    1st April 2012                                              Expiration Date   1st April 2013

Issued to  Calumet Specialty Products Partners, L.P.

End. No.  14

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

46

Swiss Re

**EXHIBIT A**

Policy No. B0180 E120600

## DATA DISTORTION/CORRUPTION ENDORSEMENT

It is noted and agreed this policy is hereby amended as follows:

The Insurer will not pay for Damage or Consequential loss directly or indirectly caused by, consisting of, or arising from:

(A)    Any functioning or malfunctioning of the Internet or similar facility, or of any intranet or private network or similar facility,

(B)    Any corruption, destruction, distortion, erasure or other loss or damage to data, software or any kind of programming or instruction set,

(C)    Loss of use or functionality whether partial or entire of data, coding, program, software, any computer or computer system or other device dependent upon any microchip or embedded logic, and any ensuing inability or failure of the Insured to conduct business.

This endorsement shall not exclude subsequent Damage or Consequential loss, not otherwise excluded, which itself results from a Defined Peril. Defined Peril shall mean: Fire, Lightning, Earthquake, Explosion, Falling Aircraft, Flood, Smoke, Vehicle Impact, Windstorm or Tempest.

This Endorsement shall not act to increase or broaden coverage afforded by this policy.

Such Damage or Consequential Loss described in A, B, or C above, is excluded regardless of any other cause that contributed concurrently or in any other sequence.

In consequence of all the foregoing the Annual Premium remains unaltered.

All other terms, conditions and exclusions of this policy remain unchanged.

Effective Date    1st April 2012                    Expiration Date   1st April 2013

Issued to  Calumet Specialty Products Partners, L.P.

End. No.  15

---

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

---

47



**EXHIBIT A**

Policy No. B0180 E120600

## ADJUSTER

In the event of an occurrence covered by this policy, Underwriters agree to allow Dan McLain of McLain Crow & Associates, William Kramer of William Kramer & Associates; Scott Archer of York Insurance Services Group, Inc., William Morgan of Crawford & Company or Tracy Smith of Specialty Adjusters to be appointed as adjuster at the Insured's option, without prior consent of Underwriters.

Use of an alternative adjuster to be mutually agreed between the Insured and Underwriters.

Effective Date    1st April 2012

Expiration Date   1st April 2013

Issued to  Calumet Specialty Products Partners, L.P.

End. No.  16

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

48



**EXHIBIT A**

Policy No. B0180 E120600

## FUNGI EXCLUSION ENDORSEMENT

This endorsement contains words and phrases which have specific definitions for this endorsement only. Please refer to item B. below for details of these definitions.

A.    **Exclusion**

Notwithstanding any other terms or conditions, this "policy" does not insure against any loss, damage, cost, claim or expense directly or indirectly arising out of or relating to:

1.    Fungi resulting directly or indirectly from any cause;

2.    The cost to test for, monitor, or assess the existence, concentration, or effects of Fungi; or

3.    The costs to clean up, remove or remediate against Fungi.

This exclusion shall apply regardless of any other cause or event that contributes concurrently or in any sequence to the loss, damage, cost, claim or expense.

However, if direct physical loss or direct physical damage by fire or explosion results, the "company" shall be liable for that resulting direct physical loss or direct physical damage by fire or explosion, subject to all terms and conditions of the "policy" to which this endorsement is attached.

B.    **Definition**

1.    For the purpose of this endorsement, Fungi shall mean any form of fungus, including but not limited to, yeast, mold, mildew, rust, smut, mushroom, spores, mycotoxins, odors, or any other substances, products, or byproducts produced by, released by, or arising out of the current or past presence of Fungi.  Fungi does not include a fungus that was deliberately grown for human consumption.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, or limitations of the "policy" to which this endorsement is attached other than as above stated.

Effective Date    1st April 2012

Expiration Date    1st April 2013

Issued to Calumet Specialty Products Partners, L.P.

End. No. 17

| Attached to and forming a part Policy No. B0180 E120600 |
| --- |
| All other Terms and Conditions remain unchanged. |

49



**EXHIBIT A**

Policy No. B0180 E120600

It is hereby agreed and understood that the following Lender's Loss Payable Clause Endorsement applies solely to assets and property maintained by Calumet Specialty Products Partners, L.P.; Calumet GP, LLC; Calumet Shreveport, LLC; Calumet Shreveport Fuels, LLC; Calumet Shreveport Lubricants & Waxes, LLC; Calumet Operating, LLC; Calumet LP GP, LLC; Calumet Lubricants Co., Limited Partnership; Calumet Finance Corp.; Calumet Penreco, LLC Calumet Sales Company Incorporated, Calumet Superior, LLC and Calumet Missouri, LLC:

### Lender's Loss Payable Clause

Loss, if any, under this policy shall be payable to (i) Bank of America, N.A., as Administrative Agent, its successors and/or assigns, as their interests may appear, for itself and Secured Hedge Counterparties, whose address is 901 Main Street, 11th Floor, Mail Code TX1-492-11-23, Dallas, Texas 75202 or (ii) Bank America, N.A., whose address is 901 Main Street, 11th Floor, Mail Code TX1-492-11-23, Dallas, Texas 75202, as agent for the lenders and other secured parties under or referenced in that certain Amended and restated Credit Agreement dated on or about June 2011, by and among Calumet Specialty Products Partners, L.P., its subsidiaries, the lenders named therein and Bank of America, N.A. (as such agreement may be amended, modified or replaced from time to time) (collectively the "Agent").

It is understood that Agent now has or will acquire from time to time an insurable interest in certain property insured under this policy, which interest is established by various financing documents, warehouse receipts, bills of lading, documentary or other written evidence heretofore, now or hereafter executed or delivered by Company to Agent or its agents.

This insurance, solely as to the interest therein of Agent, shall not be impaired or invalidated by any act or neglect of Company, mortgagor or owner of the within described property, nor by any change in the title or ownership of the property, nor by the occupation of the premises wherein such property is located for purposes more hazardous than are permitted by this policy; provided that in case Company, mortgagor or owner shall neglect to pay any premium under this policy, Agent shall, on demand, pay the same, and provided, also that Agent shall notify the insurer hereunder (the "Insurer") of any change of ownership or occupancy or any material increase of hazard which shall come to the knowledge of Agent and, unless permitted by this policy, it shall be noted thereon and Agent shall, on demand, pay the premium for such increased hazard for the term of the use thereof.

The Insurer reserves the right to cancel this policy at any time as provided by its terms. If the Insurer exercises its right to cancel or if the policy holder cancels this policy, this policy shall continue in force, without payment of any additional premium, for the benefit only of Agent for thirty (30) days after written notice of such cancellation to Agent at the address set forth above and shall then cease, and the Insurer shall have the right, on like notice, to cancel this agreement.

All other terms and conditions of the policy to which this Endorsement is attached and of which it is a part, remain unchanged, which other terms and conditions include the limit(s) of liability named in the policy and the conditions of any Value Reporting, Full Reporting, Total Insurance, Coinsurance, Reduced Rate Contribution or Average Clauses incorporated therein or attached thereto. It is hereby understood and agreed that the policy to which this Endorsement is attached will not be changed in any way which may affect Agent's rights under this policy without prior written notice to Agent at the address set forth above.

Effective Date    1st April 2012                                        Expiration Date   1st April 2013

Issued to Calumet Specialty Products Partners, L.P.

End. No. 18

| Attached to and forming a part Policy No. B0180 E120600 |
|---|
| All other Terms and Conditions remain unchanged. |

50


Swiss Re

**EXHIBIT A**

Policy No. B0180 E120600

### TIME ELEMENT ENDORSEMENT

**1.    LOCATIONS COVERED**

Locations Covered under this endorsement are as follows:

| Location | Gross Earnings Projected Amount | Gross Earnings Provisional Amount |
|---|---|---|
| Shreveport LA (including Brown Station) | USD 138,735,594 | USD 118,130,282 |
| Cotton Valley, LA | USD 61,634,675 | USD 52,480,559 |
| Princeton, LA | USD 85,120,134 | USD 72,477,906 |
| Superior, WI | USD 112,448,659 | USD 95,747,539 |
| Burnham, IL | USD 15,743,746 | USD 13,405,450 |
| Karns City, PA | USD 38,463,662 | USD 32,750,955 |
| Dickinson, TX | USD 14,895,367 | USD 12,683,075 |
| LVT Conosol Westlake, LA | USD 26,557,070 | USD 22,612,756 |
| South Hampton Silsbee, TX | USD 16,554,315 | USD 14,095,632 |
| Louisiana, MO | USD 2,500,000 | USD 2,128,694 |
| Lyondell, Houston, TX | USD 15,839,698 | USD 13,487,152 |
| Other Locations | USD Included/Interdependent in above values | |
| TOTAL AMOUNT | USD 528,492,920 | $450,000,000   (0.2686%   Rate Basis) |

**2.    LIMIT OF LIABILITY**

See Declarations Page.

**3.    SUBLIMITS OF LIABILTY**

The Sub-limits of liability shown below are part of and not in addition to the policy limit of liability. These sub-limits are any one occurrence unless otherwise noted.

Extra Expense.........................................USD 10,000,000

Service Interruption................................USD 10,000,000

**4.    RETENTIONS**

No liability shall exist under this endorsement for any Time Element loss at the property covered hereunder unless the determined period of interruption exceeds the applicable waiting period specified below and then liability shall exist only for such part of the loss that is incurred for the determined period of interruption in excess of the stated waiting period.

Business Interruption.........................................90 Days

Extra Expense...................................................90 Days

**5.    BUSINESS INTERRUPTION**

The Company agrees to insure, subject to all the terms, conditions, limitations, exceptions, exclusions, provisions and stipulations of this policy not in conflict herewith, against loss directly resulting from necessary interruption of business caused by destruction of or damage to Property

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

51

Swiss Re

**EXHIBIT A**

Insured, except finished stock, and arising from a peril covered hereunder and occurring during the Policy Period ; all while at the locations covered under this endorsement.

A.    Limit Of Liability:

The limit of liability hereunder shall in no event exceed the amount specified in the limits and sublimits of liability on this endorsement. Period of Indemnity is limited to 18 months beyond Retention shown in the Declarations.

B.    Provisional Premium:

The initial premium for each annual period under this Policy is a Provisional Premium. The Annual Earned Premium under this Policy shall be calculated as set forth below. If the Earned Premium calculation(s) produces a premium greater than the Provisional Premium (including provisional premium adjustments), the Insured shall pay the Insurers, as additional premium, the difference between the Provisional Premium (including provisional premium adjustments) and the Earned Premium. If the Earned Premium calculation(s) is less than the Provisional Premium (including provisional premium adjustments), the Insurers shall pay to the Insured the difference between the Provisional Premium (including provisional premium adjustments) and the Earned Premium (subject to J. below). Premium payments between the Insurers and Insured shall be made as soon as reasonably practicable following each annual calculation(s).

The Earned Premium under this Policy shall be calculated as follows:

Within sixty (60) days following the end of the Policy year, the Insured shall file with the Insurers a statement of actual Gross Earnings for the Policy year (or policy period) just ended. The applicable Policy rate(s) shall be multiplied times such actual Gross Earnings, the result of which shall be the Earned Premium for such Policy year.

C.    Conditions:

(1)    No claim shall be sustained with respect to Business Interruption unless and until a loss has been paid or liability admitted, in respect of direct physical damage to property insured under this Policy giving rise to such Business Interruption. This condition shall not apply if no such payment shall have been made nor liability admitted solely owing to the operation of a Retention in this policy excluding liability for losses below a specified amount.

(2)    In the event of such damage or destruction, this Company shall be liable for the actual loss sustained by the Insured resulting directly from such interruption of business, but not exceeding the reduction in Gross Earnings less charges and expenses which do not necessarily continue during the interruption of business, for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property herein described as has been damaged or destroyed, commencing with the date of such damage or destruction and not limited by the date of expiration of this policy. Due consideration shall be given to the continuation of normal charges and expenses, including payroll expense, to the extent necessary to resume operations of the Insured with the same quality of service which existed immediately preceding the loss.

(3)    If the Insured could reduce the loss resulting from the interruption of business by complete or partial resumption of operation of the property herein described, whether damaged or not, or by making use of other property at the location(s) described herein or elsewhere; or by making use of stock (raw, in process or

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

52



EXHIBIT A

Policy No. B0180 E120600

finished) at the locations(s) described herein or elsewhere; such reduction shall be taken into account in arriving at the amount of loss hereunder.

D.    Expenses Related To Reducing Loss:

This policy also covers such expenses as are necessarily incurred for the purpose of reducing loss under this policy, but in no event shall the aggregate of such expenses exceed the amount by which the loss otherwise payable under this policy is thereby reduced.    Such expenses shall not be subject to the application of the Coinsurance Clause.

E.    Gross Earnings:

For the purpose of this insurance "Gross Earnings" are defined as the sum of:

(1)    Total net sales value of production;

(2)    Total net sales of merchandise; and

(3)    Other earnings derived from operation of the business; less the cost of:

(4)    Raw stock from which such production is derived;

(5)    Supplies consisting of materials consumed directly in the conversion of such raw stock into finished stock or in supplying the service(s) sold by the Insured;

(6)    Merchandise sold, including packaging materials therefore; and

(7)    Service(s) purchased from outsiders (not employees of the Insured) for resale which do not continue under contract.

No other costs shall be deducted in determining Gross Earnings.  In determining Gross Earnings due consideration shall be given to the experience of the business before the date of damage or destruction and the probable experience thereafter had no loss occurred.

F.    Finished Stock:

This Company shall not be liable for any loss resulting from damage to or destruction of finished stock nor for the time required to reproduce said finished stock.

G.    Ingress/Egress

This policy is extended to cover Business Interruption as a direct result of physical loss or damage that is insured against under this policy to any property located within 5 miles of an insured location:

1)    Thereby preventing ingress to or egress from an insured location, and starting from the time the applicable waiting period ends, until access to the insured location is re-established but not to exceed 60 consecutive days; or

2)    When access to an insured location is prohibited by order of civil or military authority, and starting from the time the applicable waiting period ends until the order is rescinded and access to the insured location is re-established but not to exceed 60 consecutive days.

H.    Special Exclusions:

This Company shall not be liable for any increase of loss resulting from:

> Attached to and forming a part Policy No. B0180 E120600
> All other Terms and Conditions remain unchanged.

53



EXHIBIT A

(1)   Interference at the described premises, by strikers or other persons, with rebuilding, repairing or replacing the property or with the resumption or continuation of business; or

(2)   The suspension, lapse or cancellation of any lease, license, contract or order unless such suspension, lapse or cancellation results directly from the interruption of business, and then this Company shall be liable for only such loss as affects the Insured's earnings during, and limited to, the period of indemnity covered under this policy; nor shall this Company be liable for any other consequential or remote loss.

I.   Limitations:

With respect to loss resulting from damage to or destruction of media for, or programming records pertaining to electronic data processing or electronically controlled equipment, including data thereon, by the peril(s) insured against, the length of time for which this Company shall be liable hereunder shall not exceed thirty (30) consecutive calendar days; or the length of time that would be required to rebuild, repair or replace such other property herein described as has been damaged or destroyed; whichever is the greater length of time.

J.   Reporting and Premium Adjustment:

The annual Business Interruption premiums are both provisional and subject to a deposit based on the Insured's estimate of Gross Earnings at the inception of this endorsement. Within sixty (60) days following the expiration date, the Insured shall furnish these Insurers a statement of the actual one hundred (100%) percent gross earnings for the preceding calendar year for each location covered by this endorsement. Additional or return premium shall be computed on any difference between the previous provisional value and actual value at the rates agreed upon for this endorsement. Any additional or return premiums shall not be due unless the final reported values exceed 5% plus or minus the provisional Gross Earnings Estimate.

 K.   Extended Period of Indemnity:

This policy is extended to cover the actual loss sustained by the Assured resulting directly from the interruption of business, as covered by this policy, for such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss occurred, commencing with the later of the following dates:

(1)   The date on which the liability of Underwriters for loss resulting from interruption of business would terminate if this extension had not been part of this policy; or

(2)   The date on which repair, replacement or rebuilding of such part of the buildings(s), structures(s), machinery, equipment, or furniture and fixtures of the property herein described as has been damaged or destroyed is actually completed.

As respects Items (1) and (2) above, this extension shall in no event apply for more than ninety (90) consecutive calendar days from said commencement date.

6.   **EXTRA EXPENSE**

The Company agrees to insure, subject to all the terms, conditions, limitations, exceptions, exclusions, provisions and stipulations of this policy not in conflict herewith, the necessary Extra Expense incurred by the Insured in order to continue as nearly as practicable the normal

---

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

54



**EXHIBIT A**

operation of the Insured's business following damage to or destruction of real or personal property, by the peril(s) insured against during the term of this policy, which property is on premises occupied by the Insured and all while at the locations covered under this endorsement.

A.    Conditions:

(1)    No claim shall be sustained with respect to Extra Expense unless and until a loss has been paid or liability admitted, in respect of direct physical damage to property insured under this Policy giving rise to such Extra Expense.  This condition shall not apply if no such payment shall have been made nor liability admitted solely owing to the operation of a Retention in this policy excluding liability for loss below a specified amount.

(2)    In the event of such damage or destruction, this Company shall be liable for such necessary Extra Expense incurred for only such length of time, hereinafter referred to as the "period of restoration," as would be required with exercise of due diligence and dispatch to rebuild, repair or replace such part of the property herein described as has been damaged or destroyed, commencing with the date of damage or destruction and not limited by the date of expiration of this policy.

B.    Limit Of Liability:

The limit of liability hereunder shall in no event exceed the percentage of the amount specified in the sublimits of liability on this endorsement for the determined period of restoration.

100%    when the period of restoration is not in excess of one month;

100%    when the period of restoration is in excess of one month, but not in excess of two months; or

100%    when the period of restoration is in excess of two months.

C.    Resumption Of Operations:

It is a condition of this insurance that as soon as practicable, the Insured shall resume normal operations of the business and shall dispense with such Extra Expense.

D.    Extra Expense:

The term "Extra Expense", wherever used in this form, is defined as the excess (if any) of the cost(s) incurred during the period of restoration, chargeable to the operation of the Insured's business, over and above the cost(s) that would normally have been incurred to conduct the business during the same period had no damage or destruction occurred. Any salvage value of property obtained for temporary use during the period of restoration, which remains after the resumption of normal operations, shall be taken into consideration in the adjustment of any loss hereunder.

E.    Ingress/Egress

This policy is extended to cover Extra Expense as a direct result of physical loss or damage that is insured against under this policy to any property located within 5 miles of an insured location:

1)    Thereby preventing ingress to or egress from an insured location, and starting from the time the applicable waiting period ends until access to the insured location is re-established but not to exceed 60 consecutive days; or

2)    When access to an insured location is prohibited by order of civil or military authority, and starting from the time the applicable waiting period ends until the order is

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

55



Policy No. B0180 E120600

rescinded and access to the insured location is re-established but not to exceed 60 consecutive days.

F.   Special Exclusions And Limitations:

This Company shall not be liable for any Extra Expense resulting from:

(1)   Interference at the described premises, by strikers or other persons, with rebuilding, repairing or replacing the property or with the resumption of continuation of businesses;

(2)   Loss of income;

(3)   The cost of repairing or replacing any of the real or personal property herein described, or the cost of research or other expense necessary to replace or restore damaged or destroyed books of account, abstracts, drawings, card index systems or other records (including film, tape, disc, drum, cell and other magnetic recording or storage media for electronic data processing or storage media for electronic data processing), that have been damaged or destroyed by the peril(s) insured against, except cost in excess of the normal cost of such repair, replacement or restoration necessarily incurred for the purpose of reducing the loss under this policy. In no event shall such excess cost exceed the amount by which the total Extra Expense loss otherwise payable under this policy is thereby reduced; or

(4)   Any other consequential or remote loss.

7.   <u>SERVICE INTERRUPTION</u>

The Company agrees to insure, subject to all the terms, conditions, limitations, exceptions, exclusions, provisions and stipulations of this policy not in conflict herewith, the necessary interruption of business at the insured location(s) that is caused by the interruption of incoming power or other utility service when the interruption takes place at a location covered under this endorsement, and ensues from direct physical loss or damage insured against under this policy to property not at an insured location that is owned, operated, or controlled by the public utility company or any other company contracted by the Insured to supply incoming electricity, fuel, water, steam, gas, telephone, refrigerant, or other utility services directly to the Insured provided the duration of such interruption is in excess of twenty four (24) Hours. The property must be located within the policy territory. The Company's total liability from all interruptions of incoming services at all locations shall not exceed the sub-limit specified in the sublimits of liability on this endorsement for this coverage.

In no event shall this policy insure, under this coverage, for:

A.   Any loss if the interruption of the incoming services is caused directly or indirectly by the failure of the Insured to comply with the terms or conditions of any contracts or agreements the Insured has for the supply of such services;

B.   Any loss if the interruption of incoming services is caused directly or indirectly by or resulting from any deliberate act or acts by the supplying utility to shed load to maintain system integrity;

8.   <u>CONTINGENT BUSINESS INTERRUPTION (CBI) / CBI EXTRA EXPENSE</u>

Contingent Business Income and Contingent Extra Expense Benefit. The Company shall pay the actual loss sustained by the Insured resulting directly from such interruption of business or Extra Expense sustained by the Insured during the Period of Restoration that is caused by direct

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

56



EXHIBIT A

Policy No. B0180 E120600

physical loss or damage occurring during the Policy Period to property of a supplier of goods or services to the Insured or property of a purchaser of goods and services from the Insured, but only if: (i) the loss or damage to such property results from a peril insured against by this Policy that prevents the supplier of goods or services from supplying goods or services to the Insured, or prevents the purchaser of goods or services from receiving goods and services from the Insured; and (2) such property would have been Property Insured if it were located at an insured location and were either owned by the Insured or under the care, custody or control of the Insured.

To be covered under this Time Element Coverage, the property must be located within the Policy Territory.

In addition, the business interruption must occur during the period commencing on the date of the direct physical loss or damage to the property that gave rise to the claim and ending on the date not later than 18 months following the end of the applicable deductible period specified in the Declarations. This Time Element Coverage does not apply to: (1) business interruption or Extra Expense resulting from the loss of incoming utility services (refer to SERVICE INTERRUPTION above); or (2) business interruption or Extra Expense of a trader, reseller or wholesaler of electricity, gas, telephone services or any other commodity or service.

Period Of Restoration. The term "Period Of Restoration" shall mean the period of time that begins on the date of the direct physical loss or damage to Property Insured that gave rise to the claim, and ending on the earlier of (1) the date when the property at the insured location should be repaired, rebuilt, or replaced with commercially reasonable diligence or (2) the date when the business could be resumed at a new permanent location with commercially reasonable diligence.

LIMITATION. Suppliers and customers must be direct (first tier) suppliers or customers of the Insured and subject to the supplier or customer being named under this Policy (per Endorsement 33) the Liability for loss under this endorsement arising out of one occurrence shall not exceed the amount stated in the Declarations for named direct customers and suppliers. If the supplier or customers is unnamed, the Liability for loss under this endorsement arising out of one occurrence shall not exceed the amount stated in the Declarations for unnamed customers and suppliers.

Effective Date     1st April 2012

Issued to Calumet Specialty Products Partners, L.P.

Expiration Date   1st April 2013

End. No. 19

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

57

Swiss Re

**EXHIBIT A**

Policy No. B0180 E120600

## CIVIL AUTHORITY ENDORSEMENT

Subject to all terms and conditions of this Policy, the Business Interruption and Extra Expense extensions of coverage are amended to include the additional period of time during which resumption of the Insured's business is prevented as a result of any order, rule, regulation, statute or ordinance of a governmental agency or authority (including, but not limited to, the U.S. Occupational Safety and Health Administration [OSHA] which limits, prevents or otherwise affects the repair, replacement, reconstruction, releasing (to include digging up and relaying of any pipelines) or resumption of the damaged and/or demolished and/or undamaged portions of any facility following physical loss or damage by a peril not otherwise excluded to the facility.  Such additional period of time is limited to 60 days.

Furthermore, coverage is extended to include the actual loss sustained by the Insured resulting from necessary interruption of business as covered hereunder during the period of time not exceeding 60 days, while access to any premises of the Insured is prohibited by order of civil or military authority but only when such order is given as a direct result of direct physical loss or damage by a peril insured against within 5 miles of the Insured premises affected subject always to the limit of the Policy.

\This endorsement shall take precedent over any like coverage contained in the Time Element Endorsement No. 19 except when the coverage provided by this Endorsement is more restrictive than the coverage provided under Time Element Endorsement No. 19.

Effective Date    1st April 2012                                     Expiration Date    1st April 2013

Issued to  Calumet Specialty Products Partners, L.P.

End. No.  20

| Attached to and forming a part Policy No. B0180 E120600 |
| All other Terms and Conditions remain unchanged. |

58

Swiss Re

EXHIBIT A

Policy No. B0180 E120600

INCIDENTAL COURSE OF CONSTRUCTION ENDORSEMENT

Unless otherwise specifically endorsed in this policy herein, it is understood and agreed that this Policy is extended to insure property while in the course of construction, including building materials, supplies, machinery or equipment incidental to such construction while on the premises or within one thousand [1,000] feet thereof.  This coverage extension is subject to all the policy provisions and stipulations to which it is attached, and includes TESTING but excludes delay in start-up.

TESTING:
    A.  Hot Testing  - Any startup, commissioning or other forms of testing making use of any feedstock or similar media including operational or performance tests;
    B.  Cold Testing – Any functional testing, exclusive of hot testing as defined above including but not limited to electrical, mechanical, hydraulic, hydrostatic and pneumatic;

For the purposes of the foregoing definitions, startup and testing of building systems shall be considered Cold Testing.

Effective Date    1st April 2012                               Expiration Date   1st April 2013

Issued to  Calumet Specialty Products Partners, L.P.

                                                      End. No.  21

| Attached to and forming a part Policy No. B0180 E120600 |
| :---: |
| All other Terms and Conditions remain unchanged. |

Swiss Re
III

**EXHIBIT A**

Policy No. B0180 E120600

## COVERAGE TERRITORY ENDORSEMENT ("OFAC")

*This endorsement modifies insurance provided under the following:*

Payment of loss under this policy shall only be made in full compliance with all United States of America economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

Effective Date    1st April 2012                                    Expiration Date    1st April 2013

Issued to Calumet Specialty Products Partners, L.P.

End. No. 22

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

60

Swiss Re
m

**EXHIBIT A**

Policy No. B0180 E120600

### NAMED WINDSTORM COVERAGE LIMITATION ENDORSEMENT

It is understood and agreed that subject to all terms, conditions and stipulations of the policy to which this endorsement is attached, not in conflict herewith, the Sublimit of Liability shown in this policy for Named Windstorm shall apply to all loss or damage not otherwise excluded to insured property caused by and resulting from Named Windstorm whether such losses include damage to real or personal property, Time Element loss (if such coverage is applies under this policy), or both. Any such ensuing loss that is subject to its own Sublimit of Liability is still subject to that Sublimit of Liability, but in no event shall the total loss or damage from Named Windstorm and ensuing loss or damage exceed the Sublimit of Liability for Named Windstorm.

Ensuing fire, lightning or explosion caused by a Named Windstorm shall not be subject to the limitations of this endorsement or the Sublimit of Liability for Named Windstorm.

Any sublimit for Named Windstorm as described above shall not waiver, alter or increase any restriction or exclusion for Flood coverage in Flood zones A or V (100 year flood zones) shown elsewhere in this policy.

A Named Windstorm is defined as a storm that has been declared by the National Weather Service as Hurricane, Typhoon, Tropical Cyclone and/or Tropical Storm. For the purposes of this Policy and the applications of the Limit of Liability, Sub-limit and Retention, Named Windstorm shall include Damage caused by the ensuing flood and wind driven rain.

The term Flood is as defined in the policy.

This endorsement is subject to 72 hours' Occurrence clause in the policy. The term Occurrence is as defined in the policy.

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of the policy, except as herein above set forth.

Effective Date    1st April 2012

Issued to Calumet Specialty Products Partners, L.P.

Expiration Date  1st April 2013

End. No. 23

| Attached to and forming a part Policy No. B0180 E120600 |
|---|
| All other Terms and Conditions remain unchanged. |

61



**EXHIBIT A**

Policy No. B0180 E120600

## FLOOD ENDORSEMENT
(to be used only if a Named Windstorm Coverage Limitation Endorsement is attached to the Policy)

In consideration of the premium charged and subject to all terms, conditions and stipulations of the policy to which this endorsement is attached, not in conflict herewith, this policy is extended to insure against loss or damage caused by Flood as defined herein to Property Insured.

This extension of coverage is subject to limits of liability and Retention stated in the Declarations.

This endorsement does not increase any amounts or limits of insurance provided by this policy.

The sublimit of liability stated in the Declarations for Flood coverage shall be included in the sublimit of liability stated for Named Windstorm coverage in the Declarations if Flood is a direct result of the Named Windstorm event subject to the Definition of Occurrence in this policy. Such Flood loss shall contribute to the erosion of the Named Windstorm sub-limit and not to the erosion of the separate Flood sub-limit.

Ensuing fire, lightning or explosion caused by a Flood shall not be subject to the limitations of this Endorsement or the sub-limit of liability for Flood.

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of the policy, except as herein above set forth.

Effective Date    1st April 2012                                    Expiration Date    1st April 2013

Issued to  Calumet Specialty Products Partners, L.P.

End. No.  24

| Attached to and forming a part Policy No. B0180 E120600 |
| All other Terms and Conditions remain unchanged. |

62

Swiss Re

Policy No. B0180 E120600

## CLAIM PREPARATION EXPENSES / PROFESSIONAL FEES

This policy covers the actual costs, incurred by the Insured, of reasonable fees payable to accountants, architects, auditors, engineers or other professionals, excluding the cost of the Insured's own employees, for producing and certifying any particulars or details contained in the Insured's books or documents, or other such proofs or documents required by the Company, resulting from an insured loss covered under this policy for which the Company has accepted liability.

This additional coverage does NOT cover the fees and costs of attorneys, public adjusters and loss appraisers, including any of their subsidiary, affiliated, related or associated entities, either partially or wholly owned or retained by them for the purpose of assisting them.  In addition, this coverage does NOT cover fees and costs of loss consultants who provide consultation on coverage or negotiate claims.
This additional coverage is subject to the Retentions which apply to the loss.
This coverage provides 100% of the first USD250,000 incurred by the Insured and provides 50% of the remaining costs incurred up to USD750,000 that applies to this coverage.
The 100% sublimit applicable to this additional coverage is USD500,000.  This is part of, and not in addition to, the Policy Limit of Liability.

Effective Date    1st April 2012

Expiration Date   1st April 2013

Issued to  Calumet Specialty Products Partners, L.P.

End. No.  2S

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

63

Swiss Re

**EXHIBIT A**

Policy No. B0180 E120600

## ERRORS AND OMISSIONS

It is agreed that this Insurance shall not be prejudiced by an unintentional delay or omission in reporting hereunder, or any unintentional error in amount of values, provided prompt notice be given these Underwriters as soon as said facts become known to the risk manager of the named Assured and additional premium paid as required. However, nothing contained within this clause shall override any specific discovery and reporting provisions herein.

Effective Date    1st April 2012

Expiration Date   1st April 2013

Issued to Calumet Specialty Products Partners, L.P.

End. No. 26

```
Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.
```

64



**EXHIBIT A**

Policy No. B0180 E120600

## MILLENNIUM ENDORSEMENT

The policy is hereby amended as follows:

A. The Insurer will not pay for Damage or Consequential Loss directly or indirectly caused by, consisting of, or arising from, the failure of any computer, data processing equipment or media microchip, operating systems, microprocessors (computer chip), integrated circuit or similar device, or any computer software, whether the property of the Insured or not, and whether occurring before, during or after the year 2000 that results from the inability to:

1. correctly recognize any date as its true calendar date;

2. capture, save, or retain and/or correctly manipulate, interpret or process any data or information or command or instruction as a result of treating any date other than as its true calendar date; and/or

3. capture, save, retain or correctly process any data as a result of the operation of any command which has been programmed into any computer software, being a command which causes the loss of data or the inability to capture, save, retain or correctly process such data on or after any date.

B. It is further understood that the Insurer will not pay for the repair or modification of any part of an electronic data processing system or its related equipment, to correct deficiencies or features of logic or operation.

C. It is further understood that the Insurer will not pay for Damage or Consequential Loss arising from the failure, inadequacy, or malfunction of any advice, consultation, design, evaluation, inspection installation, maintenance, repair or supervision done by the Insured or for the Insured or by or for others to determine, rectify or test, any potential or actual failure, malfunction or inadequacy described in A. above.

Such damage or Consequential Loss described in A, B, or C above, is excluded regardless of any other cause that contributed concurrently or in any other sequence.

This endorsement shall not exclude subsequent Damage or Consequential Loss, not otherwise excluded, which itself results from a Defined Peril. Defined Peril shall mean: fire, lightning, explosion aircraft or vehicle impact, falling objects, windstorm, hail, tornado, hurricane, cyclone, riot, strike, civil commotion, vandalism, malicious mischief, earthquake, volcano, tsunami, freeze or weight of snow, sudden and accidental breakdown of an object, including mechanical and electrical breakdown.

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of the policy, except as herein above set forth.

Effective Date    1st April 2012                     Expiration Date   1st April 2013

Issued to  Calumet Specialty Products Partners, L.P.

End. No. 27

| Attached to and forming a part Policy No. B0180 E120600 |
| All other Terms and Conditions remain unchanged. |

65



**EXHIBIT A**

Policy No. B0180 E120600

## TERRORISM EXCLUSION

This insurance does not apply to loss, injury, damage, claim or suit, arising directly or indirectly as a result of an "act of terrorism", which is defined in the Terrorism Risk Insurance Act of 2002, as amended by the Terrorism Risk Insurance Program Reauthorization Act of 2007 (collectively, "TRIA") as follows:

(1) ACT OF TERRORISM. –

    (A) CERTIFICATION. – The term "act of terrorism" means any act that is certified by the Secretary [of the Treasury], in concurrence with the Secretary of State, and the Attorney General of the United States –
       (i) to be an act of terrorism;
       (ii) to be a violent act or an act that is dangerous to –
          (I)  human life;
          (II)  property; or
          (III)  infrastructure;
       (iii) to have resulted in damage within the United States, or outside of the United States in the case of –
          (I)  an air carrier or vessel [described in TRIA]; or
          (II)  the premises of a United States mission; and
       (iv) to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

    (B) LIMITATION. – No act shall be certified by the Secretary as an act of terrorism if –
       (i) the act is committed as part of the course of a war declared by the Congress, except that this clause shall not apply with respect to any coverage for workers' compensation; or
       (ii) property and casualty insurance losses resulting from the act, in the aggregate, do not exceed USD5,000,000.

    (C) DETERMINATIONS FINAL. – Any certification of, or determination not to certify, an act as an act of terrorism under this paragraph shall be final, and shall not be subject to judicial review.

    (D) NONDELEGATION. – The Secretary may not delegate or designate to any other officer, employee, or person, any determination under this paragraph of whether, during the effective period of the Program, an act of terrorism has occurred.

The following applies solely to commercial property policies:

Where required by state law, if an act of terrorism results in fire, the Insurer will pay for the direct loss or damage to Property Insured, as this term is defined in the commercial property policy, caused by that fire.

Effective Date    1st April 2012               Expiration Date   1st April 2013

Issued to Calumet Specialty Products Partners, L.P.

End. No. 26

---

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

---

Swiss Re

**EXHIBIT A**

Policy No. B0180 E120600

## EXPEDITING EXPENSES

The Company agrees to insure, subject to all the terms, conditions, limitations, exceptions, exclusions, provisions and stipulations of this policy not in conflict herewith, the reasonable and necessary extra costs to make temporary repairs and expedite the permanent repair or replacement of insured property damaged all while at the locations covered under this endorsement, by a cause not otherwise excluded, including overtime and the extra costs of express or other rapid means of transportation. Expediting Expenses shall not include the costs incurred by the Insured for the temporary rental of property or the temporary replacement of damaged property, nor the cost of permanent repair or replacement of the lost or damaged property. The Company's total liability for Expediting Expenses shall not exceed the sub-limit specified in the sublimits of liability in the DECLARATIONS for this coverage.

Effective Date    1st April 2012                    Expiration Date   1st April 2013

Issued to Calumet Specialty Products Partners, L.P.

End. No. 29

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

67

Swiss Re

**EXHIBIT A**

Policy No. B0180 E120600

<u>AUTHORITIES ENDORSEMENT</u>

It is hereby understood and agreed that with respect to the property section only:

Except as specifically stated in this policy or endorsement attached thereto, the company shall not be liable for loss, damage, costs, expenses, fines, or penalties incurred, sustained by or imposed on the insured at the order of any Government Agency, Court, or other Authority arising from any cause whatsoever.

Nothing contained in this Exclusions shall be deemed to alter or amend and coverage for Civil or Military Authorities provided elsewhere in this Policy.

Effective Date    1st April 2012                     Expiration Date   1st April 2013

Issued to Calumet Specialty Products Partners, L.P.

End. No.  30

| Attached to and forming a part Policy No. B0180 E120600 |
| All other Terms and Conditions remain unchanged. |

68



EXHIBIT A

Policy No. B0180 E120600

## FINE ARTS ENDORSEMENT

This Policy covers insured physical loss or damage to Fine Arts articles while anywhere within this Policy's TERRITORY, including while in transit.

### Exclusions

In addition to all other Exclusions found in this policy, this endorsement does not insure against:

1. Loss or damage from any repairing, restoration or retouching process;

2. Loss to property on exhibition at fairgrounds or premises of national or international expositions unless the premises are specifically described in this policy; and

### Valuation

The following is hereby added to the Valuation Condition of the policy.

In the event of loss or damage covered under this endorsement, the Liability of the Company shall not exceed the lesser of the following:

1. The cost to repair or restore the article to the condition that existed immediately prior to the insured event; or

2. The value designated for the article on the schedule of Fine Arts.

### Definition

Fine Arts:  Paintings; etchings; pictures; tapestries; rare or art glass; art glass windows; valuable rugs; statuary; sculptures; antique furniture; antique jewelry; bric-a-brac; porcelains; and similar property of rarity, historical value, or artistic merit excluding automobiles, coins, stamps, furs, jewelry, precious stones, precious metals, watercraft, aircraft, money, securities.

### Liability

The Company's total liability under this provision shall be limited to the amount of the Limit or Sublimit of Liability for this endorsement as specified in the Declarations, as more fully described in the Limits and Sublimits of Liability Condition of this policy.

Effective Date    1st April 2012·

Expiration Date   1st April 2013

Issued to  Calumet Specialty Products Partners, L.P.

End. No.  31

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

69



EXHIBIT A

Policy No. B0180 E120600

<u>RENTAL VALUE</u>

Time Element Endorsement No. 20, paragraph E – Gross Earnings, sub-paragraph (3) includes loss of Rental Value providing always that such loss or damage is caused by an insured peril and renders the property wholly or partially untenantable.

For the purpose of this Insurance Rental Value is defined as the sum of:

a)      The total anticipated gross rental income from tenant occupancy of the property,

b)      The amount of all charges which are the legal obligation of the tenant(s) and which would otherwise be obligations of the Insured, and

a)      The fair rental value of any portion of the property which is occupied by the Insured,

but not including non-continuing charges and expenses.

In determining Rental Value due consideration shall be given to the rental experience before the date of damage or destruction and the probable experience thereafter had no loss occurred.

Effective Date     1st April 2012                                    Expiration Date   1st April 2013

Issued to  Calumet Specialty Products Partners, L.P.

End. No.  32

| Attached to and forming a part Policy No. B0180 E120600 |
| All other Terms and Conditions remain unchanged. |

70

Swiss Re
[?]

**EXHIBIT A**

EXHIBIT A

Policy No. B0180 E120600

<u>NAMED CONTINGENT INTERRUPTION AND CONTINGENT EXTRA EXPENSE</u>

It is hereby understood and agreed the Customer and/or Supplier Names applicable to the "Contingent Business Interruption & Extra Expense Named" sublimit shown in the Property Insurance Declarations are the following (all companies named below apply as if they are direct customers or suppliers of the Insured):

Exxon Mobil Pipeline Company

TE Products Pipeline Company, LP

Plains Marketing, L.P.

Genesis Crude Oil, L.P.

Univar USA, Inc.

Lyondell Basell – Houston TX

Excel Paralubes and/or ConocoPhillips and/or Flint Hills and/or Sasol and/or LVT Conosol – Westlake, LA

Magellan

Enbridge

Great Lakes Gas Transmission

BP Products North America Inc. ("BP").

Barksdale Air Force Base.

South Hampton / Arabian-American Development Co.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

Effective Date    1st April 2012                                     Expiration Date    1st April 2013

Issued to  Calumet Specialty Products Partners, L.P.

End. No.  33

| Attached to and forming a part Policy No. B0180 E120600 |
| All other Terms and Conditions remain unchanged. |

71

Swiss Re

**EXHIBIT A**

Policy No. B0180 E120600

## SOFT COSTS/ADDITIONAL EXPENSE

This Policy is extended to include expenditures which would not have been incurred by the Insured if the interruption had not occurred as a result of physical loss or damage by any peril not excluded including, but not limited to, interest on financing, property and business taxes; resumption costs; insurance premiums and architect, engineering and consulting fees, subject to the limits of this Policy.

This Policy is further extended to include additional leasing costs incurred by the Insured due to physical loss of or damage to property insured hereunder by any peril not otherwise excluded. This Policy shall only pay the net effect of the lease costs incurred subsequent to the loss or damage and that which would have been payable had no loss or damage occurred. Such coverage shall not be limited to the Policy Period hereunder.

Liability for loss under this endorsement arising out of one occurrence shall not exceed the amount stated in the Declarations.

Effective Date    1st April 2012

Issued to Calumet Specialty Products Partners, L.P.

Expiration Date    1st April 2013

End. No. 34

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

72

Swiss Re

**EXHIBIT A**

Policy No. B0180 E120600

<u>CONFIRMATION OF COVERAGE</u>

Confirmation of Coverage and/or Verification of insurance as may be issued by John L Wortham & Son may be issued without reference to the Retention(s) or stating Retention(s) less than scheduled hereunder. The Insured hereby providing automatic indemnification to Underwriters for any difference between those Retentions shown and the actual Retentions scheduled hereto.

Effective Date     1st April 2012

Issued to  Calumet Specialty Products Partners, L.P.

Expiration Date   1st April 2013

End. No.  35

| Attached to and forming a part Policy No. B0180 E120600 |
| All other Terms and Conditions remain unchanged. |

73

Swiss Re

EXHIBIT A

Policy No. B0180 E120600

It is hereby understood and agreed that Endorsement No. 14 is deleted and replaced with the following clause:

### SERVICE OF SUIT CLAUSE (U.S.A.)

It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be due hereunder, the Underwriters hereon, at the request of the Insured, will submit to the jurisdiction of a Court of competent jurisdiction within the United States. Nothing in this clause constitutes or should be understood to constitute a waiver of Underwriters' rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer to a case to another Court as permitted by the laws of the United States or of any State in the United States. It is further agreed that service of process in such suit may be made upon Mendes & Mount, 750 Seventh Avenue, New York, NY 10019-6829 and that in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above-named are authorised and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the Insured to give a written undertaking to the Insured that they will enter a general appearance upon Underwriters' behalf in the event such suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of this contract or insurance, and hereby designate the above-named as the person to whom the said officer is authorised to mail such process or a true copy thereof.

NMA1998

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

Effective Date    1st April 2012                                   Expiration Date    1st April 2013

Issued to  Calumet Specialty Products Partners, L.P.

LONDON End. No.  A

| Attached to and forming a part Policy No. B0180 E120600 |
| All other Terms and Conditions remain unchanged. |

74



**EXHIBIT A**

Policy No. B0180 E120600

### U.S. Terrorism Risk Insurance Act of 2002 as amended
### Not Purchased Clause

*This Clause is issued in accordance with the terms and conditions of the "U.S. Terrorism Risk Insurance Act of 2002" as amended as summarized in the disclosure notice.*

It is hereby noted that the Underwriters have made available coverage for "insured losses" directly resulting from an "act of terrorism" as defined in the "U.S. Terrorism Risk Insurance Act of 2002", as amended ("TRIA") and the Insured has declined or not confirmed to purchase this coverage.

This Insurance therefore affords no coverage for losses directly resulting from any "act of terrorism" as defined in TRIA except to the extent, if any, otherwise provided by this policy.

All other terms, conditions, insured coverage and exclusions of this Insurance including applicable limits and deductibles remain unchanged and apply in full force and effect to the coverage provided by this Insurance.

LMA5092
21/12/2007

Form approved by Lloyd's Market Association

Effective Date    1st April 2012

Expiration Date    1st April 2013

Issued to Calumet Specialty Products Partners, L.P.

LONDON End. No.  B

<div style="border:1px solid black;">

Attached to and forming a part Policy No. B0180 E120600

All other Terms and Conditions remain unchanged.

</div>

75



Policy No. B0180 E120600

It is hereby understood and agreed that Endorsement No. 28 is deleted and replaced with the following clause:

## TERRORISM EXCLUSION ENDORSEMENT

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any act of terrorism regardless of any other cause or event contributing concurrently or in any other sequence to the loss.

For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to any act of terrorism.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

08/10/01
NMA2920

Effective Date    1st April 2012                          Expiration Date   1st April 2013

Issued to Calumet Specialty Products Partners, L.P.
                                                         LONDON End. No.  C

---

Attached to and forming a part Policy No. B0180 E120600
All other Terms and Conditions remain unchanged.

---

76



EXHIBIT A

It is hereby understood and agreed that Endorsement No. 13 "SCHEDULE OF LOCATIONS AND PROPERTY DAMAGE VALUES" is deleted and replaced with the following:

<u>SCHEDULE OF LOCATIONS AND PROPERTY DAMAGE VALUES</u>

It is understood and agreed that the Schedule of Replacement Cost Property Values are on file with the Companies, totaling $2,515,416,167.

The following pipelines are included in the Shreveport, Princeton and Cotton Valley values, respectively:
1) Brown Station to Shreveport: 8 miles at 10 in. diameter for crude transport. No major river crossings.
2) Princeton to Shoreline Crude Tankages: 34 miles/feet at 6 in. diameter for crude transport. Red River, major river crossings. (Cowhide Bayou, Horseshoe Bayou, Dooley Bayou, and FIFI Bayou are other crossings)
3) Fitch Pipeline to Cotton Valley: 6.2 miles/feet at 4 in. diameter for crude transport. No major river crossings.
4) Superior Plant to Magellan Pipeline – 4.927 miles of 6 in. plus 0.653 miles of 10 in. product pipeline. No major river crossings.

* Permanently idled Equipment at Shreveport, LA facility is excluded. Debris Removal coverage is provided for permanently idled equipment at the Shreveport, LA (Atlas) facility damaged as a direct result of a covered peril to covered equipment. Debris Removal sublimits apply.

JOHN L. WORTHAM & SON, L.P.
By: J. WORTHAM, L.L.C., GENERAL PARTNER

By: _Alan K. Godso_____

Alan K. Godso, Managing Director

Effective Date    1st April 2012                          Expiration Date    1st April 2013

Issued to Calumet Specialty Products Partners, L.P.

End. No.  39

| Attached to and forming a part Policy No. (See Schedule of Insurers) |
| :---: |
| All other Terms and Conditions remain unchanged. |

EXHIBIT A

Calumet Specialty Products Partners, L.P.

2012-2013 Property Damage and Time Element Insurance
Schedule of Insurers – London $650MM Quota Share

<u>TruSouth Oil, LLC and Royal Purple, Inc. Endorsement Attachment</u>

ADDITIONAL PREMIUM BASIS - $116,164

Policy No. E120600

| Insurance Company | % Participation | $ Participation | $ Premium |
|---|---|---|---|
| *Underwriters at Lloyd's London* | | | |
| Catlin (SJC) Syndicate #2003 | 3.75% | $24,375,000 | $4,356.15 |
| Brit (BRT) Syndicate #2987 | 2.00% | $13,000,000 | $2,323.28 |
| Argo (AMA) Syndicate #1200 | 3.00% | $19,500,000 | $3,484.92 |
| *London and European Companies* | | | |
| Swiss Re International SE (UK Branch) | 10.00% | $65,000,000 | $11,616.40 |
| General Security Indemnity Company Of Arizona (GSINDA – SCOR) | 10.00% | $65,000,000 | $11,616.40 |
| Partner Re Ireland Insurance Limited | 7.50% | $48,750,000 | $8,712.30 |
| International Insurance Company of Hannover, Ltd (Inter Hannover) | 3.00% | $19,500,000 | $3,484.92 |
| TOTAL: | 39.25% | $255,125,000 | $45,594.37 |

JOHN L. WORTHAM & SON, L.P.
By: J. WORTHAM, L.L.C., GENERAL PARTNER

By: *Alan K. Godso*

Alan K. Godso, Managing Director

*ENDT. 40*

**EXHIBIT A**

# CONTRACT ENDORSEMENT

| | |
|---|---|
| Unique Market Reference: | B0180/E120600 |
| Endorsement Reference: | 004 |
| Insured: | Calumet GP, LLC |

## CONTRACT CHANGES

It is hereby noted and agreed to add to the coverage provided by this Policy, the following properties. The additions shall take effect from the date detailed below or to be agreed slip leader only:

1) Effective 1 September 2012 (at 12.01 am local standard time at the address of the Insured), the Insured has acquired TruSouth Oil, LLC. Locations detailed in the attached are added effective the above date.

2) Effective 1 September 2012 (at 12.01 am local standard time at the address of the Insured), the Insured has acquired Royal Purple, Inc. Locations detailed in the attached are added effective the above date.

It is further noted and agreed that in respect of the above acquisitions the retentions that apply are:

Property Damage :     USD500,000 any one occurrence.

Business Interruption.     30 days any one occurrence.

Additional Premium.    1)    USD  65,000    annual or pro rata.
                       2)    USD 135,000    annual or pro rata.

## AGREEMENT

| GENERAL UNDERWRITERS AGREEMENT (GUA) | | |
|---|---|---|
| Each Underwriter's proportion is several not joint | | |
| Slip Leader Only | Slip Leader | All Underwriters |
| | Agreement Parties | |
| Box 1 | Box 2 | Box 3 |
| Notification to followers | | |
| | Yes / No | |
| | Within _____ working days | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

Note: Where more than one insurer participates in the contract, the contract terms may mean that it is not always necessary to obtain a record of agreement to the Contract Endorsement from all of those insurers

R K Harrison Insurance Brokers Limited (RKHIB), an appointed representative of R K Harrison Group Limited, Lloyd's broker, authorised and regulated by the Financial Services Authority. Registered Office : One Wellington Avenue, London, EC3V 1LE   Registered in England No. 728476
http://sp1/division/E/IBS_Live/Calumet GP LLC_Suite 200_IN 46214_Assured/E120600/ENDORSE/004/E120600_ENDT004.DOC

EXHIBIT A

Information:
As per attached.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

London Dated:    11 July 2012

---

AGREEMENT

| GENERAL UNDERWRITERS AGREEMENT (GUA) | | |
|---|---|---|
| Each Underwriter's proportion is several not joint | | |
| Slip Leader Only | Slip Leader And Agreement Parties | All Underwriters |
| Box 1 | Box 2 | Box 3 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Note: Where more than one insurer participates in the contract, the contract terms may mean that it is not always necessary to obtain a record of agreement to the Contract Endorsement from all of those insurers.

Page 2 of 2 Pages

R K Harrison Insurance Brokers Limited, a Lloyd's broker, authorised and regulated by the Financial Services Authority.
Registered Office - Woodlands, Manton Lane, Bedford MK41 7LW. Registered in England No. 725875

EXHIBIT A

# CONTRACT ENDORSEMENT

| | |
|---|---|
| Unique Market Reference: | B0180/E120600 |
| Endorsement Reference: | 005 |
| Insured: | Calumet Speciality Products Partners, L.P. |

## CONTRACT CHANGES

Effective 1 April 2012 Underwriters hereon note and agree that Schedule of Locations - Endorsement 13 of the policy wording is amended to read as attached (1 page).

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

London Dated:    10 August 2012

## AGREEMENT

| GENERAL UNDERWRITERS AGREEMENT (GUA) | | |
|---|---|---|
| Each Underwriter's proportion is several not joint | | |
| Slip Leader Only | Slip Leader And Agreement Parties | All Underwriters |
| Box 1 | Box 2 | Box3 |
| Notification to followers | | |
| Yes / No | | |
| Within _____ working days | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Note: Where more than one insurer participates in the contract, the contract terms may mean that it is not always necessary to obtain a record of agreement to the Contract Endorsement from all of those insurers.

R K Harrison Insurance Brokers Limited (RKHIB), an appointed representative of R K Harrison Group Limited, Lloyd's broker, authorised and regulated by the Financial Services Authority. Registered Office : One Whittington Avenue, London, EC3V 1LE. Registered in England No. 725876

http://ap1/division/E/IBS_LIVE/Calumet GP LLC_Suite 200_IN 46214_Assured/E120600/ENDORSE/005/E120600_ENDT005.DOC

EXHIBIT A

Policy No. B0180 E120600

## SCHEDULE OF LOCATIONS

It is understood and agreed that the Schedule of Replacement Cost Property Valued are on file with the Underwriters, totalling $2,515,416,168.

The following pipelines are included in the Shreveport, Princeton and Cotton Valley values respectively:
1) Brown Station to Shreveport: 8 miles at 10 in. Diameter for crude transport. No major river crossings
2) Princeton to Shoreline Crude Tankages: 34 miles/feet at 6 in. Diameter for crude transport, Red River, major river crossings (Cowhide Bayou, Horseshoe Bayou, Dooley Bayou and FIFI Bayou are other crossings).
3) Fitch Pipeline to Cotton Valley: 6.2 miles/feet at 4 in. Diameter for crude transport. No major river crossings.
4) Superior Plant to Magellan Pipeline – 4 miles of 6 in. to 8 in. product pipeline.

Permanently Idled Equipment at Shreveport, LA facility is excluded. Debris Removal coverage is provided for permanently idled equipment at the Shreveport, LA (Atlas) facility damaged as a direct result of a covered peril to covered equipment. Debris Removal sublimits apply.



Effective Date    1st April 2012

Issued to  Calumet Specialty Products Partners, L.P.

Expiration Date:  1st April 2013

End. No., 13

**EXHIBIT A**

# CONTRACT ENDORSEMENT

| | |
|---|---|
| Unique Market Reference: | B0180/E120600 |
| Endorsement Reference: | 006 |
| Insured: | Calumet GP, LLC |

## CONTRACT CHANGES

Further to Endorsement 004, reference there in under the retention to :

"Business Interruption:    30 days any one occurrence" is amended to :

"Time Element:    30 days any one occurrence".

Furthermore, effective 1 September, 2012 (at 12.01 am local standard time at the address of the Insured), it is hereby noted and agreed that the schedule of named customers and/or suppliers detailed under Endorsement 33 of this Policy, relating to the contingent business interruption and contingent extra expense coverage provided by this Policy is amended to include the following entities as they relate to the acquisitions of TruSouth Oil, LLC and Royal Purple, Inc. as per Endorsement 004 of this contract.

**TruSouth**

Infineum USA LP
B-Way Corp
Rieke Container - TSPC Inc.
Bates Container
Polyethylene Containers, Inc.

**Royal Purple**

SK Lubricants Americas, Inc.
SK Lubricants Co., Ltd., Seoul, Korea and Ulsan, Korea.
INEOS Oligomers.
ICP, LLC.

## AGREEMENT

| GENERAL UNDERWRITERS AGREEMENT (GUA) | | |
|---|---|---|
| Each Underwriter's proportion is several not joint | | |
| Slip Leader Only | Slip Leader And Agreement Parties | All Underwriters |
| Box 1 | Box 2 | Box3 |
| Notification to followers | Yes / No | |
| | Within _____ working days | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Note: Where more than one insurer participates in the contract, the contract terms may mean that it is not always necessary to obtain a record of agreement to the Contract Endorsement from all of those insurers.

R K Harrison Insurance Brokers Limited (RKHIB), an appointed representative of R K Harrison Group Limited, Lloyd's broker, authorised and regulated by the Financial Services Authority. Registered Office : One Whittington Avenue, London, EC3V 1LE. Registered in England No. 725876
http://sp1/division/E/IBS_Live/Calumet GP LLC_Suite 200_IN 46214_Assured/E120600/ENDORSE/006/E120600_ENDT006.DOC

EXHIBIT A

It is specifically noted and agreed that contingent business interruption and contingent extra expense coverage is included in respect of SK Lubricants Co., Ltd, Korea as respects their locations in Seoul (parent company location) and Ulsan (production site), notwithstanding that this falls outside the Territory of the Policy. The production site is located at Ulsan Refinery in Ulsan, Korea.

Furthermore, it is hereby noted and agreed that the Business Interruption values provided for these entities are not provisional and are not subject to adjustment at policy expiring.

Furthermore, in respect of Endorsement 006 (dated 10 August 2012), it is hereby noted and agreed that item 4) of the Schedule of Locations is amended to read:

4) Superior Plant to Magellan Pipeline – 4.927 miles of 6 in. plus 0.653 miles of 10 in. product pipeline. No major river crossings.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.
London Dated:     28 August 2012

## AGREEMENT

| GENERAL UNDERWRITERS AGREEMENT (GUA) | | |
|---|---|---|
| Each Underwriter's proportion is several not joint | | |
| Slip Leader Only | Slip Leader And Agreement Parties | All Underwriters |
| Box 1 | Box 2 | Box3 |

|  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |

Note: Where more than one insurer participates in the contract, the contract terms may mean that it is not always necessary to obtain a record of agreement to the Contract Endorsement from all of those insurers.

R K Harrison Insurance Brokers Limited, a Lloyd's broker, authorised and regulated by the Financial Services Authority.
Registered Office : Woodlands, Manton Lane, Bedford MK41 7LW. Registered in England No. 725875

**EXHIBIT A**

# CONTRACT ENDORSEMENT

| | |
|---|---|
| Unique Market Reference: | B0160/E120800 |
| Endorsement Reference: | 004 |
| Insured: | Calumet GP, LLC |

## CONTRACT CHANGES

It is hereby noted and agreed to add to the coverage provided by this Policy, the following properties. The additions shall take effect from the date detailed below or to be agreed slip leader only:

1) Effective 1 September 2012 (at 12.01 am local standard time at the address of the insured), the insured has acquired TruSouth Oil, LLC. Locations detailed in the attached are added effective the above date.

2) Effective 1 September 2012 (at 12.01 am local standard time at the address of the insured), the insured has acquired Royal Purple, Inc. Locations detailed in the attached are added effective the above date.

It is further noted and agreed that in respect of the above acquisitions the retentions that apply are:

Property Damage : USD500,000 any one occurrence.

Business Interruption: 30 days any one occurrence.

| Additional Premium. | 1) | USD | 65,000 | annual or pro rata. |
|---|---|---|---|---|
| | 2) | USD | 155,000 | annual or pro rata. |

*In respect of Naval Western Royal Purple ... to be written the USD 60m sublimit and slip retentions ... to apply.* *(handwritten)*

*CATLIN 3.75% Q.S. Line   included* *(handwritten)*

## AGREEMENT

| GENERAL UNDERWRITERS AGREEMENT (GUA) | | |
|---|---|---|
| Each Underwriter's proportion is several not joint | | |
| Slip Leader Only | Slip Leader | All Underwriters |
| | Agreed Parties | |
| Box 1 | Box 2 | Box 3 |
| Notification to followers | | |
| | Yes / No | |
| Within _____ working days | | |

*941656* *(handwritten)*

Note: Where more than one insurer participates in the contract, the contract terms may mean that it is not always necessary to obtain a record of agreement to the Contract Endorsement from all of those leaders.

Page 1 of 2 Pages

R K Harrison Insurance Brokers Limited (RKHB), an appointed representative of R K Harrison Group Limited, Lloyd's broker, authorised and regulated by the Financial Services Authority. Registered Office: One Whittington Avenue, London, EC3V 1LE. Registered in England No. 725875
http://sp1/division/E/RBS_Live/Calumet GP LLC_Suite/200_IN/4214_Assured/E120800/CNDO/R&E/004/E120800_ENDT.004.DOC

EXHIBIT A

Calumet GP, LLC

Information relating to the acquisitions of TruSouth and Royal Purple.

**TruSouth Oil, LLC**

Occupancy:        Founded in 2006 TruSouth Oil is a specialty petroleum packaging
                  and distribution operation located near the Port of Shreveport-
                  Bossier, LA.

                  TruSouth manufactures and markets a variety of specialty products
                  including motor oils, gear oils, engine oils, automotive fluids and
                  specialty engineering fuel and oil mix products.

Locations:        1)   10411 Highway 1, Shreveport, LA 71115.

                  2)   9136 Mansfield Rd., Shreveport, LA 71118.

Values:           Physical Damage    1) USD24,637,000
                                     2) USD11,500,000 (stock only)

                  Business Interruption : USD7,800,000 (annual).

Loss History:     No losses.

Other Info:       The facility is sprinklered
                  The main location is located in Flood Zone X.
                  General Description (2 pages).
                  Starr Tech Rec Update Meeting Notes (3 pages).
                  Facility photos (9 pages).

**Royal Purple, Inc.**

Occupancy:        Founded in 1986 Royal Purple is a blending and packaging operation
                  located north of Houston TX.

                  Royal Purple manufactures high performance lubricants primarily for
                  automotive, industrial, marine, motorcycle and racing applications.

Locations:        1 Royal Purple Lane, Porter, TX 77365.

       Values:    Physical Damage    1) USD17,266,000
                                     2) USD13,000,000 (stock only)

                  Business Interruption : USD39,731,000 (annual).

Loss History      No losses.

Other Info:       Located in Montgomery County
                  Facility Plot plan (1 page).
                  Facility Photos (8 pages).

**EXHIBIT A**

## Calumet Montana Refining, LLC. Endorsement

It is hereby noted and agreed to add to the coverage provided by this Policy the acquisition by the Insured of the Montana Refining Company, Inc.

The acquisition, consisting of a refinery located at 1900 Tenth Street NE, Great Falls, Montana, 59404, is to be added effective date to be agreed.

This plant is to be added subject to the terms and conditions of this Policy excepting that:

a) The Retentions that are to apply to this acquisition are as detailed below.

b) Additional Premium due at slip rate being USD1,150,000 annual subject to pro rata for period.

c) Applicable to Partner Re only: Limit and sublimits for the refinery as per the Montana Refining Company Policy (Chartis Policy Number 53089749).

Information:

The refinery is located at 1900 Tenth Street NE, Great Falls, Montana, 59404.

Refinery crude oil throughput capacity is approximately 9,800 barrels per day.

Current Insured Values: Property Damage:    USD442,100,000
                        Business Interruption:  USD 68,000,000
                        Total                 USD510,100,000

The business interruption values provided above are not provisional and are not subject to adjustment at policy expiring.

The refinery has sustained no insured losses at least the last 5 years.

### Retentions applicable to the Montana Refining Acqusition

Earthquake:                     An amount equivalent to 3% of the scheduled Property Damage insured value of the location(s) affected by the loss, subject to a minimum of USD1,000,000 any one occurrence.

Flood:                          An amount equivalent to 3% of the scheduled Property Damage insured value of the location(s) affected by the loss, subject to a minimum of USD1,000,000 any one occurrence.

Offices and Admin Buildings:    USD25,000 any one occurrence

All other Property Damage:      USD1,000,000 any one occurrence.

All Time Element coverages:     45 days any one occurrence.

Effective Date    1st October 2012                      Expiration Date   1st April 2013

Issued to Calumet Specialty Products Partners, L.P.

End. No. 41

**EXHIBIT A**

Calumet Specialty Products Partners, L.P.

2012-2013 Property Damage and Time Element Insurance
Schedule of Insurers – London $650MM Quota Share

Montana Refining Acquisition Endorsement No. 41 Attachment

ADDITIONAL PREMIUM BASIS - $573,425.00 ($1.15mm x 182 days / 365 days)

Policy No. E120600

| Insurance Company | % Participation | $ Participation | $ Premium |
|---|---|---|---|
| *Underwriters at Lloyd's London* | | | |
| Catlin (SJC) Syndicate #2003 | 3.75% | $24,375,000 | $21,503.44 |
| Brit (BRT) Syndicate #2987 | 2.00% | $13,000,000 | $11,468.50 |
| Argo (AMA) Syndicate #1200 | 3.00% | $19,500,000 | $17,202.75 |
| *London and European Companies* | | | |
| Swiss Re International SE (UK Branch) | 10.00% | $65,000,000 | $57,342.50 |
| General Security Indemnity Company Of Arizona (GSINDA – SCOR) | 10.00% | $65,000,000 | $57,342.50 |
| Partner Re Ireland Insurance Limited | 7.50% | $48,750,000 | $43,006.88 |
| International Insurance Company of Hannover, Ltd (Inter Hannover) | 3.00% | $19,500,000 | $17,202.75 |
| TOTAL: | 39.25% | $255,125,000 | $225,069.32 |

JOHN L. WORTHAM & SON, L.P.
By: J. WORTHAM, L.L.C., GENERAL PARTNER
By: _Alan K. God_
. Alan K. Godso, Managing Director

**EXHIBIT A**

## Railroad Rolling Stock & Contents Sublimit Endorsement

It is hereby noted and agreed that in respect of the coverage provided by this Policy in respect of railroad rolling stock and contents thereof, it is hereby noted and agreed that the coverage provided by this Policy applies to such property, whether owned or leased by the Insured or when such property is owned by others but is in the care, custody or control of the Insured, whilst on insured premises subject to a sublimit hereon of USD5,000,000 any one occurrence."

JOHN L. WORTHAM & SON, L.P.
By: J. WORTHAM, L.L.C., GENERAL PARTNER

By: _Alan K. Godso_
Alan K. Godso, Managing Director

Effective Date    1ˢᵗ October 2012    Expiration Date    1st April 2013

Issued to Calumet Specialty Products Partners, L.P.

End. No. 42

| Attached to and forming a part Policy No. (See Schedule of Insurers) |
| :---: |
| All other Terms and Conditions remain unchanged. |

**EXHIBIT A**

<table>
<tr><td>

CALUMET SPECIALTY PRODUCTS
PARTNERS, L.P., CALUMET
REFINING, LLC, CALUMET
SHREVEPORT REFINING, LLC,

      Plaintiffs,

VERSUS

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA,
ACE AMERICAN INSURANCE COMPANY,
GENERAL SECURITY INDEMNITY
COMPANY OF ARIZONA, XL
INSURANCE AMERICA, INC., HOUSTON
CASUALTY COMPANY, PEMBROKE
SYNDICATE #4000, SYNDICATE #1221,
SWISS RE INTERNATIONAL SE
(UK BRANCH), GREAT LAKES
REINSURANCE (UK) PLC, PARTNER
RE IRELAND INSURANCE LTD.,
INFRASSURE LTD., HDI GLOBAL
SPECIALTY SE (FORMERLY
INTERNATIONAL INSURANCE COMPANY
OF HANNOVER, LTD.), CERTAIN
UNDERWRITERS AT LLOYDS (TALBOT
SYNDICATE #1183), CERTAIN
UNDERWRITERS AT LLOYDS (CATLIN
SYNDICATE #2003), CERTAIN
UNDERWRITERS AT LLOYDS (ARGO
SYNDICATE #1200), CERTAIN
UNDERWRITERS AT LLOYDS (BRIT
SYNDICATE #2987),

    Defendants.

</td><td>

SUIT NO. 68953021    DIV. D

19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

</td></tr>
</table>

## PLAINTIFF CALUMET'S FIRST SET OF INTERROGATORIES TO DEFENDANT

TO:    CERTAIN UNDERWRITERS AT LLOYDS IDENTIFIED AS TALBOTS
        UNDERWRITING LTD SYNDICATE #1183, CAITLIN SYNDICATE #2003, ARGO
        SYNDICATE #1200, AND BRIT INSURANCE SYNDICATE
        Through its Agent for Service of Process
        Medes & Mount
        750 Seventh Avenue
        New York, NY 10019

On authority of Art. and 1458 of the Louisiana Code of Civil Procedure, Plaintiffs,

CALUMET SPECIALITY PRODUCTS PARTNERS, L.P., ET AL, propound the following

Interrogatories to Defendant, CERTAIN UNDERWRITERS AT LLOYD IDENTITIFIED AS

TALBOTS UNDERWRITING LTD SYNDICATE #1183, CAITLIN SYNDICATE #2003,

ARGO SYNDICATE #1200, AND BRIT INSURANCE SYNDICATE, to be answered fully,

completely, in writing, and under oath within the time period prescribed by law. To the full extent

required by art. 1428 of the Louisiana Code of Civil Procedure, these Interrogatories are deemed

**EXHIBIT A**

to be continuing, and supplementation of all responses is requested as information changes and/or becomes available.

:

DEFINITIONS AND INSTRUCTIONS

1. "Calumet" shall mean Calumet Specialty Products Partners, L.P., Calumet Refining, LLC, and Calumet Shreveport Refining, LLC, and any parent, subsidiary, division, affiliate, successor or predecessor in interest of those entities, and all present and former officers, directors, managers, employees, attorneys, agents, affiliates, and principals of those entities.

2. "Pipeline" shall mean the North Line owned and operated by ExxonMobil Pipeline Company.

3. "EMPCO" shall mean ExxonMobil Pipeline Company, and/or any of its present or former officers, directors, employees, in-house and outside counsel, agents, representatives, and/or other persons acting or purporting to act on their behalf or under their control, as well as any predecessor or successor company in any division, parent company, subsidiary or affiliate.

4. "PHMSA" shall mean United States Department of Transportation Pipeline and Hazardous Materials Safety Administration, and/or any of its present or former officers, directors, employees, in-house and outside counsel, agents, representatives, and/or other persons acting or purporting to act on their behalf or under their control, as well as any predecessor or successor organization in any division, parent company, subsidiary or affiliate.

5. "Rupture" shall mean the rupture of the Pipeline that occurred on April 28, 2012 near Torbert, Louisiana.

6. "Refinery" shall mean Calumet's refinery located in Shreveport, Louisiana.

7. "Insurers," "you," or "your" shall mean collectively and severally, Defendants National Union Fire Insurance Company of Pittsburgh, PA ("National Union"); ACE American Insurance Company ("Ace"); General Security Indemnity Company of Arizona ("General Security"); XL Insurance America, Inc. ("XL"); Houston Casualty Company ("HCC"); Pembroke Syndicate #4000 and Syndicate #1221; Swiss Re International SE (UK Branch) ("Swiss Re"); Great Lakes Reinsurance UK PLC ("Great Lakes"); Partner Re Ireland Insurance Ltd. ("Partner Re"); Infrassure Ltd. ("Infrassure"); HDI Global Specialty SE ("HDI"); and Certain Underwriters at Lloyds identified as Talbot Underwriting Ltd. Syndicate #1183, Catlin Syndicate #2003, Argo Syndicate #1200, and Brit Insurance Syndicate #2987 and/or any of their present or former

2

EXHIBIT A

officers, directors, employees, in-house and outside counsel, agents, representatives, and/or other persons acting or purporting to act on its behalf or under its control, as well as any predecessor or successor company in any division, parent company, subsidiary or affiliate.

8. "Policies" shall mean each of the following:

- National Union policy number 63803935
- Ace policy number EPR NO 5111559
- General Security policy number E120600
- XL policy number US00006797PR12A
- HCC policy number H12-TP10101-00
- Pembroke Syndicate #4000 and Syndicate #1221 policy number 12NSRO1390-01
- Swiss Re policy number E120600
- Great Lakes policy number E122276
- Partner Re policy number E120600
- Infrassure policy number E122280
- HDI policy number E120600
- Certain Underwriters at Lloyds identified as Talbot Underwriting Ltd. Syndicate #1183, Catlin Syndicate #2003, Argo Syndicate #1200, and Brit Insurance Syndicate #2987 policy numbers E120600 and/or AJH085579D12

9. "Claim" shall mean Calumet's claim for losses suffered as a result of the Rupture.

10. "Communication(s)" shall mean the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

11. "Document" shall be synonymous in meaning and equal in scope to the usage of the term "document" in the Louisiana Code of Civil Procedure. A draft or non-identical copy is a separate document within the meaning of this term.

12. "Include" or "including" shall have their ordinary meaning and shall mean "including, but not limited to."

13. "Knowledge," "information," "possession," "custody," and "control" possessed or exercised by a person shall be construed to include knowledge, information, possession, custody, and control possessed or exercised by such person's agents, representatives, and attorneys.

14. "Person" is any natural person or legal entity, including, without limitation, any business or governmental entity or association.

15. "Refer" or "Relate to" shall mean containing, constituting, discussing, describing, identifying, referring to, supporting, explaining, contradicting, and/or in any way pertaining to the subject specified.

16. If you believe that any of the following Interrogatories calls for privileged information, answer so much of the interrogatory not objected to, and set forth, with respect to such information as to which a claim of privilege is asserted, the nature of the privilege claimed and all the reasons upon which you base the claim of privilege.  For information as to which you claim privilege, state:

    a.  the subject matter of the information, sufficient to assess whether the assertion of privilege is valid;

    b.  the name of the person(s) with knowledge of or in possession of the information;

    c.  if not previously identified, the nature of the privilege being claimed and the facts relevant to that claim; and

    d.  the number of the interrogatory to which the information is responsive.

17. The singular of each word shall be construed to include its plural and vice versa, and the root word and all forms thereof shall be construed to include each other.

18. "And" as well as "or" shall be construed both conjunctively as well as disjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

19. "Each" shall be construed to include "all," and vice versa.

20. "Any" shall be construed to include "all," and vice versa.

21. The present tense shall be construed to include the past tense, and vice versa.

22. The masculine shall be construed to include the feminine, and vice versa.

### INTERROGATORIES

1.  Identify each provision of the Policies you contend supports your denial of the Claim.

2.  State the name, current or last-known address and job title of each Person who participated in the decision to deny or dispute the Claim, the date(s) and nature of his or her participation, the specific job title and position held by such Person at the time of his or her participation, and the basis and relevant supporting documents for each Person's participation in the decision to deny or dispute the Claim.

3.  What do you contend caused the Rupture?

4

**EXHIBIT A**

4.  Identify all information you received from Calumet relating to the Claim.

5.  Identify all information you received from any Person other than Calumet relating to the Claim.

6.  Explain your process in reaching your decision to deny coverage for the Claim, including what you consulted and how you investigated the Claim.

7.  If you contend that the Civil Authority Coverage indemnity period cannot be combined with any CBI/CEE coverage, state the basis for your understanding.

8.  Do you contend that the phrase in Endorsement 20 "This endorsement shall take precedent over any like coverage contained in the Time Element Endorsement No. 19 except when the coverage provided by this Endorsement is more restrictive than the coverage provided under Time Element Endorsement No. 19" is free of ambiguity?

9.  Identify all persons who drafted Endorsement(s) Number 19 and 20.

10. If you lack sufficient knowledge to affirm or deny any facts alleged in Calumet's Petition, please so state.

11. If you contend that Exclusion 8.i for "[u]nderground and underwater piping" (the "Pipeline Exclusion") applies to preclude coverage for the Claim, describe the nature of the application of the exclusion and set forth all facts and all relevant evidence that supports your contention.

12. If you contend that Calumet resumed supplying its Shreveport refinery with alternative crude supplies from new location(s) following the Rupture, please state the date(s) of resumption.

13. If you contend that Exclusion 9.b. for the "[c]ost of making good faulty or defective material, faulty workmanship, errors or omissions in design" (the "Faulty Workmanship Exclusion") applies to preclude coverage for the Claim, describe the nature of the application of the exclusion and set forth all facts and all relevant evidence that supports your contention.

14. If you contend that the Civil Authority Endorsement does not apply to this Claim, explain your basis for that contention and set forth all facts and all relevant evidence that supports your contention.

15. If you contend that Calumet did not exercise commercially reasonable diligence in connection with its recovery from the EMPCO Rupture, please set forth all facts and all relevant evidence that supports your contention.

5

**EXHIBIT A**

16. Please state your understanding as to whether the May 8, 2012 Corrective Action Order issued by PHMSA to EMPCO affected the repair, replacement, reconstruction, retesting, or resumption of the Pipeline.

17. State your understanding of the physical repair of the EMPCO Pipeline that you contend was carried out during May 2012.

18. State whether you considered, reviewed or relied upon any other claims asserted for EMPCO-related time element claims (e.g. Lion Oil) in connection with your investigation of this Claim. If yes, please set forth all facts and all relevant evidence that you considered, reviewed or relied upon.

19. If you contend that the physical repair of the Pipeline ends the interruption of Calumet's business under the Policy, explain your basis for that contention and set forth all facts and all relevant evidence that supports your contention.

20. For each affirmative defense you cite in response to Calumet's Petition, explain your basis for those defenses and set forth all facts and all relevant evidence that supports those defenses.

21. Identify each Person who prepared or assisted in the preparation of any responses to the preceding interrogatories, state the Person's name, business address, job title and duties, and what that Person did with respect to the preparation of the interrogatory responses, including by number the specific interrogatory responses that the Person prepared or assisted in preparing.

Respectfully Submitted:

Donald J. Cazayoux, Jr. #20742
J. Lane Ewing, Jr. #29854
CAZAYOUX EWING, LLC
257 Maximilian Street
Baton Rouge, LA 70802
Telephone: (225) 650-7400
Facsimile: (225) 650-7401
don@cazayouxewing.com
lane@cazayouxewing.com

Geoffrey J. Greeves
        (*pro hac vice application to be filed*)
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street NW, Suite 1350
Washington, DC 20036
Telephone: 202-719-8221
ggreeves@bradley.com

And

Alex Purvis
        (*pro hac vice application to be filed*)
BRADLEY ARANT BOULT CUMMINGS LLP

6

**EXHIBIT A**

Suite 1000, One Jackson Place
188 East Capitol Street
Post Office Box 1789
Jackson, MS  39215-1789
Telephone:  (601) 948-8000
Facsimile:  (601) 948-3000
apurvis@bradley.com

CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of October, 2019, the foregoing First Set of Interrogatories was served by electronic and/or first-class mail on the following:

Certain Underwriters at Lloyds identified as Talbots Underwriting Ltd. Syndicate #1183, Caitlin Syndicate #2003, Argo Syndicate #1200, and Brit Insurance Syndicate
Mendes & Mount
750 Seventh Avenue
New York, NY 10019

Cy J. D'Aquila, Jr., Esq.
D'AQUILA LAW FIRM
Post Office Box 866
New Roads, LA  70760
Email:  cy@daquilalawfirm.com

Charles L. Chassaignac, IV, Esq.
PORTEOUS, HAINKEL & JOHNSON, LLP
301 St. Charles Street
Baton Rouge, LA  70802
Email:  cchassaignac@phjlaw.com

Frank X. Neuner, Jr.
Phillip M. Smith
NEUNERPATE
One Petroleum Center, Suite 200
1001 West Pinhook Road
Lafayette, LA  70503
Email:  fneuner@neunerpate.com
Email:  psmith@neunerpate.com

Tod A. Phillips
Lisa M. Wright
WRIGHT CLOSE & BARGER, LLP
One Riverway, Suite 2200
Houston, TX  77056
Email:  phillips@wrightclosebarger.com
Email:  lwright@wrightclosebarger.com

Donald J. Cazayoux, Jr.
J. Lane Ewing, Jr.

7

**EXHIBIT A**

| | |
|---|---|
| CALUMET SPECIALTY PRODUCTS PARTNERS, L.P., CALUMET REFINING, LLC, CALUMET SHREVEPORT REFINING, LLC, | SUIT NO. 68953021        DIV. D |
| **Plaintiffs,** | |
| **VERSUS** | |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, ACE AMERICAN INSURANCE COMPANY, GENERAL SECURITY INDEMNITY COMPANY OF ARIZONA, XL INSURANCE AMERICA, INC., HOUSTON CASUALTY COMPANY, PEMBROKE SYNDICATE #4000, SYNDICATE #1221, SWISS RE INTERNATIONAL SE (UK BRANCH), GREAT LAKES REINSURANCE (UK) PLC, PARTNER RE IRELAND INSURANCE LTD., INFRASSURE LTD., HDI GLOBAL SPECIALTY SE (FORMERLY INTERNATIONAL INSURANCE COMPANY OF HANNOVER, LTD.), CERTAIN UNDERWRITERS AT LLOYDS (TALBOT SYNDICATE #1183), CERTAIN UNDERWRITERS AT LLOYDS (CATLIN SYNDICATE #2003), CERTAIN UNDERWRITERS AT LLOYDS (ARGO SYNDICATE #1200), CERTAIN UNDERWRITERS AT LLOYDS (BRIT SYNDICATE #2987), | 19TH JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE |
| **Defendants.** | **STATE OF LOUISIANA** |

---

## PLAINTIFF CALUMET'S FIRST SET OF REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANT

---

Plaintiffs Calumet Specialty Products Partners, L.P., Calumet Refining, LLC, and Calumet Shreveport Refining, LLC, pursuant to La. Code Civ. Proc. art. 1462, serve the following Request for Production of Documents (the "Request") on Certain Underwriters at Lloyds Identified as Talbots Underwriting Ltd Syndicate #1183, Caitlin Syndicate #2003, Argo Syndicate #1200, and Brit Insurance Syndicate:

DEFINITIONS AND INSTRUCTIONS

1.    "Calumet" shall mean Calumet Specialty Products Partners, L.P., Calumet Refining, LLC, and Calumet Shreveport Refining, LLC, and any parent, subsidiary, division, affiliate, successor or predecessor in interest of those entities, and all present and former officers, directors, managers, employees, attorneys, agents, affiliates, and principals of those entities.

**EXHIBIT A**

2.    "Pipeline" shall mean the North Line owned and operated by ExxonMobil Pipeline Company.

3.    "EMPCO" shall mean ExxonMobil Pipeline Company, and/or any of its present or former officers, directors, employees, in-house and outside counsel, agents, representatives, and/or other persons acting or purporting to act on their behalf or under their control, as well as any predecessor or successor company in any division, parent company, subsidiary or affiliate.

4.    "PHMSA" shall mean United States Department of Transportation Pipeline and Hazardous Materials Safety Administration, and/or any of its present or former officers, directors, employees, in-house and outside counsel, agents, representatives, and/or other persons acting or purporting to act on their behalf or under their control, as well as any predecessor or successor organization in any division, parent company, subsidiary or affiliate.

5.    "Rupture" shall mean the rupture of the Pipeline that occurred on April 28, 2012 near Torbert, Louisiana.

6.    "Refinery" shall mean Calumet's refinery located in Shreveport, Louisiana.

7.    "Insurers," "you," or "your" shall mean collectively and severally, Defendants National Union Fire Insurance Company of Pittsburgh, PA ("National Union"); ACE American Insurance Company ("Ace"); General Security Indemnity Company of Arizona ("General Security"); XL Insurance America, Inc. ("XL"); Houston Casualty Company ("HCC"); Pembroke Syndicate #4000 and Syndicate #1221; Swiss Re International SE (UK Branch) ("Swiss Re"); Great Lakes Reinsurance UK PLC ("Great Lakes"); Partner Re Ireland Insurance Ltd. ("Partner Re"); Infrassure Ltd. ("Infrassure"); HDI Global Specialty SE ("HDI"); and Certain Underwriters at Lloyds identified as Talbot Underwriting Ltd. Syndicate #1183, Catlin Syndicate #2003, Argo Syndicate #1200, and Brit Insurance Syndicate #2987 and/or any of their present or former officers, directors, employees, in-house and outside counsel, agents, representatives, and/or other persons acting or purporting to act on its behalf or under its control, as well as any predecessor or successor company in any division, parent company, subsidiary or affiliate.

8.    "Policies" shall mean each of the following:

- National Union policy number 63803935

- Ace policy number EPR NO 5111559

- General Security policy number E120600

- XL policy number US00006797PR12A

2

- HCC policy number H12-TP10101-00

- Pembroke Syndicate #4000 and Syndicate #1221 policy number 12NSRO1390-01

- Swiss Re policy number E120600

- Great Lakes policy number E122276

- Partner Re policy number E120600

- Infrassure policy number E122280

- HDI policy number E120600

- Certain Underwriters at Lloyds identified as Talbot Underwriting Ltd. Syndicate #1183, Catlin Syndicate #2003, Argo Syndicate #1200, and Brit Insurance Syndicate #2987 policy numbers E120600 and/or AJH085579D12

9.    "Claim" shall mean Calumet's claim for losses suffered as a result of the Rupture.

10.    "Communication(s)" shall mean the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

11.    "Document" shall be synonymous in meaning and equal in scope to the usage of the term "document" in the Louisiana Code of Civil Procedure. A draft or non-identical copy is a separate document within the meaning of this term.

12.    "Include" or "including" shall have their ordinary meaning and shall mean "including, but not limited to."

13.    "Knowledge," "information," "possession," "custody," and "control" possessed or exercised by a person shall be construed to include knowledge, information, possession, custody, and control possessed or exercised by such person's agents, representatives, and attorneys.

14.    "Person" is any natural person or legal entity, including, without limitation, any business or governmental entity or association.

15.    "Refer" or "Relate to" shall mean containing, constituting, discussing, describing, identifying, referring to, supporting, explaining, contradicting, and/or in any way pertaining to the subject specified.

16.    If you believe that any of the following Requests calls for the production of documents that you claim contain privileged material, produce so much of the documents as are not objected to, and set forth, with respect to each such document as to which a claim of privilege is asserted, the nature of the privilege claimed and all the reasons upon which you base the claim of privilege. For each document or part of a document as to which you claim privilege, state:

**EXHIBIT A**

a.    the date thereof;

b.    the type, title, and subject matter of the document, sufficient to assess whether the assertion of privilege is valid;

c.    the name of the person(s) who prepared or signed the document;

d.    the name and positions of all intended and actual recipients of the document;

e.    each person now in possession of the original or a copy of the document;

f.    if not previously identified, the nature of the privilege being claimed and the facts relevant to that claim; and

g.    the number of the document request to which the document is responsive.

17.    The singular of each word shall be construed to include its plural and vice versa, and the root word and all forms thereof shall be construed to include each other.

18.    "And" as well as "or" shall be construed both conjunctively as well as disjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

19.    "Each" shall be construed to include "all," and vice versa.

20.    "Any" shall be construed to include "all," and vice versa.

21.    The present tense shall be construed to include the past tense, and vice versa.

22.    The masculine shall be construed to include the feminine, and vice versa.

23.    Electronically stored information shall be produced in text searchable "Tagged Image File" format (.tif), accompanied by the complete metadata in a delimited load file. Specific items of such information, such as spreadsheets, shall be produced in their native file format.

24.    Unless indicated otherwise in the specific Request, these Request calls for information and documents beginning on January 1, 2012 up to the present date.

REQUEST FOR PRODUCTION OF DOCUMENTS

1.    All documents relating to your contention that the Policies do not provide coverage for Calumet's claim.

2.    A complete and certified copy of any insurance policy issued by you to Calumet during the policy period that would apply to a loss in April 2012.

3.    A complete copy of any insurance policy issued to Calumet within your custody, control, or possession.

4

**EXHIBIT A**

4.     All documents that relate to any aspect of any insurance policy, or part thereof, issued, sold or subscribed to by you to Calumet, including without limitation any placing slips, indemnity files, applications, rating information, specifications, endorsements, riders, binders, cover notes, memoranda of insurance, certificates, dailies, policy slips, claims manuals, underwriting manuals, correspondence, reinsurance agreements, or other documents indicating the existence, terms, conditions and scope of coverage of each such policy.

5.     All notes, records, or other documents prepared, received or maintained by you in connection with the drafting and/or intent of any provision of the Policies which you contend justifies the denial of the Claim in whole or in part.

6.     All documents that refer or relate to any visits to, inspections of, reports on, or evaluations of the Refinery that have been made by you or on your behalf, whether before or after the Rupture, including without limitation any such documents generated for loss prevention, safety, engineering, risk evaluation or coverage determination purposes.

7.     All documents generated by the Louisiana Department of Environmental Quality, in response to the Rupture which you considered in your handling of this Claim.

8.     All documents you considered in your handling of the Claim referring to the Rupture of the EMPCO North Line in April 2012.

9.     All documents that refer or relate to any visits to, inspections of, reports on, or evaluations of the Pipeline that have been made by you or on your behalf, whether before or after the Rupture, including without limitation any such documents generated for loss prevention, safety, engineering, risk evaluation or coverage determination purposes.

10.     All documents generated in connection with any aspect of your evaluation of whether to accept or decline coverage for the Claim.

11.     All documents you relied upon or considered in your analysis of the Claim which mention or refer to Delek US or Lion Oil.

12.     All documents generated by William Kramer & Associates (WKA) mentioning the Rupture which you reviewed in connection with this Claim.

13.     All documents exchanged between you and Specialty Adjusters that mention or refer to this Claim.

14.     All documents exchanged between you and the Robins Kaplan law firm that mention or refer to this Claim which were generated on or after January 1, 2016.

5

15.    All documents that mention or refer to your claims handing methodologies or guidelines for contingent business interruption losses.

16.    All depositions and/or testimony you reviewed in connection with your handling of this Claim given by any of the following:  Marsh, Delek/Lion Oil, Navigant, HSNO, AIG, EMPCO.

17.    All documents generated by Tom Dollar that reference or mention Calumet's claim or the Policies.

18.    All documents that mention or refer to your claims handling methodologies or guidelines for civil authority losses.

19.    All communications between you and EMPCO regarding the Rupture.

20.    All communications between you and PHMSA regarding the Rupture.

21.    Responses and documents produced with regard to any subpoenas you have directed to non-parties in this litigation.

22.    Your complete claim file relating to the Claim, whether maintained in your field office, regional office, home office, or any other office, including without limitation:

    a.   all letters, memoranda, and other forms of written communication to or from any of your employees, agents, consultants, or advisors relating in any way to the processing of the Claim;

    b.   all written records of any oral communications, whether in person or by telephone, to or from any of your employees, agents, consultants, or advisors relating in any way to the processing of the Claim;

    c.   all written communications or written records of oral communications, whether in person or by telephone, between any of your employees, agents, consultants, or advisers and Calumet relating in any way to the Claim;

    d.   all written communications or written records of oral communications, whether in person or by telephone, between any of your employees, agents, reinsurers, consultants, or advisers and any third party relating in any way to the Claim;

    e.   all written records of any investigation conducted in connection with the Claim;

    f.   all written communications or written records of oral communications, whether in person or by telephone, between any of your employees, agents, reinsurers,

6

EXHIBIT A

consultants, or advisers relating in any way to the decision to deny the Claim in whole or in part;

g.  all written communications or written records of oral communications, whether in person or by telephone, between any of your employees, agents, reinsurers, consultants, or advisers and any third party relating in any way to the decision to deny the Claim in whole or in part;

h.  all other written documents pertaining to the Claim; and

i.  the file folders in which the preceding documents are kept.

23.  Your complete underwriting files referring or relating in any way to the Policies, including without limitation:

a.  all letters, specifications, binders, memoranda, and other forms of written communications and records, and oral communications, whether in person or by telephone, referring or relating in any way to the issuance of the Policies or any commercial property insurance policy issued by you to Calumet for any preceding policy period; and

b.  the file folders in which the preceding documents are kept.

24.  All communications and documents exchanged between you and John L. Wortham & Son regarding this loss, the Rupture and or the Claim.

25.  All documents relating to the negotiation, purchase, execution, placement, issuance, rating, underwriting or renewal of the Policies, including any communications you have had at any time with Calumet, the Insurers, John L. Wortham & Son or any other person.

26.  All underwriting manuals and bulletins (including superseded pages of volumes that have been revised), other guidelines and instructional materials (including without limitation workbooks, training manuals, seminar materials, policy annotations, and guideline memoranda), and all other documents relating to the handling, processing, adjustment or determination of coverage for commercial property and/or time element insurance claims, including but not limited to documents reflecting or relating to matters considered in determining your response to the Claim.

27.  All documents that relate to any policy, procedure, guideline, or practice you have or have had in the past with respect to the investigation, handling, or disposition of time element losses.

**EXHIBIT A**

28.    All documents that reflect your study of any prior EMPCO losses in connection with the Claim.

29.    Any subrogation demands you made on EMPCO relating to the Rupture.

30.    All documents that reflect your study of or reference to Delek/Lion Oil's claim for coverage for the Rupture.

31.    All documents that describe the job responsibilities of any person presently or formerly employed or retained by you for their expertise related to time element and/or contingent time element losses and coverage, or describe or reflect any library or reference research or research services related to these subjects.

32.    All documents that relate to the origin, drafting, interpretation, advertising, application or use of the Policies' exclusion applicable to underground and underwater piping, including (i) all documents that relate to any definitions of "underground and underwater piping" as used in the Policies; (ii) all documents that relate to any variation of or predecessor to this exclusion that is or was used or adopted by you in connection with insurance policies sold to commercial insureds providing coverage for time element and/or contingent time element losses; and (iii) all documents that relate to "underground and underwater piping" that were issued or created by you or by others at your direction or on your behalf.

33.    All documents that relate to the origin, drafting, interpretation, advertising, application or use of the wording of Endorsement 33 to the Policy, titled "Named Contingent Interruption and Contingent Extra Expense," including (i) all documents that relate to any definitions applicable to that wording; (ii) all documents that relate to any variation of or predecessor to this wording that is or was used or adopted by you in connection with insurance policies sold to commercial insureds providing coverage for time element and/or contingent time element losses; and (iii) all documents that relate to the wording of Endorsement 33 that were issued or created by you or by others at your direction or on your behalf.

34.    All documents that relate to the origin, drafting, interpretation, advertising, application or use of the Policies' exclusion applicable to the cost of making good faulty or defective material, faulty workmanship, or errors or omissions in design "the "Faulty Workmanship Exclusion"), including (i) all documents that relate to any definitions of those terms as used in the Policies; (ii) all documents that relate to any variation of or predecessor to this exclusion that is or was used or adopted by you in connection with insurance policies sold to

EXHIBIT A

commercial insureds providing coverage for time element and/or contingent time element losses; and (iii) all documents that relate to this exclusion that were issued or created by you or by others at your direction or on your behalf.

35.    All documents that relate to the origin, drafting, interpretation, advertising, application or use of the Policies' exception to the Faulty Workmanship Exclusion, including (i) all documents that relate to any definitions relevant to the exception; (ii) all documents that relate to any variation of or predecessor to this exception that is or was used or adopted by you in connection with insurance policies sold to commercial insureds providing coverage for time element and/or contingent time element losses; and (iii) all documents that relate to this exception that were issued or created by you or by others at your direction or on your behalf.

36.    All documents that relate to the origin, drafting, interpretation, advertising, application or use of the Policies' Endorsement 19 or 20.

37.    To the extent you contend that John L. Wortham & Sons drafted all or part of Endorsements 19 and/or 20, all documents reflecting your understanding thereof.

38.    All documents that relate to any communications between you and any reinsurer concerning the Claim, including, but not limited to, (i) any documents containing your evaluation of coverage provided by the Policies for the Claim, and (ii) any invoices or bordereaux statements concerning any reinsurer's responsibility to reimburse you for any costs paid to Calumet in connection with the Claim.

39.    All documents that related to any denial of coverage by your reinsurers with respect to the Claim.

40.    All documents that relate to any loss reserves that you have established or considered establishing for the Claim.

41.    All notes, records, communications, correspondence, meeting minutes or other documents in connection with all communications between you and Calumet, Insurers, or any loss estimate or pipeline damage consultant, concerning the issuance of the Policies, or the investigation, review, or rejection of the Claim.

42.    Copies of any analyses, research, summaries of coverage, requirements or opinions concerning coverage for the Claim.

43.    All documents relating to Calumet's claim which you obtained from any source other than Calumet.

EXHIBIT A

44.    All documents relied upon or produced by any expert witness you intend to call in this matter, including their reports.

45.    All notes, records, communications, correspondence, meeting minutes or other documents in connection with all communications between you and any third party or person(s) concerning the investigation, calculation, review, adjustment or rejection of the Claim.

46.    All notes, records, communications, correspondence, meeting minutes or other documents in connection with all communications between you and any third party or person(s) concerning the investigation of the Pipeline, the Rupture, and/or rejection of the Claim.

47.    All correspondence and other documents exchanged between you and your adjuster(s) (including your attorneys engaging in activities traditionally attributed to adjustment of a claim), your forensic accountant(s), or anyone else acting on your behalf relating to the Claim.

48.    All internal communications that mention or refer to Calumet, the Policies, the Pipeline, the Rupture, or the Claim.

49.    All agreements or other documents exchanged between you and the other Insurers relating to the Claim or this litigation.

50.    All documents relating to your past and present document retention or document destruction policies.

51.    All documents relating to your structure or organization, including any organizational charts, dating from January 1, 2012 through the present.

52.    All documents or other objects which you intend to use at trial of this matter.

53.    All documents or other objects which you intend to introduce as an exhibit at trial of this matter.

54.    All documents relating to your calculation of Calumet's losses in connection with the Claim.

55.    All documents related to any other claims for loss of income stemming from pipeline ruptures.

**EXHIBIT A**

56.    All documents related to any claims in which you denied coverage for contingent time element coverage because of alleged or actual delay caused by a third party.

Respectfully Submitted:

Donald J. Cazayoux, Jr. #20742
J. Lane Ewing, Jr. #29854
CAZAYOUX EWING, LLC
257 Maximilian Street
Baton Rouge, LA  70802
Telephone:  (225) 650-7400
Facsimile:  (225) 650-7401
don@cazayouxewing.com
lane@cazayouxewing.com

Geoffrey J. Greeves
    (*pro hac vice application to be filed*)
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street NW, Suite 1350
Washington, DC  20036
Telephone:  202-719-8221
ggreeves@bradley.com

And

Alex Purvis
    (*pro hac vice application to be filed*)
BRADLEY ARANT BOULT CUMMINGS LLP
Suite 1000, One Jackson Place
188 East Capitol Street
Post Office Box 1789
Jackson, MS  39215-1789
Telephone:  (601) 948-8000
Facsimile:  (601) 948-3000
apurvis@bradley.com

11

**EXHIBIT A**

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 29th day of October, 2019, the foregoing First Request for Production of Documents was served by electronic and/or first-class mail on the following:

Certain Underwriters at Lloyds identified as Talbots Underwriting Ltd. Syndicate #1183, Caitlin Syndicate #2003, Argo Syndicate #1200, and Brit Insurance Syndicate
Mendes & Mount
750 Seventh Avenue
New York, NY 10019

Cy J. D'Aquila, Jr., Esq.
D'AQUILA LAW FIRM
Post Office Box 866
New Roads, LA 70760
Email: cy@daquilalawfirm.com

Charles L. Chassaignac, IV, Esq.
PORTEOUS, HAINKEL & JOHNSON, LLP
301 St. Charles Street
Baton Rouge, LA 70802
Email: cchassaignac@phjlaw.com

Frank X. Neuner, Jr.
Phillip M. Smith
NEUNERPATE
One Petroleum Center, Suite 200
1001 West Pinhook Road
Lafayette, LA 70503
Email: fneuner@neunerpate.com
Email: psmith@neunerpate.com

Tod A. Phillips
Lisa M. Wright
WRIGHT CLOSE & BARGER, LLP
One Riverway, Suite 2200
Houston, TX 77056
Email: phillips@wrightclosebarger.com
Email: lwright@wrightclosebarger.com

Donald J. Cazayoux, Jr.
J. Lane Ewing, Jr.

12

EXHIBIT A

171604 REV. 2/10 LPS

ORIGIN ID:OPLA        (225) 650-7400
DONALD J. CAZAYOUX, JR.
CAZAYOUX EWING, LLC
257 MAXIMILIAN ST.

BATON ROUGE, LA 70802
UNITED STATES US

SHIP DATE: 29OCT19
ACTWGT: 10.00 LB
CAD: 106894986/INET4160

BILL SENDER

TO   MENDES & MOUNT

750 SEVENTH AVENUE

NEW YORK CITY NY 10019

(212) 261-8000        REF: CALUMET
INV:
PO:                                DEPT:

FedEx
Express

E

THU – 31 OCT 10:30A

(Ex Ship Manager - Print Your Label(s)

10019
NY–US  EWR

THU – 31 OCT 10:30A
MORNING 2DAY

727 507

FedEx
TRK# 7768 4776 9142
0201

SA QNYA

EXHIBIT A